UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LINDSAY LIEBERMAN, | Case No. 21-CV-05053-ENV-RER |
| Plaintiff, | |
| -against- | |
| C.A. GOLDBERG, PLLC & CARRIE A. GOLDBERG, | |
| Defendants. | |
| C.A. GOLDBERG, PLLC, | |
| Counterclaim Plaintiff, | |
| -against- | |
| LINDSAY LIEBERMAN, | |
| Counterclaim Defendant. | |

**DEFENDANTS' AND COUNTERCLAIM PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Susan K. Crumiller
Hilary J. Orzick
Crumiller P.C.
16 Court St, Ste 2500
Brooklyn, NY 11241
(212) 390-8480
susan@crumiller.com
hilary@crumiller.com
Attorneys for Defendants/
Counterclaim Plaintiff

Dated: Brooklyn, New York
July 14, 2022

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTS ................................................................................................................................ 3

  I.    The Firm's History, Growth, and Culture ............................................................... 3

  II.   The Firm's Policies ............................................................................................... 8

  III.  Plaintiff Was Fully Supported Before, During and After Her Pregnancy ................... 10

  IV.  The Pandemic Changed Everything ...................................................................... 14

  V.   Plaintiff's Poor Performance Led to the Termination of Her Employment ..................... 20

  VI.  Plaintiff was a "Faithless Servant" ........................................................................ 26

    A.  The Firm's Title IX Work ................................................................................. 26

    B.  Plaintiff's Secret Competition .......................................................................... 28

ARGUMENT ....................................................................................................................... 29

  I.    Summary Judgment Standard .............................................................................. 29

    A.  New York State Human Rights Law .................................................................. 29

    B.  New York City Human Rights Law .................................................................. 30

  II.   Plaintiff's Termination was Not a Discriminatory Adverse Action ............................ 31

  B.  Defendants had Legitimate Nondiscriminatory Business Reasons for Terminating Plaintiff 34

    C.  Plaintiff's Gender and Motherhood Status Discrimination Claims Fail Under the Same Actor Inference ............................................................................................. 35

    III.  Defendants' Award of Plaintiff's Discretionary Bonus is Not Evidence of Pregnancy Discrimination ................................................................................................... 36

    IV.  The Remainder of Plaintiff's Purported Evidence is Insufficient to Raise an Inference of Discrimination ................................................................................................ 38

    A.  Goldberg's Stray Remarks on the Cost her Employees' Concurrent Parental Leaves Are Not Sufficient to Survive Summary Judgment .................................................. 39

  V.   Summary Judgment is Similarly Appropriate for Discrimination Claims Against Carrie Goldberg .......................................................................................................... 43

  VI.  Summary Judgment Should Be Granted on Defendant's Claims of Faithless Servant . 43

CONCLUSION ..................................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*Abdu-Brisson* v. *Delta Air Lines, Inc.*,
   239 F.3d 456, 468 (2d Cir. 2001) ............................................................... 30

*Adams v. Master Carvers of Jamestown, Ltd.*,
   91 F. App'x 718, 722 (2d Cir. 2004) .......................................................... 30

*Buczakowski v. Crouse Health Hosp.*,
   5:18-CV-0330 (LEK/ML) (N.D.N.Y. Feb. 7, 2022) ................................... 39

*Byrne v. Barrett,*
   268 N.Y.199, 197 NE 217 [1935] ............................................................... 43

*Crowley v. Magazine,*
   No. 19 Civ. 7571 (JGK) (S.D.N.Y. Dec. 21, 2021) ................................... 36

*Davis v. N.Y.C. Dep't of Educ.*,
   804 F.3d 231, 236 (2d Cir. 2015) ............................................................... 38

*Deebs v. Alstom Transp.*,
   346 F. App'x 654, 657 ................................................................................. 41

*DiStiso v. Cook*,
   691 F.3d 226, 230 (2d Cir. 2012) ............................................................... 29

*Dr. Koppar v. Orange Reg'l Med. Ctr.*,
   19-CV-11288 (KMK) (S.D.N.Y. Feb. 3, 2022) .......................................... 32

*Farmer v. Shake Shack Enters., LLC*,
   473 F.Supp.3d 309, 323-24 (S.D.N.Y. 2020) ............................................ 30

*First Mfg. Co. v. Young,*
   3 N.Y.S.3d 284 (Sup. Ct. 2014) ................................................................. 43

*Gorman v. Covidien, LLC,*
   146 F.Supp.3d 509, 530 (S.D.N.Y.2015) ................................................... 31

*Grady v. Affiliated Cent., Inc.*,
   130 F.3d 553, 560 (2d Cir. 1997) ............................................................... 35

*Inguanzo v. Hous. & Servs., Inc.*,
No. 12 Civ. 8212, 2014 WL 4678254 (S.D.N.Y. Sept. 19, 2014),
aff'd, 621 Fed.Appx. 91 (2d Cir. 2015) ................................................................. 36

*Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*,
2015 U.S. Dist. LEXIS 130116 (E.D.N.Y. Sep. 28, 2015) ...................................... 43

*James v. Mun. Credit Union*,
No. 13 Civ. 4568 (LTS)(KNF) (S.D.N.Y. Feb. 19, 2016) ........................................ 36

*Jetter v. Knoth Corp.*,
324 F.3d 73, 76 (2d Cir. 2003) ................................................................................. 35

*Kaumagraph Co. v. Stampagraph Co.*,
235 N.Y. 1, 138 NE 485 [1923] ............................................................................... 43

*LaBarbera v. NYU Winthrop Hosp.*,
527 F.Supp.3d 275, 304 (E.D.N.Y. 2021), *appeal dismissed* (July 7, 2021) ........... 34

*Lulo v. OTG Mgmt.*,
19 Civ. 3776 (PAE) (S.D.N.Y. Feb. 10, 2022) .................................................. 30, 33

*McDonnell Douglas Corp. v. Green*,
*411 U.S. 792 (1973).* ............................................................................................... 30

*Meiri v. Dacon*,
759 F.2d 989, 998 (2d Cir. 1985) ..................................................................... 29, 30, 41

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102, 110 n.8 (2d Cir. 2013) ............................................................... 30, 42

*Moccio v. Cornell Univ.*,
889 F. Supp. 2d 539, 574 (S.D.N.Y. 2012) .............................................................. 31

*Montanile v. Nat'l Broadcasting Co.*,
211 F.Supp.2d 481, 487 (S.D.N.Y. 2002), aff'd, 57 Fed.Appx. 27 (2d Cir. 2003) ... 36

*Montgomery v. N.Y.C. Transit Auth*,
806 Fed.Appx. 27, 31 (2d Cir. 2020) ....................................................................... 31

*Morrissey v. Symbol Techs., Inc.*,
910 F.Supp. 117, 122 (E.D.N.Y. 1996) .................................................................... 34

*Phansalkar v. Andersen Weinroth & Co., L.P.*,
  344 F.3d 184, 200 (2d Cir. 2003) ....................................................... 44

*Pozner v. Fox Broadcasting Company*,
  74 N.Y.S.3d 711, 714 (Sup. Ct. 2018) .............................................. 44

*Price v. Mount Sinai Hosp.*,
  458 Fed.Appx. 49, 52 n.2 (2d Cir. 2012) .......................................... 39

*Ramsaran v. Booz & Co. (N.A.) Inc.*,
  2015 U.S. Dist. LEXIS 111770 (S.D.N.Y. Aug. 23, 2015) .............. 34, 35

*Rinsler v. Sony Pictures Ent.*,
  No. 02 Civ. 4096 (SAS), 2003 WL 22015434 (S.D.N.Y. Aug. 25, 2003) .............. 34

*Roenick v. Flood*,
  2021 WL 2355108 (S.D.N.Y. 2021) ................................................. 40

*Rojas v. Roman Catholic Diocese of Rochester*,
  660 F.3d 98, 107 n.10 (2d Cir. 2011) ............................................... 30

*Schanfield v. Sojitz Corp. of Am.*,
  663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009) ...................................... 43

*Schanfield v. Sojitz Corporation of America*,
  663 F. Supp. 2d 305, 338-39 (S.D.N.Y. 2009) ................................. 37

*Solomen v. Redwood Advisory Co.*,
  183 F.Supp.2d 748, 754 (E.D. Pa. 2002) ......................................... 33

*Soloviev v. Goldstein*,
  104 F. Supp. 3d 232, 253 (E.D.N.Y. 2015) ...................................... 43

*Sosa v. Lantz*,
  No. 09-869, 2013 WL 4441523 (D. Conn. Aug. 14, 2013) ................ 29

*Stainkamp v. Changes Int'l of Fort Walton Beach, Inc.*,
  373 F.Supp.2d 163, 168 (E.D.N.Y. 2005) ........................................ 34

*Torres v. Pisano*,
  116 F.3d 625, 629 n.1 (2d Cir. 1997) ............................................... 30

*Veritas Capital Mgt., L.L.C. v. Campbell*,
   82 A.D.3d 529, 530 (1st Dept. 2011) ................................................................ 44

*Villetti v. Guidepoint Glob.*,
   21-2059-cv (2d Cir. July 7, 2022) ...................................................................... 35

*Vivian Xiang v. Eagle Enters.*,
   19-cv-1752 (LJL) (S.D.N.Y. Mar. 15, 2022) ...................................................... 30

*Watson v. Arts Entertainment Television Network*,
   No. 04-1932, 2008 WL 793596 (S.D.N.Y. Mar. 26, 2008) .................................. 37

*Wechsler v. Bowman*,
   285 N.Y. 284, 292 (1941) ................................................................................... 44

*Wellington v. Spencer-Edwards*,
   No. 16-6238, 2019 WL 2764078 (S.D.N.Y. July 1, 2019) .................................... 29

*Williams v. N.Y. City Hous. Auth.*,
   61 A.D.3d 62, 80 ................................................................................................ 42

*Woodard v. TWC Media Sols.*,
   No. 09 Civ. 3000 (BSJ), 2011 WL 70386 (S.D.N.Y. Jan. 4, 2011),
   *aff'd sub nom.* 487 F. App'x 613 (2d Cir. 2012) ................................................ 40

*Yukos Capital S.A.R.L. v. Feldman*,
   977 F.3d 216, 229 (2d Cir. 2020) ...................................................................... 44

**Statutes**

Fed. R. Civ. P. 56(a) ............................................................................................... 3

N.Y.C. Admin. Code § 8-107(6) ............................................................................ 20

New York City Human Rights Law, Administrative Code § 8-107[1][a] ("NYCHRL") . 6, 19, 20,
   21

New York State Human Rights Law, Executive Law § 296[1] ("NYSHRL") ................... passim

Defendant and Counterclaim Plaintiff C.A. Goldberg, PLLC ("the Firm"), and Defendant Carrie A. Goldberg ("Goldberg"), respectfully submit this memorandum of law in support of their motion for summary judgment dismissing Plaintiff's First, Second, Third, and Fourth Causes of Action for gender and pregnancy discrimination under the New York State and New York City Human Rights laws, and granting the Firm's counterclaim against Counterclaim Defendant for faithless servant liability.

