UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
LINDSAY LIEBERMAN

**1:21-cv-05053-ENV-RER**

*Plaintiff*,

     -against-

C.A. GOLDBERG, PLLC & CARRIE A. GOLDBERG,

        *Defendants*.
-----------------------------------------------------------------------X

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*
**3 Park Avenue, Suite 2700**
**New York, NY 10016**
**(212) 889-6565**

# TABLE OF CONTENTS

**SUBJECT**                                                                                          **PAGE**

TABLE OF AUTHORITIES                                                                          iii

PRELIMINARY STATEMENT                                                                    1

STATEMENT OF FACTS                                                                          3

LEGAL BACKGROUND REGARDING THE NEW
YORK CITY & STATE HUMAN RIGHTS LAWS                                        7

ARGUMENT

  POINT I      LIEBERMAN WAS TREATED "LESS
               WELL" BECAUSE OF HER GENDER                                  9

      A.     Goldberg Openly Expressed Her Animus
            Against Lieberman For Taking Maternity Leave          11

      B.     Goldberg Refused to Pay Lieberman Her
            Earned Bonus Because Of Her Maternity Leave          15

           1.     Goldberg Acknowledges That She Reduced
                 Lieberman's Compensation Because She
                 Took Maternity Leave                                              15

           2.     Whether Or Not Lieberman's Bonus
                 Was "Discretionary" Is Irrelevant                          17

      C.     Lieberman's Termination Was Directly
            Related To Her Maternity Leave                              18

      D.     Defendants Cannot Satisfy The
            <u>Williams</u> Affirmative Defense                              20

  POINT II     DEFENDANTS' ARGUMENTS ARE A
               PRETEXT FOR GENDER DISCRIMINATION            21

      A.     Defendants Have Not Proven That Goldberg's
            Refusal To Pay Lieberman's Bonus Was
            Motivated Soley By Financial Considerations          22

      B.     Lieberman Need Not Compare Herself To Others      23

C.     Defendants' Attack On Lieberman's Performance
Is A Pretext     24

    1.    Lieberman Consistently Received Positive Feedback    24

    2.    The Contemporaneous Statements Of
Lieberman's Co-Workers Refute
Defendants' Claim Of Poor Performance    26

    3.    Lieberman Was Not Fired Because
Of Client Complaints    28

    4.    Defendants' Audit Of "Imploding" Cases
Confirms That Lieberman Was Not The
Cause Of Client Issues    31

D.     Defendants' Other Baseless Arguments    32

    1.    Lieberman's Testimony Cannot Be Ignored
Simply Because She Is The Plaintiff    32

    2.    Defendants' Actions Are Not Immune
As "Business Decisions"    33

    3.    The Same Actor Inference Does Not Apply    34

    4.    Goldberg's Boasting & Personal Attacks
On Lieberman    35

E.     Goldberg's Other Untruths That Preclude Summary Judgment    37

    1.    Goldberg Skews The Record    37

    2.    The Declaration Of Carla Cain-Walther    38

POINT III    SUMMARY JUDGMENT MUST BE DENIED
UNDER THE "MIXED MOTIVE" ANALYSIS    40

POINT IV    LIEBERMAN ESTABLISHES HER CLAIMS
AGAINST GOLDBERG INDIVIDUALLY    41

POINT V    C.A. GOLDBERG'S MOTION FOR SUMMARY
JUDGMENT ON ITS RETALIATORY
COUNTERCLAIM IS FRIVOLOUS    42

CONCLUSION    46

**TABLE OF AUTHORITIES**

CASE                                                                          PAGE

Albunio v. City of New York,
    16 N.Y.3d 472 (2011)                                      7

Angioletti v. Foxx,
    2016 U.S. Dist. LEXIS 123700 (E.D.N.Y. Sep. 12, 2016)     17

Aulicino v. New York City Dept. of Homeless Servs.,
    580 F.3d 73 (2d Cir. 2009)                                9

Back v. Hastings On Hudson Union Free School District,
    365 F.3d 107 (2d Cir. 2004)                               25

Bennett v. Health Management Systems, Inc.,
    92 A.D.3d 29 (1st Dept. 2011)                             7, 9, 10, 18,
                                                                        21, 37, 40-41

Bueno v. Eurostars Hotel Co.,
    2022 U.S. Dist. LEXIS 4605 (S.D.N.Y. Jan. 7, 2022)       8

Byrnie v. Town of Cromwell, Bd. of Educ.,
    243 F.3d 93 (2d Cir. 2001)                                33

Carlton v. Mystic Transp., Inc.,
    202 F.3d 129 (2d Cir. 2000)                               10, 34

Chauca v. Abraham,
    2017 30 N.Y.3d 325 (2017)                                 8

Crisses v. Gucci Am., Inc.,
    2012 U.S. Dist. LEXIS 120164 (S.D.N.Y. Aug. 21, 2012)     33

Danzer v. Norden Sys. Inc.,
    151 F.3d 50 (2d Cir. 1998)                                32-33

Davis v. New York City Department of Education,
    804 F.3d 231 (2d Cir. 2015)                               17

Doe v. Bloomberg L.P.,
    36 N.Y.3d 450 (2021)                                      41

Doe v. Solera Capital LLC,
    2019 U.S. Dist. LEXIS 55860 (S.D.N.Y. Mar. 31, 2019)      45

Ebel v. G/O Media, Inc.,
    2021 U.S. Dist. LEXIS 96922 (S.D.N.Y. May 21, 2021)      44

Farmer v. Shake Shack Enters., LLC,
    473 F. Supp. 3d 309 (S.D.N.Y. 2020)      34

Feingold v. New York,
    366 F.3d 138 (2d Cir. 2004)      34

Fincher v. Depository Trust and Clearing Corp.,
    604 F.3d 712 (2d Cir. 2010)      10

Gaworksi v. ITT Commercial Fin. Corp.,
    17 F.3d 1104 (8th Cir. 1994)      33

Golston-Green v. City of N.Y.,
    184 A.D.3d 24 (2d Dept. 2020)      8

Gorzynski v. JetBlue Airways Corp.,
    596 F.3d 93 (2d Cir. 2010)      26

Graciani v. Patients Med., P.C.,
    2015 U.S. Dist. LEXIS 117155 (E.D.N.Y. Sep. 1, 2015)      26

Grewal v. Cuneo,
    2016 U.S. Dist. LEXIS 8349 (S.D.N.Y. Jan. 25, 2016)      44

Hamburg v. New York University School of Medicine,
    155 A.D.3d 66 (1st Dept. 2017)      40

Henry v. Wyeth Pharms., Inc.,
    616 F.3d 134 (2d Cir. 2010)      40

Ibok v. Securities Indus. Automation Corp.,
    369 Fed. Appx. 210 (2d Cir. 2010)      26

Ji Sun Jennifer Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP,
    120 A.D.3d 18 (1st Dept. 2014)      23

Joy v. Kinplex Corp.,
    2008 U.S. Dist. LEXIS 36977 (E.D.N.Y. May 6, 2008)      23

Kaytor v. Electric Boat Corp.,
    609 F.3d 537 (2d Cir. 2010)      9

Kia Song Tang v. Glocap Search LLC,
    2015 U.S. Dist. LEXIS 37342 (S.D.N.Y. Mar. 24, 2015)       28, 34

Kirsch v. Fleet Street, Ltd.,
    148 F.3d 149 (2d Cir. 1998)       14

Leibowitz v. Cornell University,
    584 F.3d 487 (2d Cir. 2009)       23-24

Lenzi v. Systemax, Inc.,
    944 F.3d 97 (2d Cir. 2019)       11

Lulo v. OTG Management, LLC,
    2022 U.S. Dist. LEXIS 24298 (S.D.N.Y. Feb. 10, 2022)       19

MacDuff v. Simon Mgmt. Assocs. II, LLC,
    2022 U.S. Dist. LEXIS 59505 (D. Conn. Mar. 31, 2022)       34

Martinez v. City of N.Y.,
    684 Fed. Appx. 90 (2d Cir. 2017)       32

Mate v. New York State Dept. of Transp.,
    24 A.D.3d 330 (1st Dept. 2005)       26

Melman v. Montefiore Med. Ctr.,
    98 A.D.3d 107 (1st Dept. 2012)       11

Mihalik v. Credit Agricole Cheuvreux North America,
    715 F.3d 102 (2d Cir. 2013)       8-9, 10, 40

Miller v. Levi & Korsinsky, LLP,
    2021 U.S. Dist. LEXIS 27448 (S.D.N.Y. Feb. 12, 2021)       43, 45

Morse v. Fidessa Corp.,
    165 A.D.3d 61 (1st Dept. 2018)       7, 8

O'Connor v. Consolidated Coin Caterers Corp.,
    517 U.S. 308 (1996)       23

Okeke v. The New York & Presbyterian Hospital,
    275 F. Supp. 3d 470 (S.D.N.Y. Sept. 21, 2017)       41

Ortiz v. Gazes, LLC,
    2017 N.Y. Misc. LEXIS 4221 (Sup. Ct. N.Y. Cty. Oct. 30, 2017)       28

Ostrowski v. Atlantic Mut. Ins. Cos.,
    968 F.2d 171 (2d Cir. 1992)                          13

Phansalkar v. Andersen Weinroth & Co., L.P.,
    344 F.3d 184 (2d Cir. 2003)                          42

Ramos v. Marriott Intl.,
    134 F. Supp. 2d 328 (S.D.N.Y. 2001)              34

Redd v. N.Y. State Div. of Parole,
    678 F.3d 166 (2d Cir. 2012)                         9, 17

Rollins v. Fencers Club, Inc.,
    128 A.D.3d 401 (1st Dept. 2015)                   13

Rosen v. Thornburgh,
    928 F.2d 528 (2d Cir. 1991)                          10

Sanders v. Madison Square Garden, L.P.,
    2007 U.S. Dist. LEXIS 48126 (S.D.N.Y. July 2, 2007)    44, 45

Sassaman v. Gamache,
    566 F.3d 307 (2d Cir. 2009)                          14

Shandrew v. Quest Diagnostics, Inc.,
    819 F.Supp.2d 181 (W.D.N.Y. 2011)               14-15

Smith v. Tuckahoe Union,
    2009 U.S. Dist. LEXIS 91106 (S.D.N.Y. Sept. 30, 2009)    25

Stefanovic v. Old Heidelberg Corp.,
    2019 U.S. Dist. LEXIS 133397 (S.D.N.Y. Aug. 8, 2019)    42

Summa v. Hofstra Univ.,
    708 F.3d 115 (2d Cir. 2013)                          21

Tirschwell v. Tcw Grp.,
    194 A.D.3d 665 (1st Dept. 2021)                   34

Tolbert v. Smith,
    790 F.3d 427 (2d. Cir. 2015)                        10

Tomassi v. Insignia Fin. Group, Inc.,
    478 F.3d 111 (2d Cir. 2007)                          14

Turner v. Konwenhoven,
    100 N.Y. 115 (1885)            42

Ulster Cty. v. CSI, Inc.,
    95 A.D.3d 1634 (3d Dept. 2012)        35-36

University of Texas Southwest Medical Center v. Nassar,
    570 U.S. 338 (2013)            11

Walsh v. N.Y.C. Hous. Auth.,
    828 F.3d 70 (2d Cir. 2016)         33

Weiss v. JPMorgan Chase & Co.,
    332 Fed. Appx. 659 (2d Cir. 2009)     33

Williams v. New York City Hous. Auth.,
    61 A.D.3d 62 (1st Dept. 2009)    7, 10, 16, 20, 40

Windham v. Time Warner, Inc.,
    275 F.3d 179 (2d Cir. 2001)         33

Xiang v. Eagle Enterprises, LLC,
    2022 U.S. Dist. LEXIS 46088 (S.D.N.Y. Mar. 15, 2022)    8

Yukos Capital S.A.R.L. v. Feldman,
    977 F.3d 216 (2d Cir. 2020)        44-45

**STATUTE**                       **PAGE**

N.Y.C. Administrative Code §8-101        40-41

N.Y.C. Administrative Code §8-107(1)(a)     41

N.Y.C. Administrative Code §8-107(6)     41

N.Y.C. Administrative Code §130(c)      7, 10

N.Y.S. Executive Law §296(1)(a)        41

N.Y.S. Executive Law §296(1)(h)        23

N.Y.S. Executive Law §296(6).         41

## PRELIMINARY STATEMENT

Plaintiff Lindsay Lieberman ("Lieberman") began working as a Senior Associate for Defendants C.A. Goldberg, PLLC ("C.A. Goldberg") and Carrie A. Goldberg ("Goldberg") in August 2016. Lieberman's success was observed by the firm and included verbal and written positive feedback and bonuses.

