# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
LINDSAY LIEBERMAN,

                         Plaintiff,

       -against-

C.A. GOLDBERG, PLLC & CARRIE A. GOLDBERG,

                        Defendants.
-------------------------------------------------------------- x

MEMORANDUM & ORDER

1:21-CV-5053 (ENV) (JAM)

VITALIANO, D.J.

      Plaintiff Lindsay Lieberman, an attorney, brings this lawsuit against her former employer, C.A. Goldberg, PLLC and Carrie A. Goldberg[1], the founder and sole owner of C.A. Goldberg, making claims under the New York City and State Human Rights Laws for gender and pregnancy discrimination.[2] The Firm asserts a counterclaim against Lieberman under New York common law for being a faithless servant based on Lieberman's solicitation of work as an independent contractor while employed by the Firm. Presently before the Court are the defendants' motion for summary judgment and Lieberman's motion for summary judgment on the counterclaim.[3] For the reasons that follow, these motions are GRANTED in their entirety, and the counterclaim and all of plaintiff's claims are dismissed.

---

[1] For clarity, this decision will refer to Carrie A. Goldberg the individual as "Carrie" and the firm as "C.A. Goldberg" or "the Firm."

[2] Lieberman withdrew her claims brought under the Rhode Island Fair Employment Practices Act and the Rhode Island Civil Rights Act. *See* Dkt. No. 15.

[3] Where matters outside of the pleadings are presented in a motion to dismiss, the court may convert the motion to one for summary judgment and afford all parties the opportunity to present supporting material. *See Overhoff v. Ginsburg Dev., L.L.C.*, 143 F. Supp. 2d 379, 385 (S.D.N.Y. 2001) (citing *Friedl v. City of New York*, 210 F.3d 70 (2d Cir. 2000)). Here, because both parties cite extensively to evidence outside the counterclaim in their moving papers, Lieberman's motion to dismiss the counterclaim is converted to a motion for summary judgment.

Background[4]

At all relevant times, C.A. Goldberg held itself out as having a boutique practice representing the victims of gender bias and intimidation. *See* Def. Rule 56.1 Stmt., Dkt. No. 36-64, ¶ 7. In somewhat of a man bites dog story, defendants now find themselves on the other end of a lawsuit brought by Lieberman, charging discrimination on the basis of gender and pregnancy. Compl., Dkt. No. 1, ¶ 3. C.A. Goldberg hired Lieberman as its second attorney hire in 2016. Def. Rule 56.1 Stmt. ¶¶ 11, 14. She would bring a breadth of experience to the Firm. Prior to joining the Firm, Lieberman served as an assistant district attorney in Kings County, New York, working as a felony trial assistant in the Special Victims Unit. *Id.* ¶ 12. Lieberman had vast experience in criminal cases involving sexual violence, but she expressed an interest in becoming proficient at civil litigation at the Firm. *Id.* ¶ 13. In 2017, Lieberman told Carrie that she was planning to move to Newport, Rhode Island to pursue a romantic relationship with her now-husband, but that she was "fully willing and able to continue working at the firm" remotely. Lieberman Dep. Tr., Dkt. No. 36-11, 110:8–14. Carrie responded "enthusiastically" to Lieberman working remotely from Rhode Island, as she viewed it as an opportunity to expand the Firm's presence in a new state. Def. Rule 56.1 Stmt. ¶ 21; Pl. Rule 56.1 Response, Dkt. No. 36-103, ¶ 19. Over the next few years, while working remotely from Rhode Island, Lieberman would return to New York occasionally for work-related matters. Compl. ¶ 17; Lieberman Decl., Dkt. No. 34-25, ¶ 16.

On February 6, 2018, Carrie sent an updated attorney revenue policy to all of the Firm's attorneys, including Lieberman. Def. Rule 56.1 Stmt. ¶ 57. The policy included a "discretionary

---

[4] The facts are drawn from the affidavits, exhibits, Rule 56.1 statements, and counterstatements of fact submitted by the parties. Factual disputes are noted. Where facts are disputed, "the sources for the claims made in dueling Rule 56.1 Statements" are considered directly. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 396 (S.D.N.Y. 2015). Citations to pages of the parties' briefing refer to the Electronic Case Filing System ("ECF") pagination, except that citations to a deposition reference the internal document's pagination.

bonus" request form and detailed instructions regarding when to make bonus requests and how to calculate the amount of those requests.  *Id.* ¶ 58.  The policy provided that the "firm may pay bonuses in its sole discretion depending on the overall financial performance of the business and the employee's performance," and the firm handbook, distributed on January 28, 2019, stated that "[b]onuses may be given at the sole discretion of [the Firm]."  Def. Rule 56.1 Stmt. ¶¶ 59, 62.  Lieberman nevertheless disputes that the bonuses were discretionary on the basis that the amount was determined by a formula, and she always received her bonus payment when requested until she became pregnant.  Rule 56.1 Stmt. Response ¶ 58.