## PRELIMINARY STATEMENT

This is an employment discrimination case by Plaintiff, a former employee of Defendants the Firm, a victims rights law firm, and Goldberg, its founding attorney and sole owner. Plaintiff alleges that Defendants unlawfully discriminated against her based on her gender and pregnancy, in violation of the New York State Human Rights Law and the New York City Human Rights Law. Plaintiff argues that Defendants discriminated against her insofar as Goldberg, the principal and sole owner of the Firm, spoke to her less frequently by telephone after she announced her pregnancy, and that Goldberg made a few comments – over the two full years during which Plaintiff remained employed after disclosing her pregnancy – regarding the Firm's triumph in successfully navigating two out of the Firm's four associate attorneys having taken parental leave at the same time, with the Firm's full support. Plaintiff also argues that Defendants' failure and refusal to pay her various discretionary bonuses upon her return from maternity leave in March 2020, which coincided with the onset of the global coronavirus pandemic, was a decision based on discriminatory animus, rather than the Firm's financial condition and circumstances caused by the pandemic. Plaintiff does not, and cannot, dispute that after her pregnancy announcement, she received more in discretionary bonus payments than she had ever received prior to the announcement. Plaintiff also does not, and cannot, dispute that after her pregnancy

announcement, she received significantly more in these discretionary bonus payments than any other employee of the Firm.

Finally, Plaintiff argues that the eventual termination of her employment – over a year after her return from maternity leave – was based on discriminatory animus. During that year, Goldberg had complained in writing to others about Plaintiff's escalating performance issues, including yelling and hostility which brought Goldberg to tears on one occasion, as well as multiple client complaints about Plaintiff. Yet Plaintiff alleges, without a single fact in support, that the Firm fired her over a year after her return from maternity leave not because of those well-documented performance issues, but because Goldberg suspected she might become pregnant again and did not want her to take another maternity leave. Plaintiff's theory strains credulity, especially since at the time of her termination, eight of the Firm's nine employees were women, and four were parents or caregivers for their partner's children; one other employee had taken parental leave while employed, and was later promoted, as was another female parent of childbearing age. After terminating Plaintiff's employment, Defendants acquired further evidence of her poor performance, including complaints from a co-counsel of the Firm regarding Plaintiff's work, and a fee dispute complaint in one of the cases Plaintiff had handled.

In the course of discovery, it was revealed that Plaintiff was secretly emailing prospective clients from her personal email account during business hours while employed with the Firm, in a campaign to solicit and divert business to herself in one of the Firm's practice areas. She secretly conducted at least one phone call during business hours with a prospective client she was soliciting. While employed by the Firm, she wrote to that client that she was "willing take on this work as an independent contractor so the organization wouldn't have to go through the law firm and the steep pricing that accompanies it." Her solicitation efforts on the Firm's dime

were successful, as ultimately the client paid her at least $18,500, in accordance with a proposal she created and sent to it while employed by the Firm.

Even assuming the facts in the light most favorable to Plaintiff, no reasonable jury could find that Defendants' actions were motivated by unlawful discriminatory animus. Plaintiff does not, and cannot, set forth a *prima facie* case of discrimination, but even if she could, there are well-documented legitimate business reasons for the ostensibly discriminatory acts. Accordingly, Defendants respectfully request that Plaintiff's complaint be dismissed in its entirety.

On the other hand, there is no materially disputed fact that Plaintiff acted as a "faithless servant" to the Firm by competing directly with it and secretly diverting business to herself during the course of her employment. Accordingly, Defendant respectfully request that this Court grant summary judgment on the Firm's counterclaim.

## FACTS

### I. The Firm's History, Growth, and Culture

In January 2014, Goldberg founded the Firm; she was its sole employee. Defendants' Statement of Undisputed Material Facts ("SUMF") at ⁋ 1. Goldberg has always been the Firm's sole owner. ⁋ 2. Goldberg started the firm after she suffered her own abuse by an ex-boyfriend, in what is now known as "revenge porn." ⁋ 3. Goldberg's ex threatened to release personal intimate photos she had sent him during the relationship. ⁋ 4. She was unable to secure adequate legal recourse, as judges perceived the harassment as a "first amendment issue." ⁋ 5. Goldberg started the firm to become the type of advocate she had been unable to find during her darkest moments. ⁋ 6.

Since the Firm's inception in 2014, Defendants have gained widespread respect and acclaim for their tireless work on behalf of victims of heinous acts of gender-based violence and intimidation: pursuing groundbreaking serial litigation against the NYC Department of Education

proving its pattern and practice of retaliating against girls of color who allege sexual assault; pioneering the legal fight against revenge porn; inventing a now-standard legal approach to suing the world's biggest tech companies for product liability claims; carving out an entirely new practice area protecting abortion providers; and acting as a leader of the #MeToo movement, representing the victim whose claims finally got Harvey Weinstein arrested. ¶ 7.

In May 2016, the Firm hired a legal intern, Adam Massey, then a third year law student at Benjamin N. Cardozo School of Law. ¶ 8. In September 2015, after Massey graduated from law school, the Firm hired him as a full-time attorney, admission pending. ¶ 9. At the time, Goldberg was aware that Massey wanted to get married and start a family, because they frequently discussed personal matters, which included Massey's family planning. ¶ 10.

Plaintiff was the firm's second attorney hire. ¶ 11. Before joining the Firm, Plaintiff had served as an Assistant District Attorney in Kings County, working as a Felony Trial Assistant in the Special Victims Unit, and gained experience in cases involving sexual violence. ¶ 12. Plaintiff's legal experience was predominantly with criminal law as a former prosecutor, but she expressed deep interest in becoming proficient at civil litigation at the Firm. ¶ 13. On June 21, 2016, Plaintiff executed an offer letter, thereby accepting a position as a Senior Associate with the Firm, that detailed the terms and conditions of her employment. ¶ 14. The offer letter outlines Plaintiff's employment benefits, but does not include any parental leave policy.[1] ¶ 15. On August

---

[1] Plaintiff alleges that Goldberg emailed her a document which stated that the Firm had a three-month fully paid maternity policy, and that the Firm changed the maternity leave policy in November 2018. Ex. 15 at 44:12-45:4. Defendant disputes this, and Plaintiff did not produce this document in discovery. Ex. 13 at 25. However, even construing the facts in the light most favorable to the non-moving party, the Firm maintained the same maternity leave policy from November 2018 (a full year prior to Plaintiff's maternity leave) through March 2021 (when Plaintiff's employment was terminated).

22, 2016, Goldberg emailed her business advisors asking them for assistance in creating both a family leave policy and an attorney bonus policy. ⁋ 16.

In 2017, Plaintiff told Goldberg that her and her now-husband's relationship was getting serious, and that she wanted to move to Newport, Rhode Island, and see where the relationship went. ⁋ 17. Plaintiff requested that she be permitted to continue her work with the Firm, and to work remotely from Newport, Rhode Island on a permanent basis. ⁋ 18. Goldberg agreed to honor the request; though it meant Plaintiff would be unable to fulfill certain responsibilities which would fall on others' shoulders, including face-to-face time with clients, court appearances for the Firm's voluminous New York family court practice, attending meetings with detectives and prosecutors for the criminal advocacy they did for crime victims, participate live in monthly meetings for the New York Cybersexual Abuse Task Force that the Firm co-founded, or participate in the lively on-the-groundwork the Firm did around town supporting #MeToo, the criminal prosecution of Harvey Weinstein, Title IX reform in New York City, and various legislative reform for victims of revenge porn. ⁋⁋ 19-20. She also would not be available to participate in the in-person depositions, mediations and court appearances for the Firm's major litigations. *Id.* Around the office, it meant she was not available to provide direct supervision to interns, train new staff members, or even receive the mail that came for her. She was the only person attending our daily all-staff morning meetings and weekly attorney meetings remotely. *Id.* Goldberg sought to view it as an opportunity to expand the Firm's presence in a new state, however, she was pessimistic that a presence in Rhode Island would impact the Firm in a meaningfully positive way. ⁋⁋ 21-22. At the time, Goldberg understood that Plaintiff wanted to get married, and very likely start a family, from her conversations with Plaintiff directly. ⁋ 23. Goldberg was under no obligation to accept Plaintiff's request to relocate to Rhode Island, but

she was always willing to accommodate and be flexible, and she gave her full and unequivocal support so that Plaintiff could pursue her romantic relationship. ¶ 24. The Firm gave Plaintiff time off to prepare for the Rhode Island bar exam, paid for Plaintiff's transition to remote work, including paying for Plaintiff's bar exam and admission to the Rhode Island bar. ¶ 25. The Firm approved all requests Plaintiff made to reimburse her travel expenses for when she returned to New York for work. ¶ 26.

Over time, the Firm grew and blossomed into a larger team. ¶ 27. In September 2017, the Firm hired Carrie Sophia Zoubul, an attorney pending admission (now an attorney). ¶ 28. Zoubul has two minor children and has been a parent the entire time that she has worked at the Firm. ¶ 29. Zoubul describes Goldberg as "extremely supportive and understanding" of her obligations as a parent, and that "as an employee of the Firm, Zoubul has felt supported both as a parent and as a caregiver for her aging parents. ¶ 30. In October 2017, the next month, the firm hired Aurore DeCarlo as an attorney. ¶ 31. DeCarlo has been a parent during her entire period of employment at the Firm, and her daughter was under two years old when she first started. ¶ 32. Throughout DeCarlo's employment with the Firm, she has felt supported and respected with regards to her status as a working parent, and has never personally experienced nor been witness to any discrimination on the basis of an employee's status as pregnant, a woman, or a parent. ¶ 33.

In March 2018, the Firm hired Norma Buster as Director of Client Relations. ¶ 34. Buster is a former client of the Firm's, and at the time of her hire, Buster was an unmarried woman of childbearing age. ¶ 35. Buster recalls how in the months leading to her 2018 wedding, Plaintiff would discuss her upcoming wedding and share engagement photos, and how Goldberg was excited that Plaintiff was starting a new chapter of her life. ¶ 36. Buster has never heard Goldberg make comments about employees getting pregnant and needing leave. ¶ 37. On

September 23, 2018, Plaintiff married her now-husband; Goldberg attended the wedding as an enthusiastic guest, along with Buster and Zoubul, and gave Plaintiff and her husband a wedding gift. ⁋ 38.

In March 2019, the firm hired Ann Seifullah. ⁋ 39. When Seifullah was hired, she was newly married and the mother of one child. ⁋ 40. Seifullah, who was a victim of discrimination in her previous employment, has never witnessed nor felt as though she has been discriminated against throughout her employment at the Firm. ⁋ 41. In January 2020, Hannah Meropol was hired as a legal intern during her second year of law school at the New York University School of Law. ⁋ 42. She continued her legal internship through her third year of law school and began working as a fulltime attorney in September of 2021. ⁋ 43. Meropol witnessed Defendants demonstrate only support and flexibility for Firm employees who are balancing work and parenting duties. ⁋ 44. As a woman of child-bearing age who hopes to someday become pregnant and have children, Meropol especially appreciates Goldberg's supportive attitude towards the Firm's employees who are parents and has no apprehension concerning disclosing a future pregnancy or family planning decision with Goldberg. ⁋ 45. In March 2021, the Firm hired Naomi Leeds as an attorney, who at the time was in a committed relationship and of child-bearing age. ⁋ 46. Employees "are at liberty to independently decide whether to come into the office," and Goldberg is "accommodating and compassionate [] when it comes to all things remote work, last-minute schedule changes, travel, family commitments, childcare, and mental health." ⁋ 47.