In May 2019, Lieberman advised Goldberg that she was pregnant with her first child. Goldberg responded in a hostile manner, "We already know." Goldberg distanced herself from Lieberman and, when they did interact, Goldberg was hostile and demeaning.

Goldberg stopped paying Lieberman her bonuses because of her maternity leave, a fact that cannot reasonably be disputed. Goldberg argues that she decided not to pay Lieberman her bonus as part of her "planning," as if she was justified in withholding compensation from Lieberman because Lieberman was pregnant. (CG 75, 100, 101, 266).

Lieberman began her maternity leave in October 2019. Both during and after the end of her maternity leave in early March 2020, Lieberman asked Goldberg about the bonuses she had earned in 2019. Each time, Goldberg responded that Lieberman's maternity leave was a reason for why the bonus would not be paid. Goldberg also cited the fact that another attorney took a leave, but that attorney, a male named Adam Massey, only took six weeks of parental leave, confirming that it was Lieberman's four-month maternity leave that she viewed as a hardship.

Goldberg also referenced Lieberman's maternity leave with other employees, both publicly and behind Lieberman's back. Goldberg was open about her criticisms of Lieberman for having taken maternity leave, going so far as to cite it as a setback that the firm "suffered" in 2020 at a "state of the union" presentation she made to the firm in early January 2021. Lieberman's co-

workers recognized Goldberg's animus. Although Goldberg also raised the pandemic as a reason for the non-payment, she focused more intently on Lieberman's maternity leave.

Goldberg became increasingly annoyed with Lieberman for continuing to request her bonus, particularly because, in Goldberg's warped view, Lieberman refused to acknowledge that her maternity leave had damaged the firm. Goldberg began to demonize Lieberman and inappropriately blamed her for problems with the difficult clients that Goldberg had assigned her.

Lieberman reached out to Goldberg on February 22, 2021 about her still outstanding 2019 bonus. When they finally met on March 5, 2021, Goldberg fired Lieberman. Goldberg claimed that Lieberman's work had been "suffering" since her return from maternity leave, even though it is undisputed that Goldberg had never spoken to Lieberman about any performance concerns she had.

A jury could clearly find that Goldberg's animus against Lieberman because of her pregnancy and ensuing maternity leave motivated her decisions regarding Lieberman, including not paying her a bonus and ultimately terminating her. Goldberg's repeated negative statements about Lieberman's maternity leave compels a conclusion that gender discrimination played a role.

Defendants' motion seeks to cover up these glaring questions of fact by essentially defending Goldberg's discrimination, arguing that the financial pressures Goldberg experienced warranted her actions. Revealingly, however, Defendants have failed to provide any support for their arguments about the financial health of the firm during the relevant time period, refusing to produce documents to support its position in discovery. Defendants ask the Court to simply trust them and assume that the pandemic negatively affected their finances, even though the relevant facts show that the firm weathered the pandemic just fine. The record permits a jury to reject Defendants' financial defense and find it to be a pretext discrimination.

Defendants' motion is bloated with self-serving boasts, opinions, observations, feelings, emotions and thoughts that they masquerade as undisputed facts. Nowhere is this more improper than in Defendants' 56.1 statement. Revealingly, many of Defendants self-serving and irrelevant claims are refuted by the contemporaneous text messages that Lieberman and her colleagues shared, portraying a reality far different from the fiction described in Defendants' motion.

There is simply no basis for summary judgment in this case. The sheer volume of the Defendants' submission, which mandated a lengthy submission from Plaintiff, confirms the incredible number of disputed facts that exist.

### STATEMENT OF FACTS

Lieberman began working as a Senior Associate attorney at C.A. Goldberg in or around August 2016. (Lieberman Decl. ¶2). C.A. Goldberg, which Goldberg founded in 2014, represents victims of stalking, sexual assault and online harassment. (Lieberman Decl. ¶5). One of the aspects of Goldberg's offer of employment was the benefit of a three-month paid maternity leave. (Lieberman Decl. ¶7).

Lieberman received positive feedback throughout her employment and earned bonuses based on C.A. Goldberg's bonus structure. (Lieberman Decl. ¶10, 12; Ex. 4).

In 2017, Lieberman began a relationship with the man who is now her husband. (Lieberman Decl. ¶14). When things started to become serious, Lieberman told Goldberg that she planned to relocate to Rhode Island, where her now-husband lives for work. Lieberman explained that she remained available to continue working for Goldberg on a remote basis. (Lieberman Decl. ¶14). It is undisputed that Goldberg was enthusiastic about Lieberman's move because it offered an opportunity to grow the firm there. (Lieberman Decl. ¶15). Lieberman relocated to Rhode Island in December 2017. (Lieberman Decl. ¶16).

Lieberman married her now husband in September 2018. In November 2018, the firm introduced a new Employee Handbook that removed the paid maternity leave policy. (Lieberman Decl. ¶20; Ex. 5).

In or around February 2019, Lieberman and her husband learned that she was pregnant and due in October 2019. (Lieberman Decl. ¶21). Lieberman told Goldberg of her pregnancy in May 2019, when her first trimester ended. (Lieberman Decl. ¶24).

Goldberg's attitude toward Lieberman changed after Lieberman announced her pregnancy. (Lieberman Decl. ¶26). Goldberg distanced herself from Lieberman both on cases and personally, and she began to yell at Lieberman more than she had previously. (Lieberman Decl. ¶26-27).

After Goldberg learned Lieberman was pregnant, she stopped paying Lieberman the bonuses she earned and repeatedly refused to discuss the topic with Lieberman, despite Lieberman's attempts. (Lieberman Decl. ¶25-27). Goldberg acknowledged at her deposition that she stopped paying Lieberman her bonus because of her maternity leave, claiming such a decision was part of her "planning." (CG[1] 75, 100, 101, 266; Lieberman Decl. ¶35). Lieberman requested her bonus in November 2019, but did not receive a response from Goldberg. (Lieberman Decl. ¶45, Ex. 7).

Lieberman began her maternity leave in October 2019. (Lieberman Decl. ¶40). In January 2020, while Lieberman was still on maternity leave, Goldberg and Lieberman had a telephone call during which Goldberg told Lieberman that her maternity leave "obviously affected the firm's finances." (Lieberman Decl. ¶47). Goldberg told Lieberman that she could not pay Lieberman her 2019 bonus because Lieberman had taken maternity leave and another male employee had taken

[1] Relevant pages of Lieberman's deposition transcript are referred to herein as "LL __" and relevant pages of Goldberg's deposition transcript are referred to as "CG __." All exhibits are attached to the accompanying Declaration of Brian Heller, Esq.

four weeks of parental leave. (Lieberman Decl. ¶49). Meanwhile, Adam Massey, a male employee who took just six weeks of parental leave in late 2019, had received a bonus in November 2019. (CG 103; LL 230; Lieberman Decl. ¶43, 46).

Lieberman returned to work in early March 2020. (Lieberman Decl. ¶53). Although the pandemic obviously affected everyone, Lieberman saw that things resumed for the firm quite quickly, as the increase in online activity actually led to an increase in cyber-harassment, one of the firm's practice areas. (Lieberman Decl. ¶54-55).

On June 21, 2020, Lieberman again emailed Goldberg and renewed her request for the 2019 bonus she had earned. (Lieberman Decl. ¶57-58; Ex. 7). Goldberg responded on June 30, 2020, saying Lieberman would not receive her bonus because of her maternity leave, writing:

> Having two of my 4 1/2 attorneys (counting A[] is ½ b/c she's still not been admitted and requires an attorney on all matters involving legal advice) out on pregnancy leave for the last months of 2019 and into 2020 was one recent variable impacting the firm's finances…
> (Lieberman Decl. ¶59; Ex. 7, bates 43-44).

Nevertheless, Goldberg's email confirmed Lieberman's value and contribution to the firm, as she wrote, "You work hard and I can always rely on you," and, "Again, you are valuable to the firm. And you deserve every penny you're asking for and more." (Lieberman Decl. ¶64; Ex. 7, bates 45).

Lieberman continued to work and earn bonuses under the firm's policies. (Lieberman Decl. ¶). Lieberman reached out to Goldberg in September 2020 to inquire about her bonus, which remained outstanding from 2019. (Lieberman Decl. ¶67). Goldberg spoke with Lieberman on September 23, 2020, and acknowledged that Lieberman that she was "worth every cent" but that Goldberg wanted to pay a small amount of the $53,410 that was owed and then pay the rest in monthly installments of $1,000. (Lieberman Decl. ¶68). Lieberman asked why she could not

receive her full, outstanding bonus, concerned that such a delay would prevent her from receiving any of the bonus money she would earn in the future. (Lieberman Decl. ¶68). Goldberg responded by again stating that she could not pay the full bonus because Lieberman's maternity leave had caused problems for the firm's finances. (Lieberman Decl. ¶69).

Goldberg became angry at Lieberman for refusing to accept that her maternity leave had had hurt the firm, which was not true. (Lieberman Decl. ¶). Goldberg's hostility towards Lieberman grew and continued through the rest of 2020 and into 2021. (Lieberman Decl. ¶76-78, 90).

Goldberg again demeaned Lieberman for taking maternity leave during a "state of the union" speech in early January 2021, when Goldberg listed "two parental leaves" as a "setback" that the firm "suffered" in 2020, on par with the pandemic and the death of a client, and Goldberg refused to highlight any of Lieberman's accomplishments while praising other staff members. (Lieberman Decl. ¶82-87; Exs. 11, 12).

Lieberman continued to pursue the remainder of the 2019 bonus that was owed to her, which was now almost two years overdue. (Lieberman Decl. ¶94-95). Goldberg finally scheduled a call with Lieberman for March 5, 2021. (Lieberman Decl. ¶95). Goldberg terminated Lieberman's employment on that call. (Lieberman Decl. ¶96). Goldberg's explanation was that Lieberman's "work had been suffering," yet Goldberg had never criticized Lieberman's work and, to the contrary, had only provided positive feedback, including in the weeks leading up to her termination. (Lieberman Decl. ¶97-99). Goldberg acknowledged at her deposition that Lieberman was "shocked" and "surprised" by being terminated. (CG 247).