Lieberman first transmitted a bonus request to Carrie under the new policy on December 9, 2018.  Def. Rule 56.1 Stmt. ¶ 67.  On February 3, 2019, Lieberman transmitted an updated calculation of her requested bonus—now in the amount of $18,787.65—which Carrie approved later that month.  *Id.* ¶¶ 69–70.  When approving the request, Carrie left open the possibility that additional bonus compensation could be paid if Lieberman corrected the original request, and wrote to Lieberman, "Your accomplishments fill me with joy and pride!!!! And it's a pleasure to pay a bonus to you."  *Id.* ¶ 70.  The next month, on March 18, 2019, Lieberman updated her initial bonus request to $21,616.70, which Carrie confirmed.  *Id.* ¶ 80.  Two weeks later, the Firm paid Lieberman a bonus for work that she performed in 2018.  *Id.* ¶ 82.

Lieberman learned that she was pregnant in February 2019.  Lieberman Decl. ¶ 21.  Much murkier are the waters surrounding the time when defendants became aware of that pregnancy.  All parties agree that Lieberman informed Carrie that she was pregnant in May 2019, but that Carrie was already aware of Lieberman's pregnancy.  *See* Def. Rule 56.1 Stmt. ¶¶ 84–85; Lieberman Dep. Tr. 219:19–21.[5]  According to Carrie, on or around March 1, 2019, a client told

---

[5] Lieberman recalls that when she disclosed her pregnancy to Carrie, Carrie responded "'we already know' with a tone that was hostile and accusatory."  Rule 56.1 Stmt. Response ¶ 85.

Adam Massey, another attorney at the Firm, that Lieberman told her that she was pregnant. Def. Rule 56.1 Stmt. ¶ 71. Carrie also recalls that Massey relayed to her the client's disclosure of Lieberman's pregnancy "[s]hortly after March 1," though neither Massey nor Carrie could recall the exact date. *Id.* ¶ 72.

Lieberman disputes this definite recollection of the chain of events in her Rule 56.1 Statement Response, but her deposition testimony largely corroborates Carrie's recollection. On the point of contention, Leiberman testified that she disclosed to a client that she was pregnant at a court appearance in early March 2019 to explain why she "kept running to the bathroom" and was "very nauseous and sick." Lieberman Dep. Tr. 219:24–220:13. Lieberman further testified that the client and Massey spoke soon after the case concluded, which is "when the client told [Massey] that I was pregnant." *Id.* at 220:14–19. Lieberman concluded that "Adam, based on his nature and relationship with Carrie, must have immediately gone to Carrie to tell her." *Id.* 220:19–21. Nevertheless, in her deposition testimony, Lieberman held firm that Carrie was not aware of her pregnancy when agreeing to the $21,000 bonus on March 18. *See id.* 222:13–16. While all parties agree that Carrie became aware of Lieberman's pregnancy prior to the May 2019 phone call in which Lieberman shared with Carrie that she was pregnant, there is no agreement on the critical point as to whether Carrie was aware of her pregnancy when the first bonus was approved.

Lieberman took parental leave from October 14, 2019, through March 5, 2020, which overlapped with Massey's similar leave from November 12, 2019, to January 4, 2020. Def. Rule 56.1 Stmt. ¶ 94; Lieberman Decl. ¶ 53. While on maternity leave, Lieberman communicated with Carrie about bonus payments for prior work, setting off a series of discussions that blazed a trail to the instant discrimination suit. On November 11, 2019, Lieberman submitted a bonus request for $32,556.10, which reflected a bonus for the first quarter of 2019 that she originally requested

4

on April 21, as well as additional bonuses for work performed in the second and third quarters of 2019. Lieberman Decl. ¶ 45. According to Carrie, this request "slipped through the cracks" until Lieberman followed up on January 30, 2020. Def. Rule 56.1 Stmt. ¶ 99.