Caroline Knecht was hired in March 2019 as the Public Relations and Marketing Manager, and now is the Director of Operations, Public Relations and Marketing for the Firm. ⁋ 48. Knecht is a woman. ⁋ 49. Knecht observed Goldberg was concerned with her employees'

wellbeing and sustainability, and strived to accommodate her staff's needs. ⸿ 50. At no time did Knecht witness Goldberg treating any employee differently or worse based on that employee's status as pregnant or as a parent. ⸿ 51.

Goldberg fostered, and continues to foster, a working environment that is uniquely supportive to parents. ⸿ 52. The Firm invites employees to bring their children to the Firm's office. ⸿ 53. Plaintiff herself brought her daughter to the Brooklyn office, even though she lived in Rhode Island. ⸿ 54. Goldberg herself asks about the Firm employees' families and their lives, and welcomes employees to talk about their loved ones in meetings and at social events, which they do regularly. ⸿ 55. The Firm is flexible when it comes to work hours and working remotely, and is extremely accommodating to parents who have had to supervise their kids while they were remote learning during the pandemic, take their children to doctor's appointments, or attend school functions where their children are celebrated. ⸿ 56.

## II. The Firm's Policies

In late 2017, Goldberg was focused on creating and building policies and procedures for the Firm. Ex. 3 at ⸿ 23. The Firm was expanding, and Goldberg wanted to ensure that its employees were clear about what they could expect from the Firm and vice versa. *Id.* On February 6, 2018, Goldberg emailed all attorneys (including Plaintiff) the Firm's new Attorney Revenue policy. ⸿ 57. This policy includes a standardized discretionary bonus request form and detailed instructions regarding when to make requests and how to calculate the requests. ⸿ 58. The policy explains that such bonuses are strictly discretionary:

> Our firm may pay bonuses in its sole discretion depending on the overall financial performance of the business and the employee's performance. Oral promises of bonus payment are not enforceable. An employee is only eligible for a bonus if employed on payment date and has not indicated an intent to resign.

⸿ 59. (emphasis in the original).

Later that year, Goldberg updated and distributed its Employee Handbook to the firm's employees. ¶ 60. The handbook was finalized and signed by Plaintiff on January 28, 2019. Ex. 20 ("the 2019 Handbook"). ¶ 60. Plaintiff signed a statement acknowledging receipt of the 2019 Handbook and agreeing to "read, understand, and adhere to [its] policies." ¶ 60. Plaintiff had never at any time used the handbook provided complaint method nor made any other complaints and neither had anyone else at the firm. ¶ 61.

The 2019 Handbook included a new policy entitled "Discretionary Bonuses," which states, "Bonuses may be given at the sole discretion of [the Firm]." ¶ 62. The 2019 Handbook also included a policy entitled "Family and Medical Leave/New York Paid Family Leave." ¶ 63. The Policy reflects the New York State requirements for employers to provide family and medical leave. *Id.*

The 2019 Handbook also contained an anti-discrimination policy, entitled "Equal Employment Opportunity (EEO)." ¶ 64. This policy sets out a complaint procedure in the event that any employee of the Firm experiences discrimination. This policy states:

> It is the policy of CAG to maintain a working environment free from all forms of discrimination. Any employee who believes s/he is subject to discrimination by a fellow employee or supervisor should immediately contact the COO. All complaints of discrimination will be promptly and confidentially investigated. Any employee or supervisor who violates this policy may be subject to appropriate disciplinary action, up to and including discharge.

¶ 64 at p. 10.

The Firm also has a policy restricting employees from engaging in outside work that conflicts with the work performed at the Firm:

> employees should not engage in any form of outside employment which directly or indirectly competes with or conflicts with the services and/or nature of work performed at [the Firm]. This includes, but is not limited to moonlighting, either as an employee or self employed, and regardless of whether or not the employee is compensated. Employees should notify management if they engage in or intend to

engage in any outside employment so as to avoid disruption of or accommodation to an employee's work schedule. ℙ 65.

The policies in the 2019 Handbook remained in effect through the end of Plaintiff's employment. ℙ 66.

### III.    Plaintiff Was Fully Supported Before, During and After Her Pregnancy

On December 9, 2018, Plaintiff submitted her first bonus request. ℙ 67. On December 10, Goldberg promptly responded. ℙ 67. At the time, the Firm had approximately $███ to $███ in its bank account allocated for discretionary bonuses to all staff. ℙ 68. After some discussion of the bonus calculations, on February 3, 2019, Plaintiff emailed Goldberg with an updated calculation of the bonus she was seeking. ℙ 69. On February 26, 2019, Goldberg approved Plaintiff's request for a bonus in the amount of $███, left open the possibility of additional bonus compensation on the condition that Plaintiff correct her request, and wrote "Your accomplishments fill me with joy and pride!!!! And it's a pleasure to pay a bonus to you." ℙ 70.

On or around March 1, 2019, Plaintiff disclosed to one of the Firm's clients that she was pregnant. ℙ 71. That client then disclosed the pregnancy to Massey. ℙ 71. Shortly after March 1, 2019, Massey relayed to Goldberg the client's disclosure of Plaintiff's pregnancy, though neither Massey nor Goldberg can recall the exact date of the conversation, nor was it memorialized in any way. ℙ 72. Goldberg knew Plaintiff wanted a family, and was thrilled for her. Ex. 3 at ℙ 31. Goldberg also took personal pride that she had created a business that could support growing families, and she relished that two of her first employees had stayed with the Firm through so many life changes including getting married and becoming parents. *Id.*

On March 12, 2019, Massey learned that he and his wife were pregnant. ℙ 73. He informed Goldberg immediately. ℙ 74. Goldberg was thrilled to hear Massey's news ℙ 75. Massey and Goldberg discussed his wife's pregnancy on a near-daily basis from that point on. ℙ

75. Massey's wife had to attend what felt to him like a staggering number of medical appointments in connection with starting their family. ⁋ 77. Massey was able to accompany his wife to all but one of her frequent medical appointments when they decided to start a family, and he attributes this ability to "Goldberg's total support." ⁋ 78.

During this time, in which Goldberg was aware of both pregnancies, Goldberg and Plaintiff continued to discuss Plaintiff's initial bonus request. ⁋ 79. After correcting several errors, on March 18, 2019, Plaintiff updated her bonus request to $██████ ⁋ 80. Goldberg approved it later that day, writing "will be in the march 31 payroll. Yay!" ⁋ 81. On March 31, 2019, Defendants paid Plaintiff $██████ in discretionary bonus compensation, reflecting work she did for the Firm in 2018. ⁋ 82. On April 21, 2019, Plaintiff submitted her request for a Q1 2019 bonus of $██████ and asked to schedule time to discuss a salary increase. ⁋ 83. There is no record of any subsequent communications about this request, and Goldberg does not recall any. Ex. 14 at p. 64: 9-14; at p. 116: 7-14.

In May 2019, Plaintiff disclosed to Goldberg that she was pregnant. ⁋ 84. At this point, Goldberg had already known of Plaintiff's pregnancy status for approximately two months. ⁋ 85.

Goldberg did not treat Plaintiff differently because of her pregnancy, and heavily disputes Plaintiff's allegation that Goldberg treated her worse after May 2019. ⁋⁋ 86-87. From March 2019 through November 2019, Goldberg was extremely busy preparing for and announcing the launch of her book, "Nobody's Victim," which weaves together narratives from her personal life as well as her extensive body of legal experience and acumen to educate readers about sexual predators. Ex. 3 at ⁋ 29. Particularly between June and October 2019, Goldberg was handling numerous media requests, profiles, interviews, podcasts, book signings, and television interviews. *Id*. Around this time, Goldberg also made four trips to Orange County, California for

court appearances and depositions. *Id.* In late October of 2019 the Firm was retained by then-Representative Katie Hill whose nude images had just been leaked online and for whom the Firm was urgently coordinating a crisis response. *Id.* Goldberg was generally communicating less frequently with the entire team on non-urgent matters than she had been previously. *Id.* Plaintiff and Massey were permitted to take as much time as they needed to attend medical appointments and prepare for the birth of their respective children. ⁋ 88. Massey and Plaintiff circulated photos and discussed the pregnancies at work. ⁋ 89. On July 19, 2019, Goldberg took steps to plan a joint baby shower to celebrate Massey and Plaintiff, and sent an email to the whole Firm:

> GUYS!!!!!
>
> Lindsay is coming for picture day on Aug 1. LET'S HAVE A SURPRISE DOUBLE BABY
> SHOWER IN THE OFFICE FOR LINDSAY AND ADAM AFTER. WHAT DO YOU THINK???
>
> What's the etiquette? Do baby showers need to be closer to the due date (Oct/Nov)?

⁋ 90. On July 30, Goldberg wrote, "After further exploration of the preferences of our two future perspective parents, the plan is to celebrate AFTER the babies are on the outside." ⁋ 91. Goldberg continued to view Plaintiff's pregnancy as extremely exciting, and was eager to celebrate the growth of Plaintiff and Massey's families with them. Ex. 3 at ⁋ 40; ⁋ 93. In August 2019, Goldberg even told Plaintiff that the Firm would provide her with additional time off so that she and her husband could go on a "baby moon" and spend quality time together before their baby arrived. ⁋ 92. Buster recalls how Goldberg, along with the rest of the team, shared excitement through Plaintiff's and Massey's pregnancy updates. ⁋ 93.

Plaintiff took parental leave from October 14, 2019 through March 13, 2020; Massey took parental leave from November 12, 2019 through January 4, 2020. ⁋ 94. At the time both

began their leave, their return date was indefinite, an accommodation the Firm was willing to make. ⁋ 102. Indeed, the Firm never denied any request made by Plaintiff concerning her leave. ⁋ 95. On November 21, 2019, Plaintiff requested that the Firm provide her with five months of leave, and in the following three weeks, the Firm approved her application in its entirety and worked with her to prepare her application for paid family leave and short term disability, including sending her reminders to complete the paperwork. ⁋ 96.

On Monday, November 11, 2019, which was Veterans Day, Plaintiff submitted a bonus request seeking $███████, which she stated reflected her work for the first three quarters of 2019.[2] ⁋ 97. That day Goldberg was occupied with crisis management for client Representative Hill, who had just been forced to resign because of a revenge porn scandal. ⁋ 98. Goldberg does not recall seeing the email, and unfortunately, it slipped through the cracks. Plaintiff did not follow up until January 30, 2020. ⁋ 99.[3]

Defendants worked to ensure that neither Plaintiff nor Massey had to perform work while on their respective leaves. ⁋ 100. From November 12, 2019 through January 4, 2020, DeCarlo and Goldberg covered Plaintiff's and Massey's workloads in addition to their own workloads. ⁋ 101. It was stressful for the team to have both lawyers out on leave at the same time and have the bulk of the caseload falling mainly on two attorneys and one law graduate who all also had a full roster of cases. Ex. 8 at ⁋ 13. It was particularly stressful given that Defendants intentionally did not require Massey nor Plaintiff to give a return date, and so it was unclear how long the Firm's

---

[2] Per the 2019 Handbook, all requests for discretionary bonuses must be submitted prior to the end of the Quarter. Plaintiff's November 2019 request for her Q2 and Q3 bonuses was past due.
[3] In Goldberg's experience, employees at the Firm generally know that if she does not respond promptly to an email, there's a risk it slipped through the cracks and that they should send her an email "nudge." Employees also are aware of many other ways they can get ahold of Goldberg – such as texting, calling, electronically scheduling time on her calendar, or asking her assistant to schedule an appointment. Ex. 3 at ⁋ 50.

legal staff needed to work the increased caseload. ¶ 102. Despite there being struggles with more work falling on fewer attorneys than usual, everyone was supportive of both Massey and Plaintiff throughout their leaves. ¶ 103. The Firm sent gifts and a card to Plaintiff to celebrate the birth of her baby, and on January 26, 2020, Plaintiff wrote to the Firm thanking them, stating that she missed them all, and attaching photographs of her baby. ¶¶ 104-105.