Months after she was terminated, Lieberman was retained by a sorority for whom she had worked previously. (Lieberman Decl. ¶151-152). Lieberman was engaged to provide information

on how the sorority could navigate issues of sexual misconduct, which was not something she had done during her employment with C.A. Goldberg. (Lieberman Decl. ¶153). C.A. Goldberg had specialized in representing individuals pursing claims under Title IX, which was vastly different than the services the sorority sought. (Lieberman Decl. ¶154-158).

## LEGAL BACKGROUND REGARDING THE NEW YORK CITY & STATE HUMAN RIGHTS LAWS

Lieberman's claims must be analyzed pursuant to the broad outlines of backdrop the New York City and New York State Human Rights Law. The New York City Human Rights Law is intended to be the broadest human rights law in the county. See Morse v. Fidessa Corp., 165 A.D.3d 61, 65 (1st Dept. 2018) (recognizing that the City Council "expressed a very specific vision: a Human Rights Law designed as a law enforcement tool with *no tolerance for discrimination in public life*.") (emphasis in original). In 2016, the New York City Council amended the City Law to identify three decisions "that have correctly understood and analyzed the liberal construction requirement of subdivision (a) of this section and that have developed legal doctrines accordingly that reflect the broad and remedial purposes of this title…" See Administrative Code §130(c). Specifically, the City Council identified: (1) Albunio v. City of New York, 16 N.Y.3d 472, 477-78 (2011), which held that courts must construe the New York City Human Rights Law "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible;" (2) Bennett v. Health Management Systems, Inc., 92 A.D.3d 29 (1st Dept. 2011), which clarified the analysis used to address employment discrimination cases, known as the "Bennett burden-shifting test;" and (3) Williams v. New York City Hous. Auth., 61 A.D.3d 62, 78 n.25 (1st Dept. 2009), leave denied 13 N.Y.3d 702 (2009), which first recognized that the Restoration Act required that "courts be sensitive to the distinctive language, purposes,

and method of analysis required by the City HRL, requiring an analysis more stringent than that called for under either Title VII or the State HRL."

In <u>Morse</u>, the First Department directed that, given the direction of the City Council, "courts must [] play a highly active role in the development of the City HRL by interpreting all cases in a manner consistent with the goal of providing unparalleled strength in deterring and remedying discrimination." <u>Id</u>. at 67; <u>see also</u> <u>Chauca v. Abraham</u>, 2017 30 N.Y.3d 325, 333 (2017) (recognizing that the three cases referenced in the 2016 amendment "illustrate best practices when engaging in the required analysis" and "endorse the legal doctrines where they were developed pursuant to liberal construction analyses.").

Following the August 2019 amendment, the New York State Human Rights Law now mirrors the City Law for claims filed after October 11, 2019. <u>See</u> <u>Golston-Green v. City of N.Y.</u>, 184 A.D.3d 24, 35 n.1 (2d Dept. 2020) (noting that, like the New York City Human Rights Law, "the State Human Rights Law has been amended to also require an independent liberal analysis to accomplish remedial purposes, as well as narrow construction of exceptions and exemptions" and that amendment "only applies to claims filed after the effective date" of August 12, 2019); <u>Bueno v. Eurostars Hotel Co.</u>, 2022 U.S. Dist. LEXIS 4605, at *23-24 (S.D.N.Y. Jan. 7, 2022) (recognizing that following the amendment of the New York State Human Rights Law, the State Law, like the New York City Human Rights Law, requires that "the plaintiff need only show differential treatment — that she is treated 'less well' – because of a discriminatory intent.") (quoting <u>Mihalik v. Credit Agricole Cheuvreux North America</u>, 715 F.3d 102, 110 (2d Cir. 2013).[2]

_____

[2] Defendants inappropriately ignore the amendment to the New York State Human Rights Law, claiming that claims brought under the State Law are "analytically identical" to claims under Title VII. Defendants cite to <u>Xiang v. Eagle Enterprises, LLC</u>, 2022 U.S. Dist. LEXIS 46088, at *36 (S.D.N.Y. Mar. 15, 2022), but ignore that the claims in <u>Xiang</u> were asserted *before* the State Law was amended, so that language is inapplicable to Lieberman's claims.

The First Department has also made clear that having juries decide the merits of discrimination claims, rather than Courts, ensures that the spirit and intent of the City Law is fulfilled. As the Court noted in <u>Bennett</u>, 92 A.D.3d at 38:

> [T]he existence of discrimination – a profound evil that New York City, as a matter of fundamental public policy, seeks to eliminate – demands that the courts' treatment of such claims maximize the ability to ferret out such discrimination, not create room for discriminators to avoid having to answer for their actions before a jury of their peers.

It is also well settled that, on this motion, all of Lieberman's facts must be accepted as true and all inferences drawn in her favor. <u>See</u> <u>Redd v. N.Y. State Div. of Parole</u>, 678 F.3d 166, 174 (2d Cir. 2012) ("Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit."); <u>Kaytor v. Electric Boat Corp.</u>, 609 F.3d 537, 545 (2d Cir. 2010) ("Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit"). A court must also use an analysis most favorable to the plaintiff. <u>See</u> <u>Aulicino v. New York City Dept. of Homeless Servs.</u>, 580 F.3d 73, 83 (2d Cir. 2009) (reversing summary judgment where the analysis of the lower court "dilute[d]" the strength of the plaintiff's claims and did not "appear to us to consider the record evidence *in the light most favorable to the plaintiff*, as it is required to do.") (emphasis in original).

## ARGUMENT

### POINT I

### LIEBERMAN WAS TREATED "LESS WELL" BECAUSE OF HER GENDER

Lieberman's burden under the New York City Human Rights Law is only to show, by a preponderance of the evidence, that she was treated "less well" because of a protected reason. In

Williams, 61 A.D.3d at 78 – which is now part of the text of the City Law (Administrative Code §130(c)[3]) – the First Department identified the straightforward analysis to be used:

> For HRL liability, therefore, the primary issue for a trier of fact in harassment cases, as in other terms-and-conditions cases, is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her gender.

Cited by Mihalik, 715 F.3d at 110 ("To prevail on liability, the plaintiff need only show differential treatment – that she is treated 'less well' – because of a discriminatory intent.").

Lieberman is not required to present direct evidence of discrimination, since "discrimination rarely announces itself, so that generally a discrimination plaintiff must ask the fact-finder to infer the defendant's intent from circumstantial evidence that can be difficult to obtain." Bennett, 92 A.D.3d at 36; Tolbert v. Smith, 790 F.3d 427, 434 (2d. Cir. 2015) ("This Court has repeatedly expressed the need for caution about granting summary judgment to an employer in discrimination cases where, as here, the merits turn on a dispute as to the employer's intent."); Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (recognizing that in discrimination cases, "the defendant will rarely admit to having said or done what is alleged, and third-party witnesses are by no means always available.") (citations omitted); Carlton v. Mystic Transp., Inc., 202 F.3d 129, 135 (2d Cir. 2000) (recognizing that "an employer who discriminates against its employee is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file."); Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) (noting that "employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence" and that an employer "is unlikely to leave a 'smoking gun'" of a discriminatory intent).

---

[3] The entirety of the New York City Human Rights Law can be accessed at
https://www1.nyc.gov/assets/cchr/downloads/pdf/Text_ofthe%20Law_February_2020.pdf

Further, Lieberman is not required to show that her gender was the only reason for Defendants' actions, but only that "discrimination was one of the motivating factors for the defendant's conduct." See Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 127 (1st Dept. 2012); see also University of Texas Southwest Medical Center v. Nassar, 570 U.S. 338, 343 (2013) ("So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision."); Lenzi v. Systemax, Inc., 944 F.3d 97, 108 (2d Cir. 2019) ("An employee need only show that sex was a motivating factor for any employment practice, even though other factors also motivated the practice.").

**A.    Goldberg Openly Expressed Her Animus
Against Lieberman For Taking Maternity Leave**

It cannot be disputed that Goldberg was upset with Lieberman for having taken maternity leave. Each time that Lieberman asked to speak with Goldberg about her compensation and value to the firm, Goldberg referenced how Lieberman's leave had negatively impacted the firm. For example:

- When Lieberman and Goldberg spoke by phone in January 2020 during Lieberman's maternity leave, Goldberg asked for the specific date that Lieberman would be returning to work, telling Lieberman that her leave "has obviously affected the firm's finances and I need to know if I need to hire another attorney." (Lieberman Decl. ¶47; LL 81-85).

- During that January 2020 call, when Lieberman asked Goldberg about her bonus for the first, second and third quarters of 2019, Goldberg responded that she was not going to pay Lieberman a bonus because her maternity leave was impacting the firm's finances. (Lieberman Decl. ¶49; LL 86, 88).

- On June 30, 2020, Goldberg responded to Lieberman's email of nine days earlier and directly stated that Lieberman's maternity leave was at least one of the reasons that

Lieberman would not receive her bonus, writing, "Having two of my 4 1/2 attorneys (counting A[] is ½ b/c she's still not been admitted and requires an attorney on all matters involving legal advice) out on pregnancy leave for the last months of 2019 and into 2020 was one recent variable impacting the firm's finances – our billing capacity which is the sole source of our firm's revenue was hit hard." (Lieberman Decl. ¶59, Ex. 7, bates 43-44).

- During a Zoom call between Lieberman and Goldberg on September 23, 2020, Goldberg again told Lieberman that the reason Lieberman would not receive the full amount of her outstanding and growing bonus was because her maternity leave had caused problems for the firm's finances. (Lieberman Decl. ¶68-69; LL 257).

- On December 17, 2020, in an email to Vanessa Cortez, Goldberg referenced Lieberman's maternity leave when discussing her increasing anger towards Lieberman, stating that Lieberman had not considered the "context" that Goldberg had explained, including "us being down by two attorneys for months." (Lieberman Decl. ¶79, Ex. 9).

- During her "state of the union" presentation on January 5, 2021, Goldberg described "two parental leaves" as one of the "setbacks" that the firm "suffered" and had to recover from in 2020, comparing Lieberman's leave to the death of a client. (Lieberman Decl. ¶83). Goldberg also omitted Lieberman from the list of "thank yous" she gave. (Lieberman Decl. ¶84-85).

- After Goldberg terminated Lieberman, Goldberg texted with Partner Aurore DeCarlo ("DeCarlo"), who was clearly critical of the decision to fire Lieberman, with DeCarlo writing, "It's coming as a big shock. People feeling she was an elemental part of the firm. Second hire etc. And from her perspective it's coming out of nowhere with no warning about issues with clients." (Lieberman Decl. ¶123, Ex. 24, bates CAG 1783). Goldberg responded by *again* referencing Lieberman's maternity leave, complaining that Lieberman "refused to listen to me explaining that we were still recovering from the drop in revenue from having two attorneys out at the same time and then the pandemic immediately happening." (Lieberman Decl. ¶123, Ex. 24, bates CAG 1785).

It was remarkable how many times Goldberg referenced Lieberman's maternity leave. These were only the times that Goldberg *spoke* openly about Lieberman's maternity leave. A jury could find that Goldberg was *thinking* about Lieberman's leave, and the financial impact it caused on the firm, far more frequently. See Rollins v. Fencers Club, Inc., 128 A.D.3d 401, 402 (1st Dept. 2015) (denying summary judgment and finding "that when plaintiff's testimony is credited for purposes of this motion, these remarks directly reflect age-based discriminatory bias on Cross's part and raise an inference of age-related bias sufficient to make out plaintiff's prima facie case of employment discrimination."); see, e.g. Ostrowski v. Atlantic Mut. Ins. Cos., 968 F.2d 171, 181 (2d Cir. 1992) (reversing summary judgment in an employment discrimination case and noting, "'Direct evidence,' it seems, is an unfortunate choice of terminology for the sort of proof needed to establish a 'mixed-motives' case.").