The broad strokes of the pivotal January 30th call between Lieberman and Carrie are undisputed: Carrie inquired when Lieberman planned to return from maternity leave; Lieberman stated that she intended to return in early March 2020; Lieberman then again raised her bonus request for work performed in 2019; and Carrie told Lieberman that the Firm could not, at that time, afford to pay her the requested $32,556.10 bonus because having two employees out on concurrent family leave negatively impacted the Firm's finances. *See* Def. Rule 56.1 Stmt. ¶¶ 107–111. Lieberman, says she, interpreted Carrie's statements regarding the impact of the dual parental leaves on the Firm's finances as Carrie saying that Lieberman would not be receiving her bonus because she was on maternity leave. *See, e.g.*, Lieberman Dep. Tr. 88:5–10 ("she said something along the lines of, in sum and substance, I can't give you any money . . . You're on maternity leave. That's impacting the firm's finances."); *id.* 90:24–91:4 ("I didn't feel guilt or shame [about taking leave], until Carrie told me that I did have a negative impact on the firm."); Lieberman Decl. ¶ 73 ("I did not believe [Carrie's] claim that the firm did not have money to pay me the bonus I had earned. . . . It was only when I wanted to talk to [Carrie] about my value and worth to the firm that my maternity leave was the main challenge the firm faced.").

Lieberman, the bonus she demanded still unpaid, returned from maternity leave on March 3, 2020. Def. Rule 56.1 Stmt. ¶ 112. Less than two weeks later, New York was forced into lockdown due to the COVID-19 pandemic. *Id.* ¶ 114. According to Carrie, COVID impacted the Firm's finances in myriad ways: the Firm had less work to do on many of its hourly-billed clients; many of the Firm's clients were financially suffering and thus unable to pay their legal fees; new

5

contingency cases became less likely to settle pre-litigation because the Firm could not threaten imminent public filings with the courts closed; and opposing parties in the Firm's cases had less money to pay settlements. *Id.* ¶¶ 115–119. Lieberman contests that the Firm's finances were impacted by the pandemic, as she testified that her work was not impacted, and documents produced during discovery show, in her view, that the Firm performed well throughout the pandemic. Lieberman Decl. ¶¶ 54–55, 115, 118.

On June 21, 2020, Lieberman followed up again on her November 2019 bonus request with an updated calculation inclusive of all work performed in 2019, which now amounted to $53,410.03. Def. Rule 56.1 Stmt. ¶ 139; Lieberman Decl. ¶ 57. Carrie, who testified that she was "frustrated" by Lieberman's email, responded a week later setting forth the various circumstances, including Lieberman and Massey's concurrent parental leaves, that impacted the Firm's finances and prevented full payment of the bonus at that time. *Id.* ¶¶ 146–147. Specifically, Carrie noted that "[h]aving two of my 4 ½ attorneys . . . out on pregnancy leave for the last months of 2019 and into 2020 was one recent variable impacting the firm's finances," but that this reduced billing capacity did not "compare to the fact that we're in a PANDEMIC" that is significantly hampering the Firm's finances. *Id.* ¶ 147. Nevertheless, Carrie concluded, "I'll be in touch with you about an amount I can reasonably afford to pay now. Again, you are valuable to the Firm. And you deserve every penny you're asking for and more." *Id.* ¶ 148. Lieberman interpreted the email's reference to the concurrent leaves as Carrie "blam[ing] Lieberman for the firm's alleged financial difficulties." Rule 56.1 Response ¶ 149.

As the calendar flipped to the fall of 2020, Lieberman still had not received any of her requested bonus for work completed in 2019. The parties next discussed compensation on a September 23, 2020, Zoom call. Def. Rule 56.1 Stmt. ¶ 160. Carrie proposed a payment plan on