On January 30, 2020, Goldberg contacted Plaintiff and inquired whether she had a date in mind when she wanted to return from maternity leave. ¶ 107. Ex 14 at 81:4-13. Goldberg was extremely careful with her word choice because she did not want to pressure someone with a new baby to come back to work. Ex. 14: 82:15-83:14. On this call, Plaintiff informed Goldberg that she did not wish to return from maternity leave until the first week of March 2020. The Firm approved Plaintiff's return to work date. ¶ 108. On this call, Plaintiff also raised her November 2019 bonus request on this call. ¶ 109. The substance of this call is hotly disputed, and Goldberg disputes what Plaintiff alleges was said on the call, though she does not remember the specifics of the call. Ex. 14 at p. 64: 9-14; at p. 116: 7-14. Goldberg told Plaintiff that the Firm could not afford to pay her $█████████ at that time, and candidly explained that having two employees out on leave adversely impacted the Firm's billing and collections and requested her patience while the Firm replenished its coffers. ¶¶ 110-111.

On March 3, 2020, Plaintiff returned to work, remotely, as agreed. ¶ 112. Buster observed that when Plaintiff and Massey returned from leave, they were both greeted with warm welcomes back from Goldberg and the entire team. ¶ 113.

## IV. The Pandemic Changed Everything

Less than two weeks after Plaintiff's return, the global coronavirus pandemic hit New York City. On March 20, 2020, Governor Andrew Cuomo issued an order requiring 100% closure of non-essential business statewide and banned all non-essential gatherings of individuals

of any size for any reason. N.Y. Exec. Order 202.8. The courts closed and litigation ground to a halt. The Firm had less work to do on many of its hourly-billed clients; additionally, many of the Firm's clients were financially suffering due to worldwide layoffs and shuttering of businesses, and were unable to pay their legal fees. ⁋⁋ 114-116. New contingency cases became less likely to settle pre-litigation because the Firm could not threaten an imminent and public filing. ⁋ 117. The pandemic drastically reduced the ability of people experiencing intimate partner violence to leave their partners or relocate to safer places. ⁋ 118. Opposing parties in the Firm's cases had less money to pay settlements. ⁋ 119. Most worrisome was that there was no end to the pandemic in sight. ⁋ 120. Staff were worried about their own families and health and productivity decreased. Revenue and profits dipped; the Firm had to provide its employees' now fully remote workspaces. ⁋ 121. The timing was particularly poor given that the Firm had taken over a larger 10-year lease in 2019 and had been marketing the lower floor, with 7 years remaining on the lease, as a co-working space. ⁋ 122. There were now no interested subtenants because of the obviously unexpected lockdown and the Firm was saddled with both commercial leases, a landlord that refused to negotiate even a fractional discount in rent, and nobody occupying any of the approximately 4,000 square feet of either office except Goldberg herself. ⁋ 123.

   This was a terrifying time for Goldberg. ⁋ 124. Every day while walking her dog, Goldberg walked past public spaces that had been converted into makeshift morgues. ⁋ 125. Throughout that spring, every day at 7:00p.m., Goldberg, along with thousands of other New Yorkers, opened her window to clap and cheer in support of the local hospital workers. ⁋ 125. There was no end to the pandemic in sight, and nobody had any idea when normal life would resume, if ever. ⁋ 126. At the outset of the pandemic, Goldberg did everything she could to find creative ways to retain a cohesive work environment. ⁋ 127. She provided for all employees to

work remotely, offered limitless flexible work schedules so that employees could travel to safe places to quarantine, care for their children and aging parents or other dependents who were suddenly without supervision or structure. ¶ 127. Responding to staff's stress and terror, Goldberg arranged optional weekly moderated group discussions with a licensed clinical social worker, who was already known and beloved by the staff, to help the team process their emotions and cope with everything ¶ 128. In early June 2020, the Firm provided opportunities for employees to do social justice and anti-racism work during the Black Lives Matter movement, including granting paid time off to do social justice and anti-racism work, and making Juneteenth a Firm holiday. Goldberg even communicated that the Firm was open to giving employees billable credit for anti-racism projects. ¶ 129. Goldberg also strived to do lighthearted things for the team: she organized Zoom karaoke nights, Tuesday Trivia nights, and even a remote Christmas Party with little treats she mailed to everybody in advance. She had a friend put together a "Broadway Revue," a musical comedy show, for the team via Zoom. ¶ 130. On May 6, 2020, the Firm even sent pizzas to each employee's home, just for fun. ¶ 131. The Firm had silly little exercise challenges they called the "Core-antine Club" to boost morale. ¶ 132.

At the same time, Goldberg was focused on the Firm surviving the disastrous downturn in the economy without laying off or reducing the salaries of any of her employees. ¶ 133. Goldberg navigated the federal Paycheck Protection Program ("PPP") loan process to help make ends meet. ¶ 266. Goldberg accomplished her goal: throughout the pandemic, the Firm successfully avoided making layoffs or instituting any pay cuts. ¶ 133.

Meanwhile, Goldberg's mother, who lived in the State of Washington, was entering into the late stages of a two-and-a-half year battle with Amyotrophic Lateral Sclerosis ("ALS"), also

known as Lou Gehrig's disease. ¶ 134.[4] The team had been well aware of Goldberg's mother's disease over the years and Goldberg kept them all informed that her mother was now dying. Goldberg helplessly watched her mother lose control of her motor functions. ¶ 135. Despite great logistical hurdles, Goldberg made two two-week trips in June and July 2020 to nurse her mother during her final days. ¶ 136. She was open and honest about her struggle with her mother's nearing death, and the Firm's employees generally knew that Goldberg was vulnerable at this time. ¶ 137.

On Sunday, June 21, 2020, Goldberg was preparing for her departure for what would be her second and final trip to Washington that summer, which she knew would be the last time she would ever see her mother. ¶ 138. That afternoon, Plaintiff sent Goldberg an email increasing her November 11, 2019 request for a discretionary bonus to $██████. ¶ 139. At the time, the Firm only had approximately $████ in its staff bonus fund.[5] ¶ 140. The future remained extraordinarily uncertain; there remained no indication of when a vaccine would become available or when the pandemic would end. ¶ 141. No other Firm employees had asked for a bonus since the onset of the pandemic. ¶ 144. Goldberg was shocked to receive this request given the Firm's financial situation. *Id.*

---

[4] Amyotrophic lateral sclerosis or ALS, is a fatal and progressive nervous system disease that affects nerve cells in the brain and spinal cord, causing loss of muscle control. ALS is often called Lou Gehrig's disease, after the baseball player who was diagnosed with it. Doctors usually don't know why ALS occurs although some cases are inherited. ALS often begins with muscle twitching and weakness in a limb, or slurred speech. Eventually, it affects control of the muscles needed to move, speak, eat and breathe. *See Amyotrophic lateral sclerosis (ALS) - Symptoms and causes*, The Mayo Clinic, *available at*: https://www.mayoclinic.org/diseases-conditions/amyotrophic-lateral-sclerosis/symptoms-causes/syc-20354022 (last accessed July 14, 2022).

[5] Goldberg would usually fund this account by allocating 5-10% of case recovery to it. ¶ 142. Goldberg would also draw upon this fund to pay for firm expenses in leaner months, including payroll. ¶ 143.

Goldberg replied two days later to confirm receipt of the email. ¶ 145. On June 30, 2020, Goldberg sent Plaintiff a lengthy and candid email regarding her surprise and frustration at Plaintiff's request given the global financial circumstances affecting businesses everywhere and from which the Firm was obviously not exempt. ¶ 146. In that email, Goldberg set forth the various circumstances that impacted the Firm's finances, including Plaintiff and Massey's concurrent parental leaves:

> Having two of my 4 ½ attorneys (counting Annie is ½ b/c she's still not been admitted and requires an attorney on all matters involving legal advice) out on pregnancy leave for the last months of 2019 and into 2020 was one recent variable impacting the firm's finances our billing capacity which is the sole source of our firm's revenue was hit hard. Terminating our COO, burdened me with administrative tasks cutting into my time working cases, was another variable impacting the firm's finances. But neither of those things compare to the fact that we're in a PANDEMIC. Overnight on March 12th, the whole universe changed. I suddenly had to figure out how to run a law firm virtually and attend to the panic of staff (including my own) and clients. Most of the staff members were in a state of trauma. The first month our new cases dropped enormously. They're slowly rebuilding thanks to major marketing pushes. We lost all our billable hourly revenue for our litigations – NY courts stopped taking new filings, court appearances stopped, no new motions were allowed to be filed. Even the criminal matters weren't moving forward as you saw for yourself with [redacted] prosecutors pushing arrests until later phases of the pandemic. Contingency matters stalled drastically and we lost all our settlement leverage to threaten litigation since courts were closed indefinitely, our adversaries became stingier, and the projections for when cases will resolve is now extended by about five months. Concurrently, our clients who did have money started griping about the bills because their own finances were precarious and several clients whose cases we'd not finished resolving wanted to close their cases because they needed the retainer money in our Trust account to pay things like rent. Many people who want to hire us don't have jobs.

Goldberg ended the email by stating: "I'll be in touch with you about an amount I can reasonably afford to pay now. Again, you are valuable to the firm. And you deserve every penny you're asking for and more." ¶¶ 147-148.[6]

---

[6] Goldberg's mention of the concurrent leaves in this email is one of Plaintiff's primary pieces of evidence of purported discrimination. ¶ 149.

On July 27, Goldberg's mother died. ¶ 150. Naturally, she was shattered by the news, but also felt completely unprepared for the actual reality of her mother not being alive. ¶ 151. Her absence hit Goldberg on an hourly basis. ¶ 152. For the week, Goldberg worked from her bed, totally consumed by death – both Goldberg's mother's and a new client whose daughter's murder was live posted on Instagram. ¶ 153. Goldberg sank into a depression because internet harassers who had been harassing the Firm all year spammed her mother's obituary page, commenting as "Hitler" and saying Goldberg's mother, who lived a quiet and kind life, should have "been gassed in the ovens." ¶ 154. It was an emotionally overwhelming and trying time, and Goldberg became less engaged in work. ¶ 155.