Goldberg publicly blaming "two parental leaves" as one of the "setbacks" that the firm "suffered" in 2020 during her "State of the Union" presentation on January 5, 2021 is particularly blatant. Lieberman's colleagues contemporaneously recognized Goldberg's discriminatory animus in a group text thread called "Bob Loblaw's Law Blog" (a reference to a fictional attorney on the television show "Arrested Development"). (Lieberman Decl. ¶85, Ex. 11). One employee confirmed that Goldberg compared Lieberman's leave to the death of a client ("I like that it [Goldberg's reference to Lieberman's maternity leave] was adjacent to client's unexpected death."). (Ex. 11, bates CAG 593). This thread also confirms that Lieberman was omitted from the "thank yous." (Ex. 11, bates CAG 602).

After the presentation, Seifullah wrote to Lieberman over text: "I'm really sorry about Carrie [Goldberg]'s parental leave comments and also leaving you out of the 'thank yous." (Ex. 12; LL 95). Seifullah recognized that Goldberg's comments about her maternity leave expressed

a discriminatory animus, writing, "So stupid. Her best friend is a pregnancy and motherhood discrimination attorney. Like um hellooooo." (Ex. 12). It is simply not credible for Defendants to dispute that Goldberg openly blamed the firm's finances on Lieberman's maternity leave, particularly when the very same witnesses that Defendants rely upon recognized it at the time.

In any event, Defendants' alternative interpretation of Goldberg's statements at the "State of the Union" presentation is of no consequence on summary judgment and should be ignored. See Sassaman v. Gamache, 566 F.3d 307, 313 (2d Cir. 2009) (noting that whether "plaintiff's interpretation or that of defendants best captures the meaning of Gamache's statement is not properly decided by this Court, or by the District Court, on a motion for summary judgment ... The choice between plausible interpretations of Gamache's remarks is a question of fact to be resolved by a jury."); Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998) (holding that a defendant's efforts to suggest "alternative, nondiscriminatory interpretations" of its references to youth "are arguments more properly addressed to the jury than to this Court.").

Goldberg's statements were not "stray remarks," as Defendants claim, but a window into how Goldberg viewed Lieberman's maternity leave as a threat to the firm – and how furious Goldberg was that Lieberman refused to acknowledge how her leave had purportedly harmed the firm. See Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 116 (2d Cir. 2007) (vacating summary judgment and noting, "we do not understand why the district court characterized [the supervisor's] remarks as stray" and that "it is our obligation at this stage to interpret ambiguities in the evidence in the light most favorable to the plaintiff."); Shandrew v. Quest Diagnostics, Inc., 819 F.Supp.2d 181, 190 (W.D.N.Y. 2011) (holding that a supervisor's comments regarding the plaintiff's cancer, "if true, were not 'stray' remarks that are inconsequential to Plaintiff's

discrimination claim. Rather, they are comments, which directly related to her cancer treatment, evince a discriminatory state of mind and are probative of a discriminatory pretext.").

Goldberg's other actions show her discriminatory animus at Lieberman for becoming pregnant. For example, Goldberg responded coldly to Lieberman announcing her pregnancy in May 2019, stating, "We already know," in a hostile and accusatory tone. (Lieberman Decl. ¶24). Goldberg, thereafter, distanced herself from Lieberman, both on cases and personally. (Lieberman Decl. ¶26). Goldberg had always been a difficult boss who would yell, but she began to yell at and criticize Lieberman far more frequently than she had, and did so in front of Lieberman's colleagues. (Lieberman Decl. ¶26). Partner Aurore DeCarlo assured Lieberman during her pregnancy that she was valuable to the firm and that was why Goldberg was "freaking out" in regard to her upcoming maternity leave. (Lieberman Decl. ¶27; LL 33-35). This record permits a jury to find that Goldberg held a discriminatory animus.

**B.      Goldberg Refused to Pay Lieberman Her
         Earned Bonus Because Of Her Maternity Leave**

Goldberg's deposition testimony confirms that she withheld paying Lieberman a bonus because of her maternity leave. As a matter of law, a jury could find that decision to be discriminatory.

*1.      Goldberg Acknowledges That She Reduced Lieberman's
         Compensation Because She Took Maternity Leave*

It cannot reasonably be disputed that Goldberg considered Lieberman's maternity leave when she decided not to pay Lieberman her bonus. Goldberg testified that, after Lieberman announced her pregnancy in May 2019, Goldberg undertook "planning" that consisted of not paying Lieberman any of the bonuses she earned in 2019. (CG 75). Goldberg also concedes that the "budgetary considerations" that motivated her to withhold Lieberman's 2019 bonus included

Lieberman's maternity leave. (CG 75, 100, 266) (CG 101: "Q. Did you withhold paying Lindsay a 2019 bonus because she was going to go out on maternity leave? A. No. It had nothing to do with her going out on – it wasn't related to her being on maternity leave. *It was related to the budgetary considerations from having two attorneys on leave at the same time*.").[4] The fact that Goldberg admits that she considered Lieberman's maternity leave when deciding whether or not to pay her a bonus confirms that Lieberman's maternity leave impacted the terms and conditions of her employment.

Defendants' seek to distract from this clear admission by playing word games, claiming that Lieberman's maternity leave can somehow be divorced from her gender. The fact remains that Lieberman's leave *was* because of her gender and *was* protected under New York Law.

Similarly, Defendants try to concoct a difference between "pregnancy" and "motherhood" discrimination. These semantics are irrelevant, as the law protects an employee because of their "gender," and Lieberman's pregnancy and maternity leave both related to her gender. See Williams, 61 A.D.3d 62, 75 (recognizing that the City Law cannot be parsed into different sections, but rather "there is only the provision of the law that proscribes imposing different terms, conditions and privileges of employment based, inter alia, on gender.").

Defendants' argument boils down to a claim that Goldberg was entitled to consider Lieberman's maternity leave as part of her "business decision" in whether to pay Lieberman the bonus she had earned. While Goldberg is certainly entitled to make any business decisions she wants, she may not base those decisions on Lieberman's protected maternity leave. Defendants'

---

[4] Goldberg's repeated reference having "two attorneys out at the same time" is a red herring, as the overlap of Lieberman and Massey taking parental leave at the same time was just six weeks. Furthermore, Massey, a man, took only took six weeks of parental leave, so that the harm Goldberg referred to clearly came from Lieberman's leave. (Lieberman Decl. ¶42, 50, 79, 86; Ex. 11, bates CAG 597).

argument is an admission that Lieberman's gender was a motivating factor in decisions regarding her compensation, so that summary judgment is wholly improper. <u>See</u> <u>Redd</u>, 678 F.3d at 174 ("Summary judgment is inappropriate when the admissible materials in the record 'make it arguable' that the claim has merit.").

2. *Whether Or Not Lieberman's Bonus*
   *Was "Discretionary" Is Irrelevant*

As a matter of law, Goldberg may not claim that she was permitted to deny Lieberman her bonus because it was "discretionary." The Second Circuit specifically rejected that argument in <u>Davis v. New York City Department of Education</u>, 804 F.3d 231, 235-236 (2d Cir. 2015), holding:

> The fact that the employer has the discretion whether to grant bonuses or raises does not support the conclusion that an employer may freely allocate them on the basis of […] discrimination. We do not agree that an employer's discretion to withhold or reduce a bonus entitles the employer to allocate the bonus on the basis of prohibited discrimination.

The court noted that discretion cannot be a defense, since "most aspects of [an employee's] conditions of employment are within the employer's discretion." <u>Id</u>. at 236.

Accordingly, Goldberg's may not cite her "discretion" as a defense for denying Lieberman a bonus because she took maternity leave. <u>See also</u> <u>Angioletti v. Foxx</u>, 2016 U.S. Dist. LEXIS 123700, at *4-5 (E.D.N.Y. Sep. 12, 2016) (denying summary judgment where the plaintiff alleged that a hiring policy "was discretionary and its use in this particular instance was a pretext for discrimination against plaintiff based on her age and/or gender.").

In any event, the record confirms that the bonuses C.A. Goldberg offered were not discretionary. They were not unexpected bonuses dispensed pursuant to Goldberg's sole determination. Rather, Lieberman was entitled to a bonus based on a formula that was designed to incentivize Lieberman and supplement her lower base salary. (Lieberman Decl. ¶10; Ex. 4).

Goldberg herself knew that she could not just abandon the bonus structure she put in place, as she never considered just telling Lieberman that she was not going to get a bonus because of financial conditions. (CG 138, 152). A fact-finder could determine that these bonuses were *not* discretionary, but were a key part of employee compensation.

C.     **Lieberman's Termination Was Directly Related To Her Maternity Leave**

Defendants improperly argue that Lieberman's pregnancy could not have played a role in her termination because it took place one year after Lieberman returned from maternity leave. The fact is, there is a direct link between Lieberman announcing her pregnancy in May 2019 and her termination in March 2021. Throughout that period, Goldberg repeatedly referenced Lieberman's maternity leave whenever she explained why Lieberman would not receive her bonus or the "struggles" that the firm faced in 2020. The fact that Goldberg kept bringing up Lieberman's maternity leave – even after she terminated Lieberman – connects Lieberman's maternity leave and her termination. See Bennett, 92 A.D.3d at 43 ("It is often the case that the dispute involves not a single, easily isolated incident, but rather an ongoing relationship that has context and nuance.").

Defendants argue that Goldberg did not discriminate against Lieberman because she did not take any action when Associate Adam Massey ("Massey") told her about Lieberman's pregnancy, which was before Lieberman formally announced it. A jury, however, could find that Goldberg did not take Massey's second-hand knowledge about Lieberman's pregnancy seriously, which was something that Massey said Goldberg had been "dreading." (Ex. 11, bates CAG 597)). Goldberg did not even remember Massey communicating this to her until Lieberman's deposition. (CG 68-69). Rather, it was only when Lieberman herself told Goldberg about her pregnancy, which was far along by then, that Goldberg took it seriously. It was then that Goldberg "plann[ed]" for

Lieberman's maternity leave by deciding to not to pay Lieberman the bonus she had earned. (CG 75, 100, 266). Defendants' characterize this decision as "budgetary considerations" (GG 101), but a jury could find that same decision to be discrimination.

This case is unlike Lulo v. OTG Management, LLC, 2022 U.S. Dist. LEXIS 24298, at *24 (S.D.N.Y. Feb. 10, 2022), which Defendants cite, where the plaintiff had nothing to connect her termination during a reduction-in-force to her pregnancy earlier that year, and the record was devoid of any evidence of a discriminatory animus, including a lack of "references to her pregnancy." In this case, unlike in Lulo, Goldberg repeatedly made references to Lieberman's pregnancy and resulting maternity leave, confirming the connection between them.