6

this call whereby the Firm would pay Lieberman the total amount in its bonus account ($7,958.13) on her next paycheck and $1,000 per month until the next large settlement came in, at which point the Firm would pay Lieberman an additional $15,000. *Id.* ¶¶ 160–161. Carrie recalled that Lieberman responded to this plan "in a disrespectful and domineering way in which no other employee had ever spoken to her before." *Id.* ¶ 162. Lieberman denies that she was disrespectful or domineering on the call, and states that Carrie was merely upset with Lieberman for "question[ing] why she was not receiving what she had earned a year and a half earlier, rather than just being grateful for the small amount [the Firm] was willing to pay." Rule 56.1 Response ¶ 162. Both parties agree, however, that Carrie reiterated on the call the financial stresses that were contributing to the delays in payment, including the concurrent parental leave taken by Lieberman and Massey. Def. Rule 56.1 Stmt. ¶ 163. In a later email to the Firm Administrator elaborating on this call, Carrie expressed that Lieberman was "nasty" when discussing compensation and would "rather get the money even if it meant that the Firm failed and she had no place to work." *Id.* ¶¶ 181–182. Ultimately, as discussed on September 23, the Firm made bonus payments to Lieberman in September ($7,958.13), October ($1,000), and November ($1,000). Def. Rule 56.1 Stmt. ¶ 166. And following a large settlement in December 2020, the Firm paid Lieberman a bonus of $31,649.07. *Id.* ¶¶ 169, 171. In other words, Carrie kept to the payment plan she had promised in her Zoom conversation with Lieberman.

Defendants tick through issues with Lieberman's performance that were occurring in parallel to the compensation conversations, though Lieberman contests the validity and characterization of these complaints. For example, on November 4, 2020, Lieberman failed to answer an email Carrie sent her at 5:50pm about a time sensitive matter, and when Carrie later inquired about the best way to reach Lieberman to discuss urgent client issues, Lieberman accused

7

Carrie of "attacking" her. Def. Rule 56.1 Stmt. ¶¶ 173–175. Lieberman, for her part, explains that Carrie had told staff to disengage from work that night as they awaited the results of the 2020 presidential election, and Carrie proceeded to demean Lieberman for doing exactly what Carrie had suggested. Rule 56.1 Stmt. Response ¶¶ 173–175. It is undisputed, however, that Carrie memorialized this interaction in an email to the Firm's Administrator, writing that a "really really frequent issue I have with her" is that "she doesn't get back to me on time sensitive things." Def. Rule 56.1 Stmt. ¶ 176.

Around this time, Carrie texted a different attorney at the Firm that Lieberman "was pushing herself out the door." Def. Rule 56.1 Stmt. ¶ 183. Separately, in January 2021, the Firm conducted an audit of its "imploding" cases where there was a breakdown in the attorney-client relationship. *Id.* ¶ 208. The audit determined that Lieberman was responsible for five of the Firm's 16 "imploding" cases. *See* Def. Ex. 64, Dkt. No. 36-60. While defendants state that the audit made clear that Lieberman was "the common denominator in many of the 'imploding' cases," Def. Rule 56.1 Stmt. ¶ 212, Lieberman points out that she was often assigned the most difficult clients because she was skilled at handling difficult people and Carrie herself was responsible for four such imploding cases, *see* Lieberman Decl. ¶¶ 135, 145. Finally, on February 13, 2021, the Firm received a client complaint concerning Lieberman's work in which the client threatened to file a grievance due to Lieberman's "pure incompetence" and "inaccurate billing." Def. Rule 56.1 Stmt. ¶ 215.[6]

---

[6] Lieberman disputes that the complaint was due to her conduct, "as the actual document reflects the client's dissatisfaction with a different employee." Rule 56.1 Response ¶ 215. However, the underlying email specifically states: "I am seriously considering filing complaints *against Lindsay* and your firm with the Grievances Committee of Kings County" due to "the pure incompetence *she*/the firm displayed throughout my engagement." Ex. 44, Dkt. No. 36-40 (emphasis added).

The conflict between Lieberman and Carrie reached its crescendo on January 5, 2021, when Carrie held the Firm's first "State of the Union." Def. Rule 56.1 Stmt. ¶ 186. According to Carrie, the purpose of the meeting was to acknowledge the struggles the Firm faced in 2020 and motivate the team for 2021. *Id.* When discussing the Firm's setbacks in 2020, Carrie grouped together the tragic loss of a client, some awful online harassment, and the financial difficulty of having two members of the legal team on concurrent parental leaves. *Id.* ¶¶ 189–190. As with the previous references to her parental leave, Lieberman internalized these remarks as "derogatory references to the entire firm about her maternity leave causing problems for the firm," which, she contends, "was an example of gender discrimination." Rule 56.1 Response ¶ 191. Lieberman also took issue with Carrie excluding her from the list of attorney "thank yous" during the meeting, which she believes was an intentional omission, and "glaring" at her when she announced that she had "big news," potentially because Carrie thought she was announcing another pregnancy. *Id.* ¶ 192; Compl. ¶ 51; Lieberman Dep. Tr. 95:12–98:1.