On August 12, the Firm promoted DeCarlo to Partner at the firm. ¶ 156. DeCarlo is also a mother, and her child was four years old at the time of her promotion. ¶ 157.[7]

On Friday, September 18, Plaintiff emailed Goldberg asking to speak about her requests for additional discretionary bonus compensation. ¶ 159. On September 23, the two met via Zoom, and agreed on a payment plan for the Firm to pay Plaintiff's additional bonus compensation. ¶ 160. Of the $███████ Plaintiff sought, the Firm agreed to pay Plaintiff $██████ on her next paycheck (the total amount then in the bonus account), $█████ per month until the next large settlement came in, and at that point pay an additional $█████. ¶ 161. Goldberg recalls that during that call, Plaintiff spoke to Goldberg in a disrespectful and domineering way in which no other employee had ever spoken to her before. ¶ 162. Goldberg explained the financial stresses that were contributing to the delays in payment, stressed that these were discretionary funds, and informed Plaintiff that she was already the most highly

---

[7] On June 4, 2021, the Firm promoted Massey to Partner. ¶ 158. Massey was a father and had taken paternity leave. ¶¶ 93-94.

compensated and bonused staff member at the firm. ¶ 163.[8] Nothing seemed to register with Plaintiff. Goldberg perceived this as a window into how lacking in compassion Plaintiff was about Goldberg's offer to continue to pay the discretionary bonus and also a window into how irrational Plaintiff was in general. Ex. 3 at ¶ 69. Nevertheless, the Firm made the payments to Plaintiff as promised, in September ($███), October ($███), and November ($███). ¶ 166. During this time Goldberg continued to be supportive towards Plaintiff and her family. ¶ 167. Meropol recalls that in or around October 31, 2020, Goldberg' responded enthusiastically when Plaintiff's child appeared in a Zoom meeting. ¶ 168.

In December 2020, the Firm received a large settlement. ¶ 169. Massey and DeCarlo had been responsible for having painstakingly litigated the settlement at the height of the pandemic. ¶ 170. That month, the Firm paid Plaintiff $███, Massey $███, and DeCarlo $███. ¶ 171. Thus, in 2020 as in 2019, Plaintiff received the largest bonuses of the entire staff, although Massey and DeCarlo were both engaged in far more challenging work and had respectively more experience with the Firm and practicing law. ¶ 172.

## V. Plaintiff's Poor Performance Led to the Termination of Her Employment

Meanwhile, as 2020 progressed, Plaintiff's performance declined. Ex. 3 at ¶ 77. Plaintiff frequently failed to timely respond to Goldberg's communications. Ex. 3 at ¶ 78. On November 4, 2020, Plaintiff failed to answer an email Goldberg sent her at 5:50pm about a time-sensitive matter. ¶ 173. The next morning, Goldberg followed up by calling Plaintiff and sending text messages to her, but Plaintiff continued not to respond. ¶ 174. When Goldberg counseled Plaintiff on the issue and asked how she might best reach Plaintiff to discuss time-sensitive client

---

[8] In 2019 the Firm gave only one bonus to any other legal staff member, and that was $███ to Massey (compared to Lieberman's $███). ¶ 164. As of June 2020, the only bonus compensation the Firm had paid was $███, paid to Seifullah. ¶ 165.

matters, Plaintiff yelled at Goldberg, accusing Goldberg of "attacking" her. ⁋ 175. The next day,

Goldberg memorialized this interaction in an email to Vanessa Cortez, the Firm's administrator,

writing:

> Just to keep you in the loop, I sent Lindsay an email yday at 5:50pm asking if she
> could cover something today. There are two major federal appearances today, and
> I just wanted to see if she'd be available to take notes at one. She didn't respond.
> This morning a little after 9am I texted and called. No response.
> After I sent the email to you and Elizabeth, she called me back. And said she
> couldn't do it b/c of a dentist appointment. I asked if there was a better way to be
> reaching her.
> (This is a frequent really really frequent issue I have with her. Where she doesn't
> get back to me on time sensitive things).
> She got angry and yelled at me.
> She told me I was sending mixed messages by sending staff an email about
> compassion, while also expecting her to respond to a late night email. I reminded
> her the email was at 5:50 and not late at night. When I told her I didn't want to be
> yelled at, she told me "I will not be shamed." I told her that was enough and I
> ended the call.
> Her conduct was totally unacceptable.
> I don't want to take any action right now. But just wanted to make note of it.

⁋ 176.

█████████████████████████████████████████████████████████

███████ ⁋ 177.

Between August 2020 and February 2021, Defendants received complaints at least

monthly from clients about Plaintiff's performance. ⁋ 178. ████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████. ⁋ 180.

On December 17, 2020, Goldberg wrote to Cortez further elaborating on the September

23, 2020 meeting with Plaintiff. ⁋ 181. She expressed that Plaintiff had been "nasty … to the

point of me crying" when discussing compensation and that she felt Plaintiff would "rather get the money even if it meant that the firm failed and she had no place to work." ⁋ 182. On December 18, 2020, Goldberg texted DeCarlo that "[Plaintiff] is pushing herself out the door… we should talk because I'm on my last leg with her and am starting to make…plans" and made plans to discuss with DeCarlo over the phone. ⁋ 183. Shortly thereafter, Goldberg and DeCarlo discussed Plaintiff's performance issues. ⁋ 184. Goldberg did not mention Plaintiff's pregnancy, parental leave, or her motherhood status on that call. ⁋ 185.

In January 2021, Goldberg held the Firm's first "State of the Union" meeting to bring everyone together and motivate them for the year ahead. ⁋ 186. She prepared extensively and made written notes of the remarks she planned to deliver, as well as a PowerPoint presentation. ⁋ 187. The PowerPoint presentation was distributed to the Firm's employees before the meeting. ⁋ 188. In the meeting, Goldberg stated, "we started the year dealing with the tragic loss of a client and some awful online harassment. ⁋ 189. We were finally rebooting after 2 of 5 of the legal team was back from maternity and paternity leave." ⁋ 190.[9] Fellow employees recall this comment, they did not interpret it as hostile or discriminatory. ⁋ 194. Seifullah recalled that when Goldberg "said this, [she] didn't think that [Goldberg] meant it in a hostile or discriminatory way." ⁋ 195. Zoubul declared that "the comments about finances that Carrie has made have always seemed appropriately related to the stresses of being a small business owner navigating unprecedented circumstances, and nothing more." ⁋ 196. DeCarlo, Plaintiff, Zoubul, Seifullah,

_____

[9] Plaintiff interprets Goldberg as having grouped this comment with a comment about the death of a client's death as an example of the discrimination. ¶ 191. Plaintiff also claims that Goldberg intentionally failed to include Plaintiff in the list of "thank yous," and "glared" at her during the Zoom meeting, which is further discrimination. ¶ 192. That, and the parties' interactions regarding Plaintiff's bonus compensation, constitutes much of Plaintiff's evidence of discrimination. ¶ 193.

and Massey sent each other text messages during this meeting. ℙ 197. In the texts, Plaintiff wrote to her coworkers that she is "building her discrimination case" following Goldberg's comments that the Firm was rebooting after her and Massey were on leave. ℙ 198. At least DeCarlo, Zoubul, and Seifullah disagreed with Plaintiff's interpretation of Goldberg's intention. ℙ 199. Following the meeting, Seifullah texted Plaintiff that she was "sorry" about Goldberg's comments and for not including her in the "thank yous," and that she was "pretty sure it's unintentional" and was concerned that Plaintiff had been hurt by Goldberg's reference to the two leaves, and told Plaintiff she believed that Goldberg did not intend to make Plaintiff feel bad for taking leave. ℙℙ 200-01.[10] Goldberg was commenting that the Firm was again fully staffed after 40% of its legal team was not physically working. ℙ 204. Moreover, Goldberg did not intentionally fail to thank Plaintiff, she did not thank any individual employees and instead actually thanked the entire staff for all of their contributions and efforts at the end of the presentation. ℙℙ 205-06. Finally, Goldberg did not "glare" at Plaintiff, and she is not even aware of how someone could glare at another particular person through a group Zoom call. ℙ 207.

In January 2021, the Firm conducted an audit of what it referred to as cases with "Implosion[s]," which referred to cases where there was a breakdown in the relationship with the client. ℙ 208. Knecht assisted the Firm in its audit of "imploding" cases, and reviewed cases/clients who had expressed dissatisfaction with the Firm's legal services. ℙ 209. Knecht gathered information on the behavior of each client and their respective attorney to determine why they felt the way they did and to learn what could be done to avoid such a result in the future. ℙ 210. One of the conclusions of this audit was that Plaintiff had failed to handle multiple

---

[10] Though Plaintiff cites to Seifullah's texts as evidence of the discrimination, Seifullah strongly disagreed with Plaintiff's assertions concerning Goldberg, and believes Goldberg has always been supportive of parents or those considering having children. ¶ 202-03.

cases/ clients in a satisfactory manner or to the Firm's standards, which had resulted in some negative client relationships and outcomes which fell short of the Firm's high standards. ¶ 211. Over the course of the audit, it became clear that Plaintiff was the common denominator in many of the "imploding" cases. ¶ 212. Goldberg reflected at the time that many of these issues boiled down to Plaintiff's failure to communicate with clients and client mismanagement, which led to mismatched expectations and client dissatisfaction. ¶ 213.

Goldberg felt loyal to Plaintiff, particularly given her tenure and history with the Firm, but was growing extremely frustrated by her poor performance and hostile communications. Ex. 3 at ¶ 93. Goldberg felt increasingly uncomfortable tolerating an employee who had such disdain for her, the clients, and the Firm. On February 23, 2021, the Firm received yet another complaint from a client concerning Plaintiff's work on her case. ¶ 215. This client complained that Plaintiff had failed to respond to her emails and to secure her approval for work that exceeded the retainer and incur additional fees, and threatened to file a complaint with the Grievances Committee of Kings County because of Plaintiff's "pure incompetence" and "inaccurate billing." ¶ 215. This was the last straw for Goldberg, who reluctantly concluded that it would be irresponsible to keep Plaintiff on the team. Ex. 3 at ¶ 96. Not only was Plaintiff increasingly stressful and toxic to deal with on a personal level, but she was disappointing the Firm's clients and actively damaging the Firm's reputation. *Id*.

On March 5, 2021, Goldberg called Plaintiff and informed her she wanted to transition her out of the firm. Goldberg offered to have the transition take place over the course of several months. ¶ 216. Plaintiff became irate on the call and yelled at Goldberg. ¶ 218. Goldberg's decision had nothing whatsoever to do with Plaintiff's gender, age, parental status, or the maternity leave she had taken over a year prior. At the time of Plaintiff's termination, the Firm

had 11 employees, 8 of whom are women, 6 of whom are parents, and one employee who had

taken parental leave while employed. ℙ 219. Indeed, following the call, Goldberg contacted a

small group of trusted colleagues seeking advice on how to handle the transition, with no

mention of Plaintiff's pregnancy or maternity leave:

> Hi everybody,
> On Friday I fired an attorney who worked for me for 5 of the firm's seven years. Her cases had been imploding, had to give refunds and transfer cases, she had been really hostile and domineering toward me, she can't really do litigations on her own. She's been acting like a creditor about a discretionary bonus. Etc.
> So on Fri I had a meeting with her where I broached the topic of transitioning her out. She freaked out and was totally defensive and domineering.
> I know she's reached out to the other attorneys and they are stunned and upset too. I obviously have not been keeping them informed about her performance and attitude problems and so they feel it's out of left field and she also is confirming she had no idea it was coming.
> I'm so scared about the morale issues.

ℙ 220.

Following the call, Goldberg emailed Plaintiff and suggested Plaintiff work only through the

following week, and admitting:

> I had expected you to agree that things have been a struggle for quite some time with regard to your relations with the clients and also with me. Our interactions for the past five or six months have been quite hostile and negative, which has caused great stress and anxiety for me and I have found it to be unpleasant and unsustainable. I was surprised you were surprised by this information given how hostile you have been during our last couple interactions…

ℙ 221. Plaintiff agreed, and her employment terminated on March 12, 2021. ℙ 222. The

remaining attorneys assumed Plaintiff's job responsibilities after her termination. ℙ 223. After

terminating Plaintiff, Goldberg was surprised by how easy it was for the other attorneys to cover

her workload, and realized that Plaintiff had actually been doing very little day-to-day around the

end of her employment. ℙ 224.