A jury could also find that Goldberg wanted to terminate Lieberman before she became pregnant with a second child. Lieberman was 36 years old and her daughter was 18 months old, so it would be natural for Lieberman's co-workers to speculate about whether she would have another child. Goldberg's claim that she never once thought about whether Lieberman would take a second maternity leave is simply not credible, particularly when she claims Lieberman's first maternity leave caused such a devastating impact on the firm. (CG 85)

The fact is, the record demonstrates that Goldberg had been speculating about Lieberman for years. In the group text thread during the "State of the Union" presentation, Massey, who is incredibly close to Goldberg, noted, "I think she [Goldberg] just really was dreading it happening for a long time and then it happened." (Ex. 11, bates CAG 597). Massey would not have known that Goldberg was "dreading" Lieberman's maternity leave "for a long time" if they had never spoken about it. Additionally, a co-worker named Carla Cain-Walther told Lieberman that right after she got married, she heard Goldberg and Massey talking about when Lieberman was going

to get pregnant in a demeaning way, and that it was a topic of conversation at the firm. (LL 106-107). What Goldberg was thinking can only be determined by a jury.

D.     **Defendants Cannot Satisfy The *Williams* Affirmative Defense**

The only way that Defendants can obtain summary judgment is by proving a narrow affirmative defense that what Lieberman complains of "consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" 61 A.D.3d at 79-80. In Williams, the court clarified that this affirmative defense was intended to "narrowly target concerns about truly insubstantial cases," which this case certainly rises above. Id.; see also Bennett, 92 A.D.3d at 44 n.16 ("As with Williams, it is our intention that a limited and narrow exception is not intended to be simply the new means by which an old status quo is continued.").

In this case, Lieberman repeatedly being denied her bonus because she took maternity leave, being publicly demeaned for having harmed the firm, and ultimately being fired clearly rise above claims that are "petty" or "trivial." Defendants cannot satisfy the Williams affirmative defense.

Defendants cherry pick one allegation, that Goldberg stopped speaking with Lieberman after she announced her pregnancy, as "petty and trivial," as if that was the entirety of Lieberman's claim. (Defendants' Brief pg. 41). It is improper for Defendants to isolate one small aspect of the extensive fact pattern in the record and then distort that to constitute Lieberman's entire claim.

## POINT II

### DEFENDANTS' ARGUMENTS ARE A
### PRETEXT FOR GENDER DISCRIMINATION

Defendants fail to set forth a legitimate explanation that is not a pretext for discrimination. The sheer falsity of Defendants' purported explanations are sufficient to preclude summary judgment. As the First Department held in <u>Bennett</u>:

> Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to coverup the alleged discriminatory conduct, or an improper discriminatory motive co-existing with other legitimate reasons. These will be jury questions except in the most extreme and unusual circumstances. 92 A.D.3d at 43.

<u>See also</u> <u>Summa v. Hofstra Univ.</u>, 708 F.3d 115, 129 (2d Cir. 2013) (recognizing that even under the stricter federal standard, "it is settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.") (citations omitted).

### A. Defendants Have Not Proven That Goldberg's Refusal To Pay Lieberman's Bonus Was Motivated Solely By Financial Considerations

The crux of Defendants' argument is that the firm did not have the funds to pay Lieberman's bonus. Revealingly, Defendants have refused to back up their claims that the firm was suffering financially. For example, Goldberg cited the fact that she applied for PPP loans as proof that the firm had a difficult year in 2020, but then refused to provide relevant documents during discovery. (CG 172-173). The only evidence that Defendants have to support their financial hardship argument is Goldberg's uncorroborated testimony. Defendants should not be permitted to seek judgment as a matter of law when it refuses to corroborate its own argument.

The record permits a jury to reject Goldberg's self-serving and unsupported claim of financial hardship as a pretext. Lieberman's own experiences demonstrated that things were going relatively well for the firm in 2020, as the firm continued to generate income and Lieberman was still billing a significant number of hours. (Lieberman Decl. ¶54, 73, 112). Goldberg's "State of the Union" PowerPoint presentation similarly paints a positive picture of the firm in 2020, noting that the firm had over $1 million in settlements; 2,948 hours of work; a record of new retainers that was achieved in August 2020; 159 new cases, which was 31 more than in 2019; 11% high retainers for new cases, totaling $767,000; top two highest months for new cases; and a sales team that hit their goal all four quarters for the first time ever. (Lieberman Decl. ¶115, Ex. 15).

The financial information that the Court ordered Defendants to provide raises further questions about the believability of Goldberg's claims. (Ex. 16). For example, the firm's income during the time that Lieberman was on maternity leave in early 2020 was relatively stable, as the firm earned $190,112.34 in January 2020, $176,194.41 in February 2020 and $169,179.12 in March 2020. The pandemic that started in March 2020 did not initially appear to have a significant impact on the firm, as the firm received $122,201.20 in April 2020 and $140,607.73 in May 2020. Lieberman's request for a bonus in June 2020, therefore, followed a relatively positive month. While the numbers that Defendants were forced to produce showed a dip in July 2020 of $88,717.35, the firm had a very strong fall 2020, with revenues of $144,923.96 in September 2020, $213,810.56 in October 2020 and $356,637.30 in December 2020. Goldberg's claim that the firm's "earning capacity dropp[ed] significantly during the pandemic" (Ex. 9) is simply not true.

There are other facts that raise questions about the believability of Defendants' financial defense. For example, Goldberg was financially stable enough to purchase a home for herself in the summer of 2020. (CG 93). Goldberg claimed to have liquidated the staff bonus account to pay

Lieberman a bonus in late 2021, but she also paid DeCarlo and Massey bonuses at the same time. (CG 169, 265; Lieberman Decl. ¶74). It was only when it came to paying Lieberman's bonus that the firm was struggling, permitting a jury to find that Goldberg's refusal to pay Lieberman her bonus was motivated by discrimination. See Joy v. Kinplex Corp., 2008 U.S. Dist. LEXIS 36977, at *24 (E.D.N.Y. May 6, 2008) ("Drawing all reasonable inferences in plaintiff's favor, in the context of the entire record, a reasonable jury could conclude that the 'undue hardship' justification was pretextual."); Ji Sun Jennifer Kim v. Goldberg, Weprin, Finkel, Goldstein, LLP, 120 A.D.3d 18, 25-26 (1st Dept. 2014) finding triable issues of fact on whether the defendant's claim of workforce reduction was pretextual where the plaintiff testified that she was "busier than ever" and there was a record number of new applications).

**B.      Lieberman Need Not Compare Herself To Others**

Defendants argue that Goldberg could not have had a discriminatory animus against Lieberman because she is so incredibly generous to her employees. Defendants attach Declarations from her current employees praising Goldberg. Even if such obviously manufactured statements were true, they are irrelevant in determining how Lieberman was treated.

It is black letter law that while Lieberman is permitted to prove her claim by comparing herself to others, she is not required to do so. In fact, the New York State Human Rights Law specifically states: "Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared." Executive Law §296(1)(h). Lieberman need only show that *her* pregnancy played a role in her employment. See O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*.") (emphasis in original); Leibowitz v. Cornell

University, 584 F.3d 487, 502 n.5 (2d Cir. 2009) (holding that requiring the plaintiff to show she was replaced by someone outside of the protected class was "inappropriate and at odds with the policies underlying Title VII.").

In any event, the record shows that C.A. Goldberg did not have any employees that were comparable to Lieberman. The only employee who took parental leave during Lieberman's employment was Massey, a man, who took just six weeks of parental leave. (Lieberman Decl. ¶41-42). Massey received a bonus when he had a child in November 2019, even though Goldberg's "budgetary considerations" prevented Lieberman from receiving a bonus at the same time. (Lieberman Decl. ¶43; CG 103; LL 230). Massey was ultimately promoted to Partner after Lieberman was fired, confirming that she was treated less well than a man who took parental leave. (LL 26).

The other employees that Goldberg hired were either in their early 20s, single and not looking to start a family or they were in their late 30s and early 40s, and were not planning to have children. (Lieberman Dec. ¶104-109). For example, Aurore DeCarlo, Ann Seifullah and Carrie Zoubul were older with established families. (Lieberman Dec. ¶106). Lieberman, a recently married woman in her mid-30s, was simply at a different place in her life than her colleagues.

## C.    Defendants' Attack On Lieberman's Performance Is A Pretext

Defendants' attacks on Lieberman's performance are contradicted by the record.

### 1.    *Lieberman Consistently Received Positive Feedback*

Lieberman only received positive feedback from Goldberg during her employment. Goldberg told a client on September 23, 2020, after assigning Lieberman to her case, "I put my best lawyer on the case, Lindsay." (Ex. 1; LL 254, 260). Goldberg complimented Lieberman on her work on that case days later, writing, "Sounds like you are doing an excellent job, Lindsay."

(Ex. 13; LL 260). Goldberg also commented in meetings that Lieberman was "so good" and "the best" at handling certain difficult clients and personalities. (LL 254). At one point after assigning Lieberman a particularly difficult client, Goldberg said, "If you can't handle this client, no one can." (Lieberman Decl. ¶93). While telling Lieberman on June 30, 2020 that she would not receive a bonus because of her maternity leave, Goldberg wrote, "You work hard and I can always rely on you," and, "Again, you are valuable to the firm. And you deserve every penny you're asking for and more." (Lieberman Decl. ¶64; Ex. 7, bates 45). Goldberg even sent Lieberman positive feedback on an assignment just two days before she was fired. (Ex. 14; LL 254, 260). See Smith v. Tuckahoe Union, 2009 U.S. Dist. LEXIS 91106, at *22 (S.D.N.Y. Sept. 30, 2009) (denying summary judgment because "[a]lthough Defendants have offered many complaints about [plaintiff's] job performance, …[plaintiff] offered admissible evidence creating material issues of fact as to his alleged poor performance.").

The first time that Goldberg spoke with Lieberman about her allegedly poor performance was when she was terminating her on March 5, 2021, telling Lieberman that her "work had been suffering." (Lieberman Decl. ¶98). When Lieberman asked when her work had started suffering, Goldberg responded since March 2020 – the exact time that Lieberman had returned from maternity leave. (Lieberman Decl. ¶98). See Back v. Hastings On Hudson Union Free School District, 365 F.3d 107, 125 (2d Cir. 2004) (holding that "the sudden decline in performance evaluations that occurred between the beginning and end of Back's third year – that is, only after the alleged discriminatory comments began – support a conclusion of pretext.").

Furthermore, Goldberg did not want to immediately remove Lieberman, but wanted to "transition" Lieberman into a different type of role working for the firm. Goldberg's willingness to continue working with Lieberman after firing her undercuts her claim that Lieberman's

performance was so atrocious that she had to be fired. See Graciani v. Patients Med., P.C., 2015 U.S. Dist. LEXIS 117155, at *39 (E.D.N.Y. Sep. 1, 2015) ("That Defendants were willing to re-hire Plaintiff at some point in the future could be viewed by a jury as probative evidence that Defendants' justification that Plaintiff performed poorly is pretextual.").

The fact is, Goldberg's views of Lieberman's performance were tainted by her discriminatory animus. A jury is permitted to reject Goldberg's criticisms of Lieberman as pretext. See Ibok v. Securities Indus. Automation Corp., 369 Fed. Appx. 210, 214 (2d Cir. 2010) (reversing summary judgment where the defendants did not retain the plaintiff because of his disciplinary record, since "much of this record is potentially tainted by retaliatory animus."); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 108 (2d Cir. 2010) (reversing summary judgment where the person "accused of being responsible for much of the discrimination" conducted the negative evaluation); Mate v. New York State Dept. of Transp., 24 A.D.3d 330, 332 (1st Dept. 2005) (denying summary judgment because "there are credibility issues concerning the validity of [plaintiff's] evaluations since the supervisor responsible for the evaluations is the same person who allegedly mistreated plaintiff").