On February 2, 2021, Lieberman emailed Carrie requesting an opportunity to discuss the "rest of the 2019 bonus." Ex. 21, Dkt. No. 36-17. Carrie forwarded the request to the Firm's administrator, editorializing that "[t]his just makes my blood boil given what an extreme deficit we're in for January b/c of low billables and how much time I've wasted in the past few months picking up cases she can't handle." *Id.* Carrie and Lieberman agreed to speak on March 5, and during that call Carrie expressed that the employment relationship was no longer working and raised transitioning Lieberman out of the Firm. Def. Rule 56.1 Stmt. ¶ 216. Following the call, Carrie emailed Lieberman memorializing that Lieberman "indicated quite forcefully on the call" that she "w[as] not interested in considering a transition plan" and stating instead that Lieberman would be terminated at the end of the week. *See* Ex. 45, Dkt. No. 36-41.

9

Lieberman's last day at the Firm was March 12, 2021. Def. Rule 56.1 Stmt. ¶ 222. Six months later, on September 10, Lieberman brought suit under the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") alleging that she was unlawfully delayed payment on her bonus and unlawfully terminated due to her gender and pregnancy. *See* Compl. ¶¶ 65–98.

Separate and apart from the bonus saga, Lieberman's outreach to potential clients during late 2020 and early 2021 forms the basis of C.A. Goldberg's counterclaim. The parties agree that the Firm historically represented college students, graduate students, and professors who are subject to university disciplinary hearings or who bring claims against universities under Title IX. Def. Rule 56.1 Stmt. ¶ 231, 238. It is also undisputed that Lieberman participated in the Firm's Title IX work: she marketed the Firm's services directly to sororities; drafted a blog post titled "Twelve Things to Do if Your Sorority Sister Says She was Just Sexually Assaulted;" and reached out to Carrie about a potential speaking engagement with her own sorority, Sigma Delta Tau ("SDT"). *Id.* ¶¶ 241–244.

On January 20, 2021, the Director of Chapter Services at SDT reached out to Lieberman to see if she were willing to discuss "some trends . . . with sexual misconduct/assault." Ex. 54, Dkt. No 36-50. A few days later, Lieberman forwarded the request to her career coach[7], noting that speaking to SDT would be "an opportunity for me to put something together that I could potentially market to other schools/sororities but it's not really in line with my immediate goals." Ex. 50, Dkt. No. 36-46. Despite this ambivalence, Lieberman spoke with the SDT representative about a potential engagement during the Firm's business hours on February 9. Def. Rule 56.1 Stmt. ¶¶ 252–253. On February 16, Lieberman's career coach emailed her that she was "so excited

---

[7] A career coach is an outside consultant who provides guidance and support to individuals on issues related to their careers.

for [her] and [her] side hustle." *Id.* ¶ 255. On February 22, Lieberman asked her career coach to review an email she had drafted to send to SDT, which included an offer to "put together a formal proposal." *Id.* ¶ 256; Ex. 52, Dkt. No. 35-48. Lieberman sent the draft email to SDT on February 25, writing that she was "willing [to] take on this work as an independent contractor so the organization wouldn't have to go through the law firm and the steep pricing that accompanies it." Ex. 54, Dkt. No. 35-50.

However, Lieberman did not send a formal work proposal to SDT until March 19, after her employment with the Firm had terminated. Ex. 54. Ultimately, SDT engaged Lieberman as a consultant on April 7, and paid her $18,500 for her work. Def. Rule 56.1 Stmt. ¶ 261; Ex. 55, Dkt. No. 36-51. C.A. Goldberg alleges in its counterclaim that "Lieberman acted as a faithless servant to the Firm" by "divert[ing] business opportunities from the Firm so she could engage in competitive work for her own financial gain," Counterclaim, Dkt. No. 21, ¶ 16.[8]

## Legal Standards

Summary judgment shall be granted in the absence of a genuine dispute as to any material fact and upon a showing that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[A] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986)). A dispute over material facts is "genuine" where "a reasonable