Shortly after the Firm terminated Plaintiff's employment, Goldberg spoke with Marc

Randazza, an attorney who co-counseled with the Firm on several occasions, and had

specifically been working with Plaintiff on litigation filed in Rhode Island. ⁋ 225. Goldberg

disclosed to Randazza that she had terminated Plaintiff's employment. ⁋ 226. Randazza

explained that throughout her time on the case, Plaintiff had failed to communicate timely with

him and the client, failed to actively litigate the case, and in general gave him a "dim view of

Plaintiff's abilities, drive, ambition, and competence." ⁋ 227.



⁋ 230.

## VI. Plaintiff Was a "Faithless Servant"
### A. The Firm's Title IX Work

Throughout Plaintiff's tenure, and to this day, the Firm has been a national leader in the

Title IX field. ⁋ 231. In the years 2015 and 2016, the Firm had the most Title IX cases in the

country accepted for investigation by the Obama administration's Department of Education

Office for Civil Rights. ⁋ 232. Goldberg has been nationally recognized for her Title IX work,

twice attending Title IX Task Force meetings at the White House in 2016, and presenting on the

Firm's observations about retaliation against girls of color who reported sexual assault. ⁋ 233. In

July 2018, the Firm obtained the highest recovery for a Title IX case against New York City in a

case Plaintiff herself had played a bit part in defending a deposition and for which she sought

bonus compensation. ¶ 234. On October 25, 2018 and April 30, 2019, Goldberg's scathing criticism of the NYC DOE at a press conference resulted in the DOE increasing its Title IX coordinators nine-fold on June 19, 2019. ¶ 235. The Firm's groundbreaking Title IX cases have been featured in *The New York Times, The Washington Post,* and the HBO Documentary *Netizens*. ¶ 236. Goldberg also discusses the Firm's Title IX cases in her book *Nobody's Victim*, a New York Times Editor's Choice. ¶ 237. The Firm has been hired to do Title IX disciplinary hearings and litigations around the country in cases representing children as young as 11, college students, graduate students, and professors. ¶ 238. On April 4, 2019, Goldberg presented to one institution, and after that the Firm was retained to create a curriculum for students and trainers to incorporate online harms into the Title IX rubric and the school's code of conduct. ¶ 239. The Firm's intent was to offer this expertise to other institutions and student organizations as well. ¶ 240.

Plaintiff specifically participated in this work. ¶ 241. Starting in 2016, the Firm marketed its services directly to sororities, an effort in which Plaintiff participated. ¶¶242-43 For example, on August 29, 2016, Plaintiff assisted in drafting a blog post called "Twelve Things to Do If Your Sorority Sister Says She was Just Sexually Assaulted" which instructs readers on the counseling and resolution services at schools. ¶ 243. Plaintiff wrote: "Not sure if I mentioned that my own sorority, ▮▮▮▮▮▮▮▮, is partnered with [client], which I know you're also involved in. I bet ▮▮▮▮ would love to get you to one of their events – our 100 year anniversary is coming up in 2017 with a big convention. ¶ 244.

The Firm sent the post directly to sorority leadership, including the sorority ▮▮▮▮▮▮▮▮ ▮▮▮▮ seeking feedback and partnership. ¶ 245. ▮▮▮▮ never retained the Firm. ¶ 246.

**B. Plaintiff's Secret Competition**

In discovery in the instant litigation, Defendants learned that beginning in late 2020, Plaintiff had been sending emails to potential clients and potential revenue sources using her personal Gmail account, instead of the email account provided by the Firm, to directly compete with the Firm's Title IX practice, marketing herself as an individual without mentioning the Firm or her employment there. ¶¶ 247-48.

On January 25, 2021, Plaintiff wrote an email to her career coach, Meredith Mitnick, regarding an opportunity to provide Title IX training to a sorority, ███████████████, on a college campus. ¶ 249. ████ was the one of the very sororities that the Firm had contacted regarding potential collaboration in 2016. ¶ 250. She expressed hope that she "could potentially market to other schools/sororities" to discuss sexual misconduct/assault. ¶ 251. On Tuesday, February 9, 2021, at approximately 3:30p.m. (i.e. during business hours of her employment with the Firm) Plaintiff spoke with the ████ representative for approximately 33 minutes. ¶¶ 252-53 She never disclosed this call to anyone at the Firm. ¶ 254

On February 16, Mitnick emailed Plaintiff that she was "so excited for [Plaintiff] and [Plaintiff's] side hustle!", explicitly referencing Plaintiff's efforts to circumvent the Firm and divert business from it. ¶ 255. On February 22, Plaintiff emailed Mitnick so Mitnick could review an email Plaintiff had drafted to send to ████ offering to "put together a formal proposal." ¶ 256. On February 23, Plaintiff wrote to Mitnick, "now that I have this side hustle and I'm creating this public women's rights/pregnancy rights/women's empowerment message, I feel like I have this as another way to market myself for possible future opportunities and employment." ¶ 257. On February 25, Plaintiff wrote to ████

Because of my connection to ████ I am willing take on this work as an independent contractor so the organization wouldn't have to go through the law firm and the

steep pricing that accompanies it. . . . Please let me know if you agree and I can put together a formal proposal.

¶ 258. Plaintiff did not include Knecht in her efforts to retain ███ as a client, even though

Knecht would ordinarily be aware of these types of proposals. ¶¶ 259-60. Plaintiff's efforts were

successful: following her termination from the Firm, ███ engaged her and paid her $18,500 in

legal fees. ¶ 261. The Firm did not have the opportunity to engage ███ services or earn that

money. ¶ 262. Moreover, the Firm continued to pay Plaintiff her salary for January 2021,

February 2021, and half of March 2021, while Plaintiff acted as a faithless servant. ¶ 263.

## ARGUMENT

### I.  Summary Judgment Standard

Courts "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). The non-movant "cannot avoid summary judgment through mere speculation or

conjecture[.]" *Wellington v. Spencer-Edwards*, No. 16-6238, 2019 WL 2764078, at *1 (S.D.N.Y.

July 1, 2019). Moreover, "where a party relies on affidavits or deposition testimony to establish

facts, the statements must be made on personal knowledge." *DiStiso v. Cook*, 691 F.3d 226, 230

(2d Cir. 2012); *Sosa v. Lantz*, No. 09-869, 2013 WL 4441523, at *4 (D. Conn. Aug. 14, 2013)

(conclusory claims lacking basis in personal knowledge do not establish questions of fact).

"[T]he salutary purposes of summary judgment – avoiding protracted, expensive and harassing

trials – apply no less to discrimination cases than to commercial or other areas of litigation."

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### A.  New York State Human Rights Law

"'Claims brought under New York State's Human Rights Law are analytically identical

to claims brought under Title VII.'" *Vivian Xiang v. Eagle Enters.*, 19-cv-1752 (LJL), at *22

(S.D.N.Y. Mar. 15, 2022) (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011); *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997)). Claims under both Title VII and the NYSHRL, including sex and pregnancy discrimination, are generally treated as analytically identical, and addressed together. Both are governed by the familiar three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green . . .*" (internal quotation marks and citations omitted)). *Farmer v. Shake Shack Enters., LLC*, 473 F.Supp.3d 309, 323-24 (S.D.N.Y. 2020).

If the plaintiff makes that showing, the burden shifts to the defendant to present a "legitimate, non-discriminatory" explanation for the challenged employment action, McDonnell, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant meets its burden at the second step, the burden returns to the plaintiff, who must prove by a preponderance of the evidence that the justification put forward by the defendant is pretextual. *Id.* at 804.

A plaintiff cannot rely on "purely conclusory allegations" and must offer "concrete particulars" to make the requisite showing. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). "The Second Circuit has repeatedly held that stray remarks of a decision-marker, without more, cannot prove a claim of employment discrimination." *Adams v. Master Carvers of Jamestown, Ltd.*, 91 F. App'x 718, 722 (2d Cir. 2004) (summary order, citing *Abdu-Brisson* v. *Delta Air Lines*, *Inc.*, 239 F.3d 456, 468 (2d Cir. 2001)).

### B.    New York City Human Rights Law

The standard for establishing *a prima facie* case of discrimination under the NYCHRL is more relaxed than that of the NYSHRL. *See Lulo v. OTG Mgmt.*, 19 Civ. 3776 (PAE), at *20 (S.D.N.Y. Feb. 10, 2022). A plaintiff must show that her employer treated her "less well, at least in part for a discriminatory reason." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,* 715 F.3d 102, 110 n.8 (2d Cir. 2013) (*"[T]he *prima facie* case is satisfied if a member of a protected class

was treated differently than a worker who was not a member of that protected class.") (citations and quotation marks omitted)). It is sufficient to show that the plaintiff "was treated differently from others in a way that was more than trivial, insubstantial, or petty." *Gorman v. Covidien, LLC,* 146 F.Supp.3d 509, 530 (S.D.N.Y.2015) (cleaned up). Nevertheless, summary judgment for the defense on a claim under the NYCHRL "is appropriate if the record establishes as a matter of law that discrimination … played no role in the defendant's actions." *Montgomery v. N.Y.C. Transit Auth,* 806 Fed.Appx. 27, 31 (2d Cir. 2020) (summary order).

Defendants do not dispute that Plaintiff was a member of a protected class as a woman throughout her employment, she was affected by pregnancy between March and October 2019, and a mother from October 2019 through the end of her termination. Defendants also do not dispute that Plaintiff was qualified for her job. Defendants further do not dispute that her termination constituted an adverse action. However, Plaintiff's claims of gender and pregnancy discrimination should be dismissed as she has not, and cannot, produce any evidence that she was treated less well, or that her employment was terminated, because of her gender or pregnancy. *See Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 574 (S.D.N.Y. 2012) (granting summary judgment where the court found that plaintiff could not credibly argue the defendants' proffered reasons for termination were pretext.).

## II.     Plaintiff's Termination was Not a Discriminatory Adverse Action[11]

The record contains no evidence whatsoever of gender, pregnancy, or motherhood discrimination. To the contrary, the record is clear that Defendants were supportive and accommodating to employees who decided to get pregnant and have children.

---

[11] Plaintiff does not specifically allege in her causes of action that she was discriminated against on the basis of her motherhood status. *See* Dkt. No. 1. However, it is alluded to in the factual background of the Complaint, and so it is addressed in this brief.

### A.     There is No Evidence Plaintiff was Fired Because she was Pregnant

Plaintiff's claim that her termination was based on her pregnancy and/or maternity leave "strains credulity" for multiple reasons. First, Plaintiff contends that the alleged discriminatory treatment did not start until after her call with Goldberg in May 2019. Goldberg testified, and Massey declared, that Goldberg had been aware of Plaintiff's pregnancy since on or around March 1, 2019, and Lieberman concedes that Goldberg knew about her pregnancy before May 2019. Ex 15 at 219:19-221:12. It is illogical that Goldberg would learn of Lieberman's pregnancy, but not discriminate against her for that pregnancy until their discussion in May 2019, and no reasonable jury would find that Goldberg started discriminating against Plaintiff one to two months *after* she learned of Plaintiff's pregnancy. Second, while Plaintiff contends Goldberg's discriminatory animus commenced in May 2019, even using the date on which Plaintiff returned from parental leave, March 3, 2020, which was a full year before Goldberg terminated Plaintiff (and May 2019 would be almost two years). Lastly, any comments Goldberg made about the length of Plaintiff's and Massey's leaves were not made "in relation to Plaintiff's termination nor in any way related to the process which led to Plaintiff's termination." *Dr. Koppar v. Orange Reg'l Med. Ctr.*, 19-CV-11288 (KMK), at *32 (S.D.N.Y. Feb. 3, 2022) ("The Court finds that Plaintiff has failed to meet his burden of establishing that his termination took place under circumstances giving rise to an inference of discrimination . . . While the fact that the remark was made by a supervisor could counsel in favor of a finding of discriminatory intent, the remark was neither made in relation to Plaintiff's termination nor in any way related to the process which led to Plaintiff's termination; indeed, the remark was made over two years before Plaintiff's termination") (internal citations omitted).