2.    *The Contemporaneous Statements Of Lieberman's*
      *Co-Workers Refute Defendants' Claim Of Poor Performance*

The fact that Lieberman's colleagues were effusive in their support of Lieberman following her termination also refutes Defendants' claim of poor performance. The group text thread from that day shows how devastated Lieberman's colleagues were by her termination, as well as how upset they were with Goldberg. (Ex. 17). For example:

- Zoubul texted Lieberman the following day and said, among other things, "I think you will be 100% better off, but it's so incredibly not ok," "it's a message that she is not in fact human" and, "It's not even a good decision for the firm. It's

not thought through. It can't be." (Ex. 18; Lieberman Decl. ¶120).

- Seifullah texted Lieberman (Ex. 19) and left an incredibly support voicemail that stated, "I just think you're wonderful," "I think you're so good at your job and I learned so much from you," "I can't imagine surviving this job without you" and started to cry. (Ex. 20).

- Almna Khalid texted, "What the fuck?? You're one of the best attorneys at work and you're always on top of everything," and "I'm in shock that she would do this." (Ex. 21).

- DeCarlo texted that Lieberman would "be better off" for being terminated and "we miss you so much already." (Ex. 23).

- DeCarlo even told Goldberg about how the decision to terminate negatively impacted the firm, writing to Goldberg over text, "It's coming as a big shock. People feeling she was an elemental part of the firm. Second hire etc. And from her perspective it's coming out of nowhere with no warning about issues with clients." (Ex. 24, bates CAG 1783; CG 261-262). **Goldberg responded to DeCarlo by *again* referencing Lieberman's maternity leave, complaining about "having two attorneys out at the same time…"** (Ex. 24, bates CAG 1785).

- Deborah Shapiro was supportive, emailing Lieberman that she hoped that Lieberman leaving was her choice and that, "It has been both my pleasure and privilege to work with you and I do hope we can stay in touch." (Ex. 25).

On its motion, Defendants try to re-write history, submitting Declarations from Lieberman's colleagues that are entirely inconsistent with the contemporaneous records. Of particular note is the Declaration of Seifullah, who left the supportive voicemail stating, among other things, "please know that I like hold you in the highest regard and I'm shocked and I just kind feel like reality hasn't really set in." (Ex. 20). Seifullah's comments in her Declaration that she *now* realizes that Lieberman "created a toxic work environment for the team" are in stark

contrast to what she said at the time. (¶10). A jury will have to determine whether Seifullah's sudden about-face is genuine, or if she is merely signing the document her employer presented to her. See Kia Song Tang v. Glocap Search LLC, 2015 U.S. Dist. LEXIS 37342, at *12 (S.D.N.Y. Mar. 24, 2015) ("It is well established, however, that a genuine issue of fact ... is not disposed of simply by the submission of a self-serving affidavit.") (citation omitted).

### 3. *Lieberman Was Not Fired Because Of Client Complaints*

Defendants' claim that Lieberman was terminated because of client complaints is not credible. Goldberg told Lieberman on numerous occasions that she specifically assigned her difficult clients because she knew that Lieberman was skilled at handling difficult people. (LL 101). In fact, Goldberg was assigning Lieberman "red-flag" clients during the same time period she claims to have lost faith in her. On January 11, 2021 – less than two months before Lieberman was terminated – Goldberg assigned Lieberman a client that she described as "anxious" and needed expectations set. (Ex. 28; CG 233). Goldberg even assigned Lieberman one case where she herself could not deal with the clients, and those clients ultimately left the firm. (LL 103-104).

Revealingly, Goldberg never spoke to Lieberman about concerns regarding how she handled clients. (LL 100; CG 214, 233-234). Goldberg assumes that Lieberman should have known" there were issues (CG 162), but, Goldberg always had Lieberman's back with clients. (CG 225; LL 101-102). See Ortiz v. Gazes, LLC, 2017 N.Y. Misc. LEXIS 4221, at *17 (Sup. Ct. N.Y. Cty. Oct. 30, 2017) (denying summary judgment where defendants claimed they terminated plaintiff due to attendance issues, though "defendants' acknowledge that they did not address attendance issues with plaintiff while she was an employee.").

The reality is that C.A. Goldberg's practice dealt with emotional and potentially volatile clients, who could be set off by the firms' hourly billing model. The firm represents individuals

who are going through a traumatic time in their lives, many of whom feel the system has already failed them and believe it is unfair that they have to pay a lawyer to correct those issues. (CG 209-210; LL 100). Almost all of the difficulties that the firm had with clients involved billing.

Goldberg's contemporaneous conduct shows that she did not fault Lieberman for difficult clients. For example:

- When she spoke to Lieberman about transferring a client to Massey in the fall of 2020, she recognized that the client was aggressive and abusive towards Lieberman and asked if she was okay with transferring the client. (LL 102-103).

- After Lieberman received an email from a client who complained after the firm sent her an invoice, Goldberg responded to Lieberman on September 9, 20202, "How bizarre. Wasn't SHE insisting on a bill?!?!" (Ex. 27).

- Goldberg wrote to DeCarlo in December 2020 that the "imploding" cases that Lieberman had were "[d]ifficult clients to begin with." (Ex. 24, bates CAG 1773; CG 256-257).

- Goldberg could be volatile herself with clients, as confirmed in an email she sent to Lieberman on December 14, 2020, where she wrote about a problem client, "I fired them as clients yesterday." (Ex. 29).

- Goldberg sent an email on September 9, 2020 conceding that she had signed up a case that had "red flags written all over this that I'm ignoring," and stating that the firm needs to "resist the PNCs [potential new clients] that we know right off the bat are problems." (Ex. 34). This was in response to one particular client who Goldberg acknowledged was "paranoid" about Lieberman for no reason.

- The minimum number of clients that the sales team had to sign up, along with a bonus for exceeding those minimums, caused certain sales employees to promise more than they could deliver, as confirmed by one intake employee promising a prospective employee that the firm would "pursue a criminal case in Latvia," which Goldberg acknowledged was not appropriate. (Ex. 33; CG 229).

Unreasonable clients were unfortunately part of the practice. (Lieberman Decl. ¶138). Some clients could be grateful one week and then accusatory the next. (Lieberman Decl. ¶138). In the "Bob Loblaw's Law Blog" thread, an employee wrote that one client would be "a nothing burger" and that "client relationship implosion guaranteed," confirming that it was common knowledge that, at that time, certain client relations were retained knowing that they would create challenges for the firm. (Ex. 11, bates CAG 601). Goldberg trusted Lieberman to handle the most difficult clients, making it not surprising that Lieberman found herself with difficult clients.

Defendants claim that the firm had to reimburse clients because of Lieberman, but they do not provide any support for that claim. In one of the handful of examples that Defendants cite (Defendants Ex. 44), the firm reimbursed the time of a different employee, Amna, not Lieberman (Ex. 35). Notably, that email shows that Goldberg was not at all critical of Lieberman or her handling of that difficult client, who at one point had sent Lieberman threatening texts and then was appreciative of her work. (Lieberman Decl. ¶142).

In any event, there were not many cases that had client issues. As Goldberg made clear at her deposition, "The majority of our clients are very happy with the services we provide, so we're talking about a very small sample size of our cases." (CG 220). In their motion, Defendants refer to only three clients that "imploded," MicGre, PegSha and AshSmi. (Decl. of Norma Buster ¶22). The fact that Goldberg did not want to immediately remove Lieberman, but rather sought to "transition" Lieberman and have her continue represent clients, also raises questions about the believability of Goldberg's claims. A jury could find that Goldberg exaggerated Lieberman's issues with clients as a pretext.

### 4. Defendants' Audit Of "Imploding" Cases Confirms
### That Lieberman Was Not The Cause Of Client Issues

Contrary to Defendants' effort to blame Lieberman for all the issues the firm had with clients, the reality was that, in late 2020, Goldberg recognized a much larger issue with difficult clients and sought to address it. On January 6, 2021, Goldberg sent an email stating that the firm would undertake an audit of "imploding clients" and search for ways to avoid problems in the future. (Ex. 36; Goldberg 231).

The results of this audit confirm that the firm's issues with clients went to the methods the firm used to evaluate and retain new clients. Defendants produced an undated PowerPoint containing the conclusions of the audit (Ex. 37), which refutes Defendants' claim that Lieberman was solely to blame for deteriorating client relationships. For example:

- Of the 16 "imploding" cases that the audit identified, only five were attributed to Lieberman; four to Goldberg; another four to DeCarlo; and three were to Massey. (Ex. 37, bates CAG 2460). Lieberman only had one more "imploding" case than Goldberg. (CG 251).

- The audit states that one client became "paranoid" that the prosecutor's office decided not to prosecute a perpetrator because Lieberman had worked as a District Attorney, something that Goldberg recognized was not Lieberman's fault. (Ex. 37, bates 2445; CG 225).

- The audit confirms that many attorneys, including Goldberg, had difficulties with clients. Defendants tout that Goldberg represented a victim of Harvey Weinstein, but the audit notes that the client "dumped" Goldberg and was then represented by Gloria Allred. (Ex. 37, bates CAG 2451).

- The firm refunded an entire fee to a client handled by DeCarlo. (Ex. 37, bates CAG 2447).

- Goldberg noted that, for one client who would only communicate via a PO Box she would check once a week, Goldberg "sent a harsh email in response to this absurdity. And she fired us as I expected." (Ex. 37, bates CAG 2452).

- For all of Defendants' talk about returning money to clients because of Lieberman, the audit report shows that the firm billed $182,452.75 on these imploding clients and lost only $12,352.25. (Ex. 37, bates CAG 2462).

- The report also detailed steps on how to improve procedures moving forward, meaning that Goldberg did not think that simply firing Lieberman would solve the problem of imploding clients. (Ex. 37, bates 2465-67).

Defendants' effort to blame Lieberman for a complaint that two former clients lodged with the Brooklyn Bar association is patently improper. First of all, the former clients' complaints did not even mention Lieberman, but were directed against a prior attorney who handled their case. (CG 208-209; Ex 38). Additionally, Defendants have vigorously defended the firm's actions in the lawsuit and noted that the complaint came two years after the firm withdrew from handling that case. Goldberg's speculation in her Declaration that she "likely will have to reimburse an additional $17,310.22" to those clients has no support, and proves how Goldberg twists the facts to fabricate performance complaints about Lieberman. (¶113).

## D. <u>Defendants' Other Baseless Arguments</u>

Defendants present a number of arguments that, as a matter of law, have no merit.

### 1. *Lieberman's Testimony Cannot Be Ignored Simply Because She Is The Plaintiff*

Defendants inappropriately ask the Court to ignore Lieberman's testimony as "self-serving and supported only by her own deposition testimony." (Defendants' Brief pg. 41). This request is patently improper, as Lieberman's testimony cannot be ignored simply because she is the Plaintiff. See <u>Martinez v. City of N.Y.</u>, 684 Fed. Appx. 90, 92 (2d Cir. 2017) (vacating summary judgment where the lower court refused to credit the plaintiff's deposition testimony and affidavit "in the absence of 'independent corroboration,'" noting, "Our precedent is to the contrary."); <u>Danzer v. Norden Sys. Inc.</u>, 151 F.3d 50, 57 (2d Cir. 1998) ("To hold, as defendants ask us to do, that the

nonmovant's allegations of fact are (because self-serving) insufficient to fend off summary judgment would be to thrust the courts – at an inappropriate stage – into an adjudication of the merits. Such a radical change in the court's role would be inappropriate not just in the discrimination context, but everywhere.") (cited by Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 79-80 (2d Cir. 2016) (reversing summary judgment and holding that the lower court's rejection of evidence of a discriminatory statement "because the only evidence it was made is plaintiff's self-serving testimony ... further compounded the error.").