---

[8] Documents produced in discovery also show that, in late 2020, Lieberman sent business development emails from her personal Gmail account to third parties, including pitching a presentation to the Rhode Island Women's Bar Association on "cyber sexual violence and privacy law" and an article on "tech-facilitated harassment" to a reporter. *Id.* ¶ 247; Exs. 47–48, Dkt. Nos. 36-43–44. Lieberman explains that she sent these emails "to market herself/the Firm in Rhode Island as part of her effort to build a practice in Rhode Island for the firm." Rule 56.1 Response ¶ 248; Lieberman Dep. Tr. 261:7–11. However, these emails did not reference the Firm. Def. Rule 56.1 Stmt. ¶ 248.

jury could return a verdict for the nonmoving party" based on the evidence cited. *Anderson*, 477 U.S. at 248. In determining whether genuine issues of fact exist, "'the district court may not properly consider the record in piecemeal fashion, trusting innocent explanations for individual strands of evidence.'" *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024) (quoting *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019)).

Assertions of fact made in connection with a motion for summary judgment must be supported by citations "to particular parts of materials in the record" that could be presented as admissible in evidence, which may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A), (c)(2); *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 57 (2d Cir. 2012). "Before summary judgment may be entered, the district court must ensure that each statement of material fact is supported by record evidence sufficient to satisfy the movant's burden of production even if the statement is unopposed." *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014). With that standard in mind, the Court's job at this stage is not to try the facts but instead to merely "determine whether there are issues of fact to be tried." *Sutera v. Schering Corp.*, 73 F.3d 13, 16 (2d Cir. 1995) (citing *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir. 1984)).

The movant carries the burden of demonstrating that there is no genuine dispute as to any material fact, *see Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005), and the Court will resolve all ambiguities and draw all permissible factual inferences in the light most favorable to the party opposing the motion. *See Reese v. Triborough Bridge & Tunnel Auth.*, 91 F.4th 582, 589 (2d Cir. 2024). Where the nonmoving party "will bear the burden of proof at trial," it bears the initial procedural burden at summary judgment of demonstrating that undisputed facts

"establish the existence of [each] element essential to that party's case[.]" *Celotex Corp.*, 477 U.S. at 322–23. "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 33 (2d Cir. 1997).

## Discussion

I. New York Discrimination Claims

For a non-resident of New York to bring a claim under either NYSHRL or NYCHRL, the non-resident "must plead and prove that the alleged discriminatory conduct had an impact in New York." *See Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 291 (N.Y. 2010). In *Hoffman*, the New York Court of Appeals affirmed the dismissal of a plaintiff's unlawful termination claims brought under NYSHRL and NYCHRL for lack of subject-matter jurisdiction because there were no allegations that the plaintiff, a Georgia resident working in Georgia, was subjected to discrimination while working in New York city or state. *Id.* Following *Hoffman*, New York state courts have uniformly referred to the so-called "impact test" as a jurisdictional hurdle to asserting claims under the New York human rights laws. *See, e.g.*, *Pakniat v. Moor*, 192 A.D.3d 596 (N.Y. App. Div. 1st Dep't, Mar. 25, 2021); *Jarusauskaite v. Almond Diamonds, Ltd.*, 198 A.D.3d 458 (N.Y. App. Div. 1st Dep't, Oct. 12, 2021). Mirroring the approach taken in state court, numerous federal district courts have dismissed state and local discrimination claims for want of subject-matter jurisdiction where the impact test is not met, *see, e.g.*, *Amaya v. Ballyshear LLC*, 340 F. Supp. 3d 215, 223 (E.D.N.Y. 2018); *Shiber v. Centerview Partners, LLC*, 21-cv-3649, 2022 WL 1173433, at *4 (S.D.N.Y. Apr. 20, 2022), and the Second Circuit has affirmed such dismissals, *see Vangas v. Montefiore Medical Ctr.*, 823 F.3d 174, 177 (2d Cir. 2016).