Indeed, Plaintiff had not been pregnant for 18 months at the time Defendants terminated her employment. A plaintiff who was not pregnant at or near the time of the adverse employment action must introduce evidence at the prima facie stage that she was still "affected by pregnancy" when she suffered the adverse employment action. *Lulo v. OTG Mgmt.*, 19 Civ. 3776 (PAE), at *16 (S.D.N.Y. Feb. 10, 2022). Such evidence might consist of "evidence that harassment or discriminatory statements by plaintiffs supervisors began during her pregnancy or maternity leave and continued with some regularity until the adverse employment action occurred" or "evidence that she developed a medical condition during pregnancy that continued to cause problems with her job until the adverse employment action occurred." *Id.* at 16-17 (citing *Solomen v. Redwood Advisory Co.*, 183 F.Supp.2d 748, 754 (E.D. Pa. 2002) (citations omitted). "Essentially, a plaintiff who was not pregnant at or near the time she was terminated must demonstrate that the effects of her pregnancy continued to exist at the time she was terminated, either in actual fact or in the thoughts and actions of those responsible for firing her." *Lulo*, 19 Civ. 3776 (PAE) at 17 (citing *Solomen*, 183 F.Supp.2d at 754).

Here, Plaintiff has not adduced any evidence along these lines-or any factual basis on which to conclude that she continued to be "affected by pregnancy" as of the March 2021 termination. She has not adduced evidence of harassment (before, during, or after her pregnancy), references to her pregnancy, or statements that her pregnancy affected her conditions of employment, let alone her termination. Her claim of pregnancy discrimination reduces to the fact that one year prior to her termination, she had been pregnant. The only evidence Plaintiff relies on is that Goldberg commented on how Plaintiff's five-month maternity leave taken in concurrence with another senior attorney caused financial strain on the Firm. This is insufficient to support *a prima facie* case that her termination was an act of discrimination based on her

previously being pregnant. *See Rinsler v. Sony Pictures Ent., No.* 02 Civ. 4096 (SAS), 2003 WL 22015434, at *6 (S.D.N.Y. Aug. 25, 2003) (finding no *prima facie* case where relying solely on temporal proximity, and the termination occurred three months after the company found out about pregnancy); *Morrissey v. Symbol Techs., Inc.,* 910 F.Supp. 117, 122 (E.D.N.Y. 1996); *Stainkamp v. Changes Int'l of Fort Walton Beach, Inc.,* 373 F.Supp.2d 163, 168 (E.D.N.Y. 2005); *LaBarbera v. NYU Winthrop Hosp.,* 527 F.Supp.3d 275, 304 (E.D.N.Y. 2021), *appeal dismissed* (July 7, 2021).

For the same reasons Plaintiff's NYSHRL pregnancy discrimination claim fails for lack of evidence that she was terminated based on her earlier pregnancy, her NYCHRL pregnancy claim fails too. The only evidence supporting those claims is that she had been pregnant two years earlier (2019) and that Goldberg referenced on three occasions over the course of two years that Plaintiff's five-month maternity leave taken in concurrence with another senior attorney caused financial strain on the Firm. Those facts would not permit a factfinder to find, other than by pure speculation, that discrimination played a role in the termination decision, let alone that Plaintiff had been treated less well than other employees on account of her prior pregnancy.

### B. Defendants had Legitimate Nondiscriminatory Business Reasons for Terminating Plaintiff

It is irrefutable that Defendants received complaints from clients about Plaintiff's performance, that Goldberg personally observed Plaintiff's failure to timely respond to emails, texts, and calls, and that Goldberg and Plaintiff's relationship broke down to the point where their communications were hostile. *See* infra at pp. 24-25. These constitute legitimate nondiscriminatory business reasons for terminating Plaintiff's employment. *See Ramsaran v. Booz & Co. (N.A.) Inc.*, 2015 U.S. Dist. LEXIS 111770, at *26 (S.D.N.Y. Aug. 23, 2015) (the question is not whether the employer reached a correct conclusion, but whether it made a good

faith business decision). Courts do not sit as "super-personnel departments" to reexamine a company's business decisions or assess whether a plaintiff's performance was deficient. *Id.* (granting summary judgment and holding the question is not whether the employer reached a correct conclusion, but whether it made a good faith business decision); *see also Ghent v. Moore,* 324 F. App'x 55, 57 (2d Cir. 2009) (granting summary judgment and finding courts should not examine whether the employer believed the employee's performance was deficient, not "reexamine whether an employee's performance was really deficient"). Here, the undisputed evidence supports the Firm's legitimate reason for terminating Plaintiff's employment due to complaints from clients, communication issues, and hostility from Plaintiff herself.

### C. Plaintiff's Gender and Motherhood Status Discrimination Claims Fail Under the Same Actor Inference[12]

Plaintiff's claims of discrimination on the basis of gender and motherhood fail because Goldberg is part of the same protected class as Plaintiff, and was the individual who made the decision to hire and fire her. First, it is an undisputed fact that Goldberg made the decision to hire Plaintiff and also made the decision to terminate Plaintiff. The Second Circuit has repeatedly emphasized that when the firing decisionmaker is also the hiring decisionmaker, "it is difficult to impute to [her] an invidious motivation that would be inconsistent with the decision to hire." *Villetti v. Guidepoint Glob.*, No. 21Civ. 2059, at *6 (2d Cir. July 7, 2022); *see also Jetter v. Knoth Corp.*, 324 F.3d 73, 76 (2d Cir. 2003); *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (noting that same actor inference—where "the person who made the decision to fire was the same person who made the decision to hire"—strongly suggests "invidious discrimination was unlikely"). Additionally, the fact that Goldberg participated in these decisions

---

[12] The "same actor inference" applies to all of Plaintiff's claims.

and belongs to the same protected class as Plaintiff creates a further inference against discrimination. *Crowley v. Magazine,* No. 19 Civ. 7571 (JGK), at \*13 (S.D.N.Y. Dec. 21, 2021); *see also James v. Mun. Credit Union*, No. 13 Civ. 4568 (LTS)(KNF), at \*10 (S.D.N.Y. Feb. 19, 2016) ("[A] well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class.") (internal citations omitted).

It is also undisputed that after Plaintiff's termination, Plaintiff's job responsibilities and duties were assumed by individuals who were members of the same protected class as Plaintiff. This fact "weighs heavily against the inference that [the plaintiff] suffered discrimination." *Crowley v. Magazine*, 19-cv-7571 (JGK), at \*14 (S.D.N.Y. Dec. 21, 2021); *Montanile v. Nat'l Broadcasting Co.*, 211 F.Supp.2d 481, 487 (S.D.N.Y. 2002), aff'd, 57 Fed.Appx. 27 (2d Cir. 2003); *see also Inguanzo v. Hous. & Servs., Inc.*, No. 12 Civ. 8212, 2014 WL 4678254, at \*19 (S.D.N.Y. Sept. 19, 2014), aff'd, 621 Fed.Appx. 91 (2d Cir. 2015) ("Where a member of the plaintiff's protected class is contemporaneously hired as a replacement, the offering of proof of intentional discrimination appears extremely difficult, if not practically impossible.") (internal citations omitted).

## III. Defendants' Award of Plaintiff's Discretionary Bonus is Not Evidence of Pregnancy Discrimination

Defendants properly used their discretion to create a payment plan to pay Plaintiff's discretionary bonuses in light of the Firm's financial state. There is no evidence in the record whatsoever to adduce that Defendants' deferral of Plaintiff's requested discretionary bonus was because of her gender, pregnancy, or motherhood status.

First, the policy is clear that any award of bonus compensation is completely at the discretion of Goldberg. No employee is entitled to any amount of bonus discretion. The Firm

policy also clearly sets out that any award of bonus compensation is dependent on the Firm's ability to pay. Plaintiff's allegation that she was somehow entitled to a particular bonus amount to be paid on a specific day is completely belied by the record. Significantly, Defendants never denied Plaintiff her bonus compensation. Defendants only delayed paying Plaintiff's requests for bonus compensation to accommodate its own financial status. Indeed, in her correspondence to Plaintiff, Goldberg emphasized how Plaintiff deserved the bonus she received, and how, in June 2020, she was a valued member of the team.

Second, Plaintiff does not offer evidence that non-pregnant, male, or non-parent employees were paid bonuses. No evidence whatsoever supports a claim that the failure to pay Plaintiff a bonus was predicated on Plaintiff's gender, pregnancy, or motherhood status. This is insufficient to survive summary judgment. *Schanfield v. Sojitz Corporation of America*, 663 F. Supp. 2d 305, 338-39 (S.D.N.Y. 2009) (granting summary judgment when Plaintiff's only evidence that he was discriminatorily denied a bonus was that other employees were "eligible" for a bonus); *Watson v. Arts Entertainment Television Network*, No. 04-1932, 2008 WL 793596, at *16 (S.D.N.Y. Mar. 26, 2008) ("Vague references that plaintiff's treatment was inferior to that afforded to unidentified comparators are insufficient to withstand a motion for summary judgment.") Indeed, Plaintiff's request for bonus compensation were uniquely high – accounting for over 50% of her base salary. Plaintiff received, by far, the most bonus compensation in 2020. There is no evidence whatsoever that Plaintiff was treated worse than her colleagues in terms of bonus compensation.

Second, the timing of Plaintiff's requests for bonus compensation suggests that Plaintiff's gender, pregnancy, and motherhood status had no role in Goldberg's decision-making process. It is undisputed that Plaintiff requested and received a bonus in March 2019, *after* Goldberg was

already aware of Plaintiff's pregnancy. No reasonable jury could find that Goldberg would approve Plaintiff's first request for a bonus despite having knowledge of her pregnancy, but then discriminatorily delay payment of Plaintiff's subsequent bonus requests because of her pregnancy.

Finally, assuming *arguendo* that the delayed payments constituted adverse employment actions, Plaintiff has not directed the Court to facts that support any inference of discrimination or retaliation behind the delays. By contrast, Defendants have set forth valid, pregnancy-neutral explanations for the temporal gap between Plaintiff's request for the bonus and her delayed compensation. Defendants explained that the Firm had two attorneys absent, which impacted the Firm's ability to generate revenue. *See* infra at pp. 14-20. The Firm thus had less money to distribute to attorneys for bonus compensation. *Id.* The Firm had the right to divide its available funds as a bonus between Plaintiff and other employees. *Davis v. N.Y.C. Dep't of Educ.*, 804 F.3d 231, 236 (2d Cir. 2015) (granting summary judgment and finding that the employer non-discriminatorily deducted funds from the employee's discretionary bonus because the employee had been out on a leave of absence and the employer needed to compensate another employee who contributed to the employer's earnings in the employee's absence). The Firm was permitted to consider how Plaintiff and Massey's absences adversely impacted the Firm's finances, and apportion Plaintiff's bonus in light of the more meager amount of funds available. This is a legitimate and nondiscriminatory business reason for delaying the remainder of Plaintiff's bonus payment.