2. *Defendants' Actions Are Not Immune As "Business Decisions"*

Defendants cannot insulate Goldberg's discriminatory decisions by cloaking them as "business decisions." See Weiss v. JPMorgan Chase & Co., 332 Fed. Appx. 659, 663 (2d Cir. 2009) ("An employer's invocation of the business judgment rule does not insulate its decisions from all scrutiny in a discrimination case."); Crisses v. Gucci Am., Inc., 2012 U.S. Dist. LEXIS 120164, at *30 (S.D.N.Y. Aug. 21, 2012) (recognizing that a court, "to ensure that the business decision was not discriminatory, is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith."); Windham v. Time Warner, Inc., 275 F.3d 179, 190 (2d Cir. 2001) (vacating the grant of summary judgment where the lower court "failed to understand plaintiffs' argument," as plaintiffs did not allege that they were terminated "as merely a bad decision."); Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 105 (2d Cir. 2001) (noting that the business judgment rule "does not protect the employer against attacks on its credibility."); Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1110 (8th Cir. 1994) ("The materially conflicting evidence in this case, however, raises a question of fact as to the *believability*, not the propriety, of [defendant's] purported reasons for discharging [plaintiff].") (emphasis in original).

3. *The Same Actor Inference Does Not Apply*

Defendants make the bizarre argument that because Goldberg hired Lieberman in 2016, should could not have developed a discriminatory animus once Lieberman became pregnant years later in 2019. As a matter of law, the fact that Goldberg hired Lieberman does not prevent her from developing a discriminatory animus in the future. See Farmer v. Shake Shack Enters., LLC, 473 F. Supp. 3d 309, 329 n.6 (S.D.N.Y. 2020) ("The same-actor doctrine has no bearing on Farmer's pregnancy discrimination claims, because, on the facts pled, Cordova was unaware at the time he hired Farmer that she was pregnant."); Kia Song Tang, 2015 U.S. Dist. LEXIS 37342, at *11 ("But Plaintiff was not pregnant when she was hired or promoted, so the 'same actor doctrine' would not prevent a reasonable trier of fact from inferring that discrimination occurred."); MacDuff v. Simon Mgmt. Assocs. II, LLC, 2022 U.S. Dist. LEXIS 59505, at *20 n.6 (D. Conn. Mar. 31, 2022) (holding that the same actor inference does not apply in a disability case where the perpetrator did not know of the plaintiff's disability until "approximately eight months after plaintiff was hired.").

Lieberman's pregnancy was an intervening act that renders any the same actor inference inapplicable. See Tirschwell v. Tcw Grp., 194 A.D.3d 665, 666 (1st Dept. 2021) (rejecting the same actor inference where "a jury could reasonably conclude that there was a change in circumstances") (citing Feingold v. New York, 366 F.3d 138, 155 (2d Cir. 2004) (rejecting the same actor inference because such an inference "would not necessarily apply here given the changes in circumstances during the course of Feingold's employment.")); Carlton, 202 F.3d at 138 (recognizing that the "inference alone cannot support summary judgment in this case where circumstances could have changed over the course of time."); Ramos v. Marriott Intl., 134 F. Supp. 2d 328, 346 (S.D.N.Y. 2001) (recognizing that "the same-actor inference is merely plausible and should not be used as a substitute for a thorough factual inquiry.").

*Goldberg's Boasting & Personal Attacks On Lieberman*

Much of Defendants' motion is devoted to issues that are completely irrelevant to this case. For example, Goldberg spends a substantial number of pages boasting about her accomplishments and how "extremely accommodating" the firm is.[5] (Goldberg Decl. ¶56). Goldberg also dramatically recounts how she felt during the initial stages of the pandemic and the George Floyd protests, describing what she saw while "walking [her] dog" (¶55). Goldberg describes the difficult position she created for herself through her financial decisions, including obtaining more real estate than the firm required and her extravagant taste in furniture. (CG 111: "Then the furniture was expensive. It was beautiful."). Goldberg repeatedly bring ups personal challenges, such as her mother's passing and her own health struggles.

None of these matters provide a basis to summarily dismiss this case. At most, these issues are a transparent effort to ask the Court to ignore the record and dismiss Lieberman's claims out of sympathy to Goldberg. A jury could see through Goldberg's claims and recognize that Goldberg was furious at Lieberman for daring to seek a bonus after taking maternity leave.

Equally irrelevant are the Declarations that Defendants submit from Goldberg's current employees fawning over Goldberg. These Declarations are hyperbolic and irrelevant, with self-congratulating statements such as, "I cannot imagine an environment or law firm that celebrates children and parenthood more than the Firm." (Massey Decl. ¶28). A jury could find that the promotions and raises that these employees have received since Lieberman's termination motivated their favorable testimony. (Lieberman Decl. ¶127, Ex. 16). See Ulster Cty. v. CSI, Inc.,

---

[5] Even Goldberg's boasts are disputed. For example, the breast feeding room that Goldberg touts was never used for breast-feeding and became the Peloton room. (Lieberman Decl. ¶110; CG 81-82). The "Lunch with Louise" therapy session that Goldberg offered was Goldberg paying her personal therapist to speak with her employees, ignoring that those employees would not feel free to speak with their boss' therapist. (Lieberman Decl. ¶111).

95 A.D.3d 1634, 1636 (3d Dept. 2012) ("As the unsworn writings are inadmissible hearsay, they are insufficient to support the motion for summary judgment.").

The employee's statements are in stark contrast to what the employees actually wrote about Goldberg to Lieberman, including Zoubul writing that Goldberg was "not in fact human" (Ex. 18, bates 96). Goldberg's employees were also critical of a profile of Goldberg featured in "The Cut" in June 2019 (Ex. 26), where Goldberg boasted about building a firm without giving any credit to her team, and describing how she and her best friend Susan Crumiller – who serves as defense counsel in this case – have "B.I.T.C.H. Day," where they go to a dermatologist and "talk about hiring and firing decisions."

Defendants go so far as to include Declarations from witnesses who do not have relevant information. For example, Defendants include a Declaration from Naomi Leeds, who was hired *after* Lieberman was terminated, and whose only contribution is to note "how accommodating and compassionate" Goldberg is. (¶3). Defendants' reliance on the Declaration of Marc J. Randazza is particularly improper, since his opinion about Lieberman's relationship with the clients is disputed. (Lieberman Decl. ¶130-131). Randazza's credibility is so poor that he was disciplined in several states and was denied pro hac vice admission in Connecticut court when he applied to represent Alex Jones in the Sandy Hook defamation lawsuit. (See https://www.corruptrandazza.com/ethical-complaints/attorney-marc-randazza-is-too-unethical-to-represent-alex-jones). In fact, Jones, who used to have Randazza on his show "Info Wars," later fired and threatened to sue Randazza. (See https://www.thedailybeast.com/alex-jones-is-turning-on-his-own-lawyers-in-sandy-hook-case). Randazza is clearly motivated to support Goldberg, who chooses to continue to work with him despite his reputation.

Defendants not only fawn over Goldberg in their motion, but attack Lieberman personally. For example, Defendants essentially portray Lieberman as greedy by referencing the relatively large size of her bonuses in comparison to her co-workers. What Defendants ignore is that Lieberman *earned* the highest bonuses, using Defendants' own calculations. It is improper for Defendants to hold Lieberman's hard work against her, as if she did something wrong by seeking the compensation that Defendants offered.

Defendants also unfairly criticize Lieberman for seeking bonuses that were relatively large, since it was Goldberg's delay that caused Lieberman's bonus to balloon in size. Had Goldberg paid the bonuses quarterly, as the policy dictates, the bonuses would have been far less.

**E.    Goldberg's Other Untruths That Preclude Summary Judgment**

Defendants' motion contains specific false statements that preclude summary judgment. See Bennett, 92 A.D.3d at 43 ("It is difficult enough to discern a defendant's motive or motives in those circumstances without giving it a tactical advantage to throwing numerous nondiscriminatory justifications against the wall and seeing which stick.").

*1.    Goldberg Skews The Record*

Goldberg's Declaration describes Lieberman moving to Rhode Island as a hardship (¶22), but Goldberg testified at her deposition that she was "enthusiastic" about Lieberman moving to Rhode Island. (CG 66). The concerns identified in Goldberg's Declaration were never mentioned before this motion.

Defendants twist the facts to create the illusion that Goldberg paid Lieberman a bonus on March 18, 2019, knowing she was pregnant. Goldberg claims in her Declaration (¶30) to have learned about Lieberman's pregnancy on March 1, 2019, when Massey reported that a client had told him that Lieberman was pregnant. At her deposition, however, Goldberg testified that she had

forgotten about Massey telling her that Lieberman was pregnant, and that she only recalled this after Lieberman's deposition. (CG 68-69). Goldberg further testified that she and Massey were unable to recall when that conversation happened. (CG 68-69; Lieberman Decl. ¶31). Goldberg's suddenly crystal-clear recollection on this motion of the exact date she learned of Lieberman's pregnancy – which is conveniently before she paid the March 18 bonus, 2019 – is not credible. Furthermore, Goldberg's claim that she paid the March 18 bonus knowing of Lieberman's pregnancy also contradicts her claim that she did not pay Lieberman's bonus because of "planning" she did after learning of Lieberman's pregnancy in May 2019. (CG 75).

Defendants criticize Lieberman for submitting her April 21, 2019 bonus calculation so soon after receiving her 2019 bonus around March 18, 2019, but ignore that it was Goldberg who had directed Lieberman to submit her bonus calculations on a quarterly basis. (Ex. 7, bates 52). Goldberg testified that Lieberman did nothing wrong submitting this request and that she should not have withheld her bonus submission after having just received one. (CG 63-64, 109, 133). Defendants' claim that Lieberman's bonus submissions were late is disingenuous, as Goldberg acknowledged at her deposition that she was "not strict" with any deadline. (GG 58).

### 2. *The Declaration Of Carla Cain-Walther*

The accompanying Declaration of Lieberman's former co-worker, Carla Cain-Walther ("Cain-Walther"), also confirms the falsity of Defendants' arguments. For example, Goldberg claimed at her deposition that she never spoke with Massey about whether or not I would get pregnant is not true. (See Goldberg 67:23-25: "Q. Did you ever speak to Adam Massey about whether or not Lindsay might get pregnant? A. No."). Cain-Walther, however, confirms that this is not true, as Cain-Walther states:

> Almost immediately after Lieberman's move, Goldberg and [Massey] frequently speculated on Lindsay's relationship and pregnancy status in what I felt was a catty, mean-spirited manner in the open plan office where I could easily overhear. They made insulting statements about Lindsay only wanting to be married and pregnant and how that could negatively impact the Firm's case workload. (Cain-Walther Decl. ¶4; LL 106-107).

Cain-Walther also confirms how differently Goldberg viewed Massey, a man, having children as opposed to Lieberman. (Cain-Walther Decl. ¶5). Cain-Walther notes that she "heard Goldberg ask Massey on multiple occasions when he was planning on having a baby with his now-wife in an excited and encouraging manner," yet with Lieberman, "Goldberg's tone was disparaging and full of concern over how Lieberman's future pregnancy would affect the firm's operations." (Cain-Walther Decl. ¶5).

Cain-Walther also heard Goldberg express trepidation about hiring two female attorneys with children in early 2018, namely Carrie Zoubul and DeCarlo, but recalled that Goldberg said, "but I think Zoubul is done having them." (Cain-Walther Decl. ¶6).