While the New York Court of Appeals conceived of the impact test as a question of subject-matter jurisdiction, it is a misnomer for federal courts sitting in diversity to dismiss NYCHRL or NYSHRL cases for lacking subject-matter jurisdiction where the impact test is not met. To illustrate the point, there can be no doubt that the Court in this case has original subject matter jurisdiction under 28 U.S.C. § 1332(a)(1)—the parties are citizens of different states (New York and Rhode Island), and the amount in controversy exceeds $75,000.[9] Nevertheless, "whether a district court has subject matter jurisdiction over a dispute, as a general matter, is substantively different from the question whether a district court has, or has acquired, the power to adjudicate a particular dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of America*, 626 F.3d 699, 720 (2d Cir. 2010). Thus, even though Congress has empowered the Court to hear this diversity dispute under 28 U.S.C. § 1332(a), the Court must still consider whether the claims brought by Lieberman under NYSHRL and NYCHRL "are cognizable and thus justiciable." *Rinsky v. Cushman & Wakefield, Inc.*, 918 F.3d 8, 18 (1st Cir. 2019) (noting the confusion over "the very different concepts of subject matter jurisdiction and justiciability.").[10]

Applying these principles, Lieberman's New York state and city discrimination claims are not justiciable because Lieberman does not plead or prove that the impact of the alleged discrimination was felt by her in New York. This case is similar to *Hoffman*, where the New York Court of Appeals held that the dismissal of a non-resident's NYSHRL and NYCHRL claims was

---

[9] While the parties stipulated to the Court's jurisdiction to hear NYSHRL and NYCHRL claims, *see* Dkt. No. 15, "a federal court cannot simply accept a stipulation of the parties regarding subject matter jurisdiction—whether it be that jurisdiction does or does not exist—without rendering an affirmative finding on that issue." *Zanotti v. Invention Submission Corp.*, No. 18-cv-5893, 2020 WL 2857304, at *8 (S.D.N.Y. June 2, 2020) (quotations omitted). But as discussed *infra*, the Court's jurisdiction to hear the New York claims (which exists) and its capacity to do so (which does not) are two separate inquiries. Should those inquiries reveal deficiencies, they are not amenable to remedy on the mere stipulation of the parties.

[10] The defendants do not raise in their moving papers the issue of whether the New York human rights laws cover a non-resident in Lieberman's position, but the Court can raise this issue of justiciability *sua sponte*, *see Rogath v. Koegel*, No. 96-cv-8729, 1998 WL 695668, at *2 (S.D.N.Y. Oct. 6, 1998) (citing *Thomas v. City of New York*, 143 F.3d 31, 34 (2d Cir. 1998)), and it does.

proper even though the defendant-company was headquartered in New York, the decision to terminate the plaintiff was made in New York, all management decisions were made from New York, and the plaintiff occasionally attended meetings in New York. 15 N.Y.3d at 289–91. Critically, Lieberman, like the plaintiff in *Hoffman*, cannot identify any discriminatory conduct that occurred when she was in New York; each of the material incidents underlying her discrimination claim—where Carrie justified the non-payment of her bonus by referencing the negative impact of the concurrent parental leave on the Firm's finances—occurred over the phone, email, or Zoom, while Lieberman was working from Rhode Island. *See* Rule 56.1 Stmt. ¶¶ 107–111 (January 30, 2020 phone call); *id.* ¶¶ 146–147 (June 30, 2020 email); *id.* ¶¶ 160–163 (September 23, 2020 Zoom); *id.* ¶¶ 185–191 (January 5, 2021 Zoom). This failure to connect any of the alleged discrimination to her presence in New York is fatal to Lieberman's claims. *See, e.g.*, *Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 192–93 (S.D.N.Y. 2024) (dismissing claims brought by California resident working from California for New York-based sports league because discrimination did not occur during New York travel); *Shiber*, 2022 WL 1173433, at *3–5 (dismissing claims where plaintiff "at all relevant times worked from her home in New Jersey" and "cannot demonstrate an impact in New York City or New York State"); *Pakinat*, 192 A.D.3d at 596–97 (rejecting argument that the increase of remote working arrangements since *Hoffman* expands the reach of NYSHRL and NYCHRL and dismissing claims of plaintiff living and working in Montreal because "she failed to allege that the conduct had any impact in New York State or New York City."). For the same reasons, Lieberman's employment discrimination claims based on New York law meet the same fate, and defendants' summary judgment motion seeking their dismissal is granted.

15

II.       The Counterclaim

C.A. Goldberg's counterclaim, as noted earlier, boils down to the argument that Lieberman acted as an unfaithful servant when she "directly competed with the Firm by surreptitiously speaking with the sorority, a potential client of the Firm, during business hours, diverted the sorority away from the Firm by offering the sorority a competitive rate, and ultimately retained the sorority." Def. Counterclaim Mot. Opp., Dkt. No. 30-8, at 14–15. Specifically, C.A. Goldberg points to Lieberman's February 9, 2021, phone call during business hours with SDT and follow up email two weeks later noting her willingness to "take on [the] work as an independent contractor" at a lower rate as evidence that Lieberman acted as an unfaithful servant. *Id.* at 6.

"Under New York law, an agent is obligated to be loyal to his employer and is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003) (cleaned up). The "faithless servant" doctrine provides that an employee "who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Id.* However, there is a lack of clarity in New York law regarding the standard for the faithless servant doctrine. *See Regency NYC, Inc. v. Atkinson*, 23-cv-5479, 2024 WL 4337486, at *5 (S.D.N.Y. Sept. 27, 2024). Under the *Turner* standard, courts focus on whether the alleged misconduct "substantially violates the contract of service." *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 237 (2d Cir. 2020). Under the *Murray* standard, by contrast, "misconduct by an employee that rises to the level of a breach of a duty of loyalty or good faith is sufficient to warrant forfeiture." *Id.* (internal citations omitted). "New York courts have not reconciled any differences between the *Turner* and *Murray* standards or defined the circumstances, if any, in which one standard should apply rather than the other." *Id.*

16

The Court need not attempt to answer these questions here, however, because the Firm fails to raise a triable issue of fact under either standard.

"'Under the *Turner* standard, courts have found disloyalty not to be substantial only where the disloyalty consisted of a single act, or where the employer knew of and tolerated the behavior.'" *Robinson v. De Niro*, 739 F. Supp. 3d 33, 122 (S.D.N.Y. 2023) (quoting *Yukos*, 977 F.3d at 237); *see also Phansalkar*, 344 F.3d at 201–02 (an act of disloyalty is not substantial "where the disloyalty consisted of a single act."). Here, the alleged disloyalty amounts to "only a single disloyal act" of client solicitation that was not consummated until after Lieberman left the Firm, which "clearly fails to demonstrate substantial disloyalty under *Turner*." *LifeSci Capital LLC v. Revelation Biosciences, Inc.*, 22-cv-1411, 2024 WL 3634709, at *3 (S.D.N.Y. Aug. 1, 2024); *see also Sanders v. Madison Square Garden, L.P.*, No. 06-cv-589, 2007 WL 1933933, at *6 (S.D.N.Y. July 2, 2007) ("[a]n employee who violates an incidental work rule . . . need not forfeit her entire salary.").

C.A. Goldberg fares no better under the *Murray* standard. "[A] breach of the duty of loyalty occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." *Regency NYC*, 2024 WL 4337486, at *6 (internal quotations omitted). Plainly, Lieberman's conversations with SDT are not sufficient to warrant a finding of a breach of the duty of loyalty. In *Pawlowski v. Kitchen Expressions, Inc.*, for example, it was held that a counterclaim plaintiff stated a faithless servant claim where it pleaded that its employee, using his employer's tools and while employed by his employer, solicited and performed work that the employer would have performed if

17

presented to it. No. 17-cv-2943, 2017 WL 10259773, at *3 (E.D.N.Y. Dec. 15, 2017). Here, by contrast, Lieberman did not perform any work while still employed by the Firm, nor does the Firm present any evidence that Lieberman took advantage of any of its tools, commercial trade secrets, or proprietary information in pitching SDT on potential work. *See also Island Sports Physical Therapy v. Kane*, 84 A.D.3d 879, 880 (N.Y. App. Div. 2d Dept. 2011) ("An employee may create a competing business prior to leaving her or his employer without breaching any fiduciary duty unless she or he makes improper use of the employer's time, facilities or proprietary secrets in doing so."); *cf. Regency NYC*, 2024 WL 4337486, at *6 (counterclaim plaintiff stated claim for breach of loyalty where company alleged employee solicited clients exclusive to employer by taking advantage of misappropriated emails with confidential and proprietary client information). Indeed, the Firm does not cite to a single case where the court determined that an employee breached his or her duty of loyalty to his or her employer by engaging in a single solicitation call with a non-client and sending a follow up email to gauge potential interest in a future relationship.

In sum, under either the *Turner* or *Murray* standard, Lieberman's motion for summary judgment dismissing the Firm's faithless servant counterclaim is warranted and is now ordered.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment is granted, as is Lieberman's motion for summary judgment dismissing the counterclaim. The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
      April 30, 2025

                                                     */s/* Eric N. Vitaliano
                                                     ERIC N. VITALIANO
                                                     United States District Judge