## IV. The Remainder of Plaintiff's Purported Evidence is Insufficient to Raise an Inference of Discrimination

Plaintiff cannot establish an inference of discrimination based on Goldberg's comments related to the business cost of her employees' concurrent parental leaves with respect to any of

her claims. Nor does Plaintiff's allegation that Goldberg called her less often following their May 2019 pregnancy discussion rise to the level of an adverse employment action.

### A. Goldberg's Stray Remarks on the Cost her Employees' Concurrent Parental Leaves Are Not Sufficient to Survive Summary Judgment

Plaintiff cannot establish an inference of discrimination based on Goldberg's comments with respect to any of her claims. The *only* comments that Plaintiff points to in support of her claims are statements Goldberg made about the financial impact of Plaintiff and Massey's concurrent parental leaves. These comments are (a) not related to Plaintiff's gender, pregnancy, or parental status, and (b) are at most, unactionable stray remarks.

To be clear: Plaintiff does not claim that she was discriminated against because she took protected leave. Plaintiff only alleges that she was discriminated against on the basis of her gender and pregnancy. Goldberg's comments that Plaintiff and Massey's parental leaves had a financial impact on the firm do not relate to Plaintiff's gender, pregnancy, or parental status. Comments regarding Plaintiff's leave alone does not necessarily implicate the employee's protected characteristics. *See Price v. Mount Sinai Hosp.*, 458 Fed.Appx. 49, 52 n.2 (2d Cir. 2012) ("Discussions about FMLA leave alone do not necessarily implicate Plaintiff's protected characteristics."); *Buczakowski v. Crouse Health Hosp.*, No. 5:18 Civ. 330 (LEK/ML), 2022 U.S. Dist. LEXIS 21694, at *30 (N.D.N.Y. Feb. 7, 2022). These comments were not related to the protected reason for Plaintiff taking leave – her pregnancy. Goldberg's comment instead *only* related to the fact that her employees were not working at that time. Indeed, Goldberg's other employees who were present for the meeting did not believe Goldberg was discriminatorily commenting on Plaintiff's decision to become a mother. *See* infra at pp. 22-23. Goldberg's comments are not related to Plaintiff's gender, pregnancy, or parental status. Rather, they are factual statements about the Firm's financial state, and how having two employees concurrently

absent from work for an extended period affected the Firm's capacity to bill and therefore collect money from clients.

Even if this Court finds that these comments pertain to Plaintiff's protected characteristics, they are nothing more than unactionable stray remarks. "'[S]tray remarks, even if made by a decision maker, do not constitute sufficient evidence to support a case of employment discrimination." *Roenick v. Flood*, 2021 WL 2355108 (S.D.N.Y. 2021). "In determining whether a comment should be considered a stray remark, courts consider who made the remark, when the remark was made in relation to the termination, the content of the remark, and the context in which the remark was made." *Woodard v. TWC Media Sols*., No. 09 Civ. 3000 (BSJ), 2011 WL 70386, at *7 (S.D.N.Y. Jan. 4, 2011), *aff'd sub nom*. 487 F. App'x 613 (2d Cir. 2012). "Remarks are especially likely to be 'stray' when made by a decision maker unrelated to the decision-making process temporally remote from the date of decision." *Id.* The context in which Goldberg made these three comments is consistent with a nondiscriminatory motive. Twice, Goldberg was in discussions with Plaintiff about why the Firm could not afford to pay her the exorbitant bonus she requested at that time (Goldberg and Plaintiff's January 30, 2020 call, Goldberg's June 30, 2020 email to Plaintiff) and raised the concurrent leaves along with other incidents that impacted the Firm's finances. The third instance involved Goldberg addressing the Firm and summarizing the events that took place over the course of 2020 that impacted the Firm, which had absolutely nothing to do with Plaintiff's employment.

Significantly – each time Goldberg made a remark about Plaintiff's parental leave, she also mentioned the parental leave of Plaintiff's male colleague, Adam Massey. Plaintiff admits that Massey was not discriminated against. No reasonable jury could believe that these

comments were discriminatory towards Plaintiff and not Massey. As such, these comments are not evidence of discrimination.

### B. Plaintiff's Self-Serving Unsupported Allegations are Nothing More than Petty Slights Which Are Not Actionable Discrimination

Plaintiff's claim that she was discriminated against because Goldberg called her less frequently following their May 2019 discussion of Plaintiff's pregnancy is not an adverse employment action.

First, Plaintiff's claim is belied by common sense. There is no dispute that Goldberg learned of Plaintiff's pregnancy in or around March 2019, months prior to May 2019. Plaintiff even admitted in her deposition that Goldberg was aware of Plaintiff's pregnancy at least as early as April 2019. However, Plaintiff maintains that Defendant's treatment of her did not worsen until May of 2019. Plaintiff has offered no explanation as to why Goldberg's alleged discriminatory treatment of her commenced at least a month after she learned of Plaintiff's pregnancy. No reasonable jury would believe that Goldberg learned of Plaintiff's pregnancy, and then waited at least an entire month to start discriminatorily treating her poorly because of her pregnancy.

Second, Plaintiff's statements are completely self-serving and supported only by her own deposition testimony, and thus should not be given weight on a summary judgment motion. Plaintiff's conclusory deposition testimony, with nothing more, is insufficient to show pretext as a matter of law. *See Deebs v. Alstom Transp.*, 346 F. App'x 654, 657 ("the only 'evidence' cited in plaintiff's brief is their own self-serving testimony and that the plaintiffs have 'made no attempt . . . to square their own speculative, and subjective, testimony with the hard evidence adduced during discovery.'"); *Meiri*, 759 F.2d at 998 (affirming grant of summary judgment where plaintiff "has provided no indication that any evidence exists that would permit the trier of

fact to draw a reasonable inference of pretext"). Plaintiff's statements are unreliable and should not credited on summary judgment.

Third, even if this allegation is given weight, the act of calling an employee less frequently is nothing more than a petty slight or trivial inconvenience. The City and State law are not a "general civility code" and "petty slights and trivial inconveniences" do not rise to the level of discrimination. *Mihalik*, 715 F.3d at 111 (quoting *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 80) (it is not enough that a plaintiff has an overbearing or obnoxious boss. She must show that she has been treated less well at least in part "because of her gender."). There is no evidence in the record that Goldberg calling Plaintiff less frequently had absolutely anything to do with Plaintiff's protected characteristics or that it impacted Plaintiff's ability to do her job in any way. As such, even if accepted as true, this is not sufficient to establish an adverse employment action for the purposes of *a prima facie* case.

Finally, it bears noting that Defendants maintain an extremely diverse workforce. Goldberg is a woman, and Goldberg hired and fired Plaintiff. DeCarlo, Zoubul, Leeds, Meropol, Seiffulah, Buster, and Shapiro are all women who work under Defendants and are supervised by Goldberg, and all deny hearing Goldberg make any discriminatory comments about gender or pregnancy. Zoubul, DeCarlo, Seiffulah, and Massey are all parents who work under Defendants and are supervised by Goldberg, and all deny hearing Goldberg make any discriminatory comments about parental status. Massey also took a parental leave, and has never witnessed Goldberg engage in any form of discrimination on the basis of being a parent or pregnancy. DeCarlo and Massey were both promoted, and they remain employed by Goldberg. None of these employees corroborate any of Plaintiff's claims of discrimination. Plaintiff does not believe that these employees were discriminated against. ¶¶ 265-266.

## V.    Summary Judgment is Similarly Appropriate for Discrimination Claims Against Carrie Goldberg

Plaintiff also asserts claims against Goldberg as an "aider" and "abettor" to her own conduct. Although claims may be asserted against individual defendants under the NYSHRL and NYCHRL, liability must first be established as to the employer before an individual may be considered liable. See N.Y.C. Admin. Code § 8-107(6); *Irons v. Bedford-Stuyvesant Cmty. Legal Servs.*, 2015 U.S. Dist. LEXIS 130116, at *95-96 (E.D.N.Y. Sep. 28, 2015); *Soloviev v. Goldstein*, 104 F. Supp. 3d 232, 253 (E.D.N.Y. 2015). Because Plaintiff's gender and pregnancy discrimination claims fail under the NYSHRL and the NYCHRL against the Firm, they must similarly be dismissed against Goldberg.

## VI.    Summary Judgment Should Be Granted on Defendant's Claims of Faithless Servant

Under New York's faithless servant doctrine, sometimes referred to as a breach of the duty of loyalty, the employer must show "(1) that the employee's disloyal activity was related to the performance of his duties, and (2) that the disloyalty permeated the employee's service in its most material and substantial part." *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 348 (S.D.N.Y. 2009). "Liability for such conduct may arise under the long standing rule that the fiduciary status of an employee imposes a duty upon such employee to refrain from using confidential knowledge acquired during his or her employment in competition with the employer (*see Byrne v. Barrett,* 268 N.Y.199, 197 NE 217 [1935] ), thereby precluding an employee who gained knowledge of a secret from availing themselves of it for their private advantage against their employer (*see Kaumagraph Co. v. Stampagraph Co.,* 235 N.Y. 1, 138 NE 485 [1923])." *First Mfg. Co. v. Young*, 3 N.Y.S.3d 284 (Sup. Ct. 2014). "This duty of loyalty, however, has only been extended to cases where the employee "act[s] directly against the employer's interests—as in embezzlement, improperly competing with the current employer, or usurping

business opportunities." *Pozner v. Fox Broadcasting Company*, 74 N.Y.S.3d 711, 714 (Sup. Ct. 2018) (citing *Veritas Capital Mgt., L.L.C. v. Campbell*, 82 A.D.3d 529, 530 (1st Dept. 2011)).

"Moreover, New York's faithless servant doctrine holds that "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 229 (2d Cir. 2020) (citing *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003)). A "principal is entitled to recover from his unfaithful agent any commission paid by the principal." *Id.* (citing *Wechsler v. Bowman,* 285 N.Y. 284, 292 (1941)).

Here, Lieberman made "improper use of [her] employer's time . . . [and] proprietary secrets" when she spoke to the sorority over the phone during the Firm's business hours, sent emails to various possible opportunities and publications during work hours and held herself out as a cyber and privacy rights attorney separate and apart from the Firm. *Id.; see* Exs. 46-53. ¶ 252-253. Lieberman's attempts to solicit business for herself and deliberately circumvent the Firm – even going so far as to say:

> Because of my connection to ███ I am willing take on this work as an independent contractor so the organization wouldn't have to go through the law firm and the steep pricing that accompanies it. . . . Please let me know if you agree and I can put together a formal proposal.

Infra at pp. 28-29. This the exact type of activity that the faithless servant doctrine contemplates. Through these communications, Plaintiff was clearly pursuing outside employment that directly competed with the nature of the work performed at the Firm, thus violating the Handbook's policies and the faithless servant doctrine. She also "solicit[ed] [her] employer's customers" *before* the employment relationship had been terminated. *Id.* Therefore, her actions squarely fall within the ambit of duty of loyalty violations as set forth by New York appellate courts.

**CONCLUSION**

Defendants' and Counterclaim Plaintiff's motion should be granted in its entirety.