When Cain-Walther went into Goldberg's office to give her notice, she said, "I have some news," and she recalled that Goldberg's face dropped and Goldberg said, "Are you pregnant?" like it was bad news. This sounds remarkably similar to the face that Goldberg made at the "State of the Union" speech about two months before Lieberman was let go, when Lieberman said she had "big news."

Cain-Walther also recounts the difficulties she had in getting Goldberg to pay her the bonuses she earned. (Cain-Walther Decl. ¶9-11). Cain-Walther left the firm in November 2018, which means that Goldberg's delay in paying bonuses existed long before Lieberman's maternity leave or the pandemic.

# POINT III

## SUMMARY JUDGMENT MUST BE DENIED
## UNDER THE "MIXED MOTIVE" ANALYSIS

At a minimum, summary judgment must be denied under the "mixed motive" analysis. As the First Department held in Bennett, 92 A.D.3d at 41, a defendant seeking summary judgment in an employment discrimination case "bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the McDonnell Douglas test, or as one of a number of mixed motives, by direct or circumstantial evidence." See also Mihalik, 715 F.3d at 110 (noting that the question of what analysis applies is "less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason."); Hamburg v. New York University School of Medicine, 155 A.D.3d 66, 73 (1st Dept. 2017) (recognizing that "the newer 'mixed motive' framework . . . imposes a lesser burden on a plaintiff opposing" a motion for summary judgment, noting that such a motion can be defeated "with evidence 'that discrimination was one of the motivating factors for the defendant's conduct.'") (quoting Williams, 61 A.D.3d at 78, n.27).

The mixed motive analysis does not require Lieberman to disprove Defendants' explanation for its actions. A jury could believe Goldberg's performance claims and *still* believe that Lieberman's pregnancy played a "motivating factor" in terminating her employment. As the Second Circuit recognized in Henry v. Wyeth Pharms., Inc., 616 F.3d 134, 157 (2d Cir. 2010), "There are many circumstances in which a jury may justifiably find a prohibited discriminatory motivation notwithstanding a different explanation given by the employer in good faith without intent to deceive." See also Bennett, 92 A.D.3d at 40 ("It is not uncommon for covered entities to have multiple or mixed motives for their action, and the City HRL proscribes such 'partial'

discrimination since under Administrative Code §8-101, discrimination shall play no role in decisions relating to employment, housing or public accommodations.") (citations omitted); Okeke v. The New York & Presbyterian Hospital, 275 F. Supp. 3d 470, 479 (S.D.N.Y. Sept. 21, 2017) (denying judgment as a matter of law and noting that "the jury had evidence available that, if credited, could have allowed it to conclude that the Hospital's stated reason for firing Plaintiffs was not, in fact, the only reason for its decision, even though it was unquestionably part of the reason (perhaps even most of the reason) why they were fired."). Viewing the totality of the facts, a jury could find that Lieberman's gender was at least a "motivating factor" in Defendants' decisions surrounding her employment.

## POINT IV

### LIEBERMAN ESTABLISHES HER CLAIMS AGAINST GOLDBERG INDIVIDUALLY

Lieberman properly brings her claims against Goldberg individually. The New York City Human Rights Law permits a claim against "an employer or an employee or agent thereof…" Administrative Code §8-107(1)(a); see also Doe v. Bloomberg L.P., 36 N.Y.3d 450, 459 (2021) (holding that "the shareholders, agents, limited partners, and employees" of a corporate entity "may incur liability only for their own discriminatory conduct, for aiding and abetting such conduct by others, or for retaliation against protected conduct."). The New York State Human Rights Law similarly provides a claim against "an employer…" Executive Law §296(1)(a). Goldberg, as the sole owner of C.A. Goldberg and the perpetrator of the discrimination, is properly sued individually.

Should it be determined that Goldberg is not liable individually or as an employer, she is liable for "aiding and abetting" the discrimination of C.A. Goldberg. See Administrative Code §8-107(6); Executive Law §296(6).

## POINT V

## C.A. GOLDBERG'S MOTION FOR SUMMARY JUDGMENT
## ON ITS RETALIATORY COUNTERCLAIM IS FRIVOLOUS

As set forth in Plaintiff's FRCP 12(b)(6) motion to dismiss C.A. Goldberg's counterclaim, filed simultaneously with Defendants' motion for summary judgment, C.A. Goldberg fails to plead the elements of a faithless servant claim. C.A. Goldberg's allegation that Lieberman was "willing to engage in outside employment" – even though she never actually engaged in any outside work – does not set forth a cause of action. (Counterclaim ¶10). For C.A. Goldberg to claim that no jury could resolve the disputed facts in Lieberman's favor is simply arrogant.

It is not enough for C.A. Goldberg to allege that Lieberman was considering outside employment. Rather, C.A. Goldberg must demonstrate that Lieberman's actions "substantially violate[d]" her duty to her employer. Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 201 (2d Cir. 2003) (citing Turner v. Konwenhoven, 100 N.Y. 115, 120 (1885)). An act of disloyalty is not substantial "where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior." Id. at 201-02; see, e.g. Stefanovic v. Old Heidelberg Corp., 2019 U.S. Dist. LEXIS 133397, at *8 (S.D.N.Y. Aug. 8, 2019) (noting that "courts in this Circuit have held a faithless servant claim requires showing that the employee breached their duty of loyalty to their employer in a way that was substantial and material to the performance of their duties.").

C.A. Goldberg's argument that Lieberman was "competing" with it is absolutely false. Notably, *Lieberman never actually did any work for any outside entity during her employment with C.A. Goldberg.* (Lieberman Decl. ¶151). It is undisputed that Lieberman did not do any work for the sorority or receive any compensation until *after* she was terminated. (Lieberman Decl. ¶152; LL 283). Cutting through C.A. Goldberg's bluster, the allegations in the Counterclaims boil down to two emails and one phone call that Lieberman had with a sorority who used to employ

her, which never culminated in any actual work. (Lieberman Decl. ¶151). The organization was merely looking for some free information and Lieberman gave them some thoughts off the top of her head. (Lieberman Decl. ¶151). A jury could find that this did not "substantially violate" her obligations to C.A. Goldberg. See Miller v. Levi & Korsinsky, LLP, 2021 U.S. Dist. LEXIS 27448, at *13 (S.D.N.Y. Feb. 12, 2021) (recognizing that "courts have found disloyalty not to be 'substantial' where the behavior consisted of a single act of disloyalty, as opposed to a persistent pattern").

The work that Lieberman was contemplating was not even within C.A. Goldberg's practice area. C.A. Goldberg specializes in representing victims asserting their rights, including their rights under Title IX. (Lieberman Decl. ¶153). What the sorority desired was far different and involved navigating its own policies and procedures related to sexual misconduct. (Lieberman Decl. ¶153; LL 282). This was not something the firm had ever done before. (LL 282). In fact, Lieberman herself was not even sure that she wanted to do this work at the time. (Lieberman Decl. ¶153; LL 281). C.A. Goldberg masks the stark difference between what the firm did and what the sorority wanted by vaguely referring to the firm's plaintiff-side practice as "Title IX work." (Defendants' Brief pg. 26). A jury could see through this smokescreen.

The record confirms that C.A. Goldberg's prior dealings with sororities was to market the firm to their members as prospective clients, not to the sororities themselves. (Lieberman Decl. ¶154). As Goldberg confirmed at her deposition, "Well, we did extensive Title IX work and we represented people who were in sororities. We took cases against fraternities or fraternity members." (CG 43). Goldberg described "extensive marketing at undergrad populations." (CG 44). In 2016, Goldberg emailed the National Panhellenic Conference stating that her law firm "represents survivors of sexual assault in campus proceedings throughout the country" and that

she was "hoping to write some articles, give presentations, and increase awareness about this even more," clearly envisioning marketing the firm to potential plaintiffs. (Ex. 39). None of this is comparable to what the sorority was seeking.

It is improper for C.A. Goldberg to characterize the sorority as a prospective client. In fact, the sorority was not even covered by Title IX, so the Title IX work that C.A. Goldberg touts was completely irrelevant to what the sorority wanted. (LL 282-283). See Grewal v. Cuneo, 2016 U.S. Dist. LEXIS 8349, at *25 (S.D.N.Y. Jan. 25, 2016) (dismissing counterclaims based on breach of fiduciary duty and duty of loyalty where the employer did not allege any facts showing that the plaintiff "took a material step to steal the firm's clients"); Sanders v. Madison Square Garden, L.P., 2007 U.S. Dist. LEXIS 48126, at *18 (S.D.N.Y. July 2, 2007) (holding that "the alleged misconduct here is so far removed from [plaintiff's] job responsibilities that it cannot be said that the misconduct 'substantially' interfered with her job performance.").

C.A. Goldberg's faithless servant claim must also be dismissed because Lieberman never lessened her efforts for the firm. The mere fact that Lieberman had one phone call with the sorority "during the Firm's business hours" should not expose Lieberman – or any employee – to a lawsuit. (Defendants' Brief pg. 44).

In short, C.A. Goldberg cannot meet the extraordinarily high bar necessary to establish a faithless servant claim. As the Court noted in Ebel v. G/O Media, Inc., 2021 U.S. Dist. LEXIS 96922, at *17 (S.D.N.Y. May 21, 2021) – a case where present defense counsel obtained dismissal of a faithless servant counterclaim – "it is important to ensure that this doctrine does 'not stretch so far,' given its severe penalty: forfeiture of an employee's entire salary during the period of faithlessness." See also Yukos Capital S.A.R.L. v. Feldman, 977 F.3d 216, 239 (2d Cir. 2020) (holding, where the company alleged that the employee improperly secured a $2.6 million

kickback, "Reasonable minds could disagree about whether the [employee's kickback scheme] was a 'substantial and material' violation of the duty of loyalty as a matter of law."); Miller, 2021 U.S. Dist. LEXIS 27448, at *17-18 (dismissing a faithless counterclaim where the plaintiff was alleged to have negotiated unfavorable terms for her employer and caused the departure of a client, holding that the allegations "are not severe enough to warrant relief under the faithless servant doctrine" and that the conduct alleged "cannot be said to violate the 'substantial misconduct' or 'adverse action' standards warranting forfeiture" of the plaintiff's compensation); Doe v. Solera Capital LLC, 2019 U.S. Dist. LEXIS 55860, at *27-28 (S.D.N.Y. Mar. 31, 2019) (granting 12(b)(6) dismissal of a faithless servant counterclaim where the employee improperly used her employer's credit card to charge $224.20, which the court found to be "garden-variety, petty pilfering by an employee" that does not rise to the level of "a 'persistent pattern of disloyalty' that courts have found necessary to bring conduct within the confines of the doctrine."); Sanders, 2007 U.S. Dist. LEXIS 48126, at *19-20 ("The remedies of the faithless servant doctrine are drastic, and appropriately so where the doctrine applies. An employee who violates an incidental work rule … need not forfeit her entire salary.");

The counterclaim is a transparent effort to retaliate against Lieberman and should be dismissed. It is frivolous for C.A. Goldberg to argue that there are no disputed facts and no jury could find in Lieberman's favor.

## CONCLUSION

For the foregoing reasons, Lieberman respectfully requests that Defendants' motion for summary judgment be denied in its entirety, and for such further relief as this Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
BRIAN HELLER
DAVIDA S. PERRY
3 Park Avenue, Suite 2700
New York, NY 10016
(212) 889-